

800 Third Avenue
New York, NY 10022
+1 212 957 7600 phone
www.cohengresser.com

Mark S. Cohen
+1 (212) 957-7600
mcohen@cohengresser.com

July 30, 2025

**VIA ECF**

The Honorable Joan M. Azrack
United States District Court
Eastern District of New York
Long Island Courthouse
100 Federal Plaza
Central Islip, New York 11722

Re: *United States v. Adam Kaplan*, 23 Cr. 293 (JMA)

Dear Judge Azrack:

We write on behalf of our client, Adam Kaplan, to respectfully request that he be granted temporary release on or about August 8, 2025[1] pursuant to 18 U.S.C. § 3142(i), subject to the extremely strict conditions proposed in the Annex to this letter, due to his inability to prepare and participate in his defense while detained at the Metropolitan Detention Center, Brooklyn ("MDC").

**I.    Introduction**

Pursuant to 18 U.S.C. § 3142(i), a court may

> permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason.

18 U.S.C. § 3142(i). Temporary pretrial release is particularly appropriate in complex financial fraud matters involving voluminous discovery and when there is only a limited period of time before trial. *See, e.g., United States v. Weigand*, 492 F. Supp. 3d 317, 319 (S.D.N.Y. 2020) (granting pretrial release pursuant to 18 U.S.C. § 3142(i) eight weeks before trial in a "complex, document-heavy white collar case"); *see United States v. Bodmer*, 2004 WL 169790, at *3 (S.D.N.Y. Jan. 28, 2004) (granting pretrial release of a defendant facing multiple, serious white-collar charges).

In seeking temporary release, Mr. Kaplan is not relitigating the grounds on which the Court ordered his initial remand on September 11, 2024 or denied his motion for release on conditions pursuant to 18 U.S.C. § 3142(c) on December 17, 2024, and is not required to revisit

---

[1] Ideally, Mr. Kaplan could be released as early as August 1, 2025. As a practical matter, however, if the Court grants this motion, it would take time to put in place the conditions proposed in the Annex.

The Honorable Joan M. Azrack
July 30, 2025
Page 2

those issues as a legal matter. Rather, we submit that temporary release is essential at this point to ensure that Mr. Kaplan is able to prepare his defense in the few weeks remaining before trial and to have any ability to confer with counsel and otherwise participate in his defense during trial. *See, e.g., United States v. Ghailani*, 751 F. Supp. 2d 508, 514 & n.37 (S.D.N.Y. 2010) ("A defendant, of course, has the right to assist in his defense.") (citing *Jones v. Barnes*, 463 U.S. 745, 751 (1983)).

The trial in this case will begin in 40 days. Mr. Kaplan is facing trial currently on 21 serious charges with extraordinary exposure under the Sentencing Guidelines – that is, he is essentially fighting for his life. Yet since his remand to MDC, he has been unable to review discovery material in a manner that is proportionate to the complexity of the case and the risks confronting him. This remains true today despite the Court's order on July 9, 2025 (ECF No. 212) (the "July 9 Order"). We respect and appreciate the Court's efforts to address the situation, but as explained below, as a practical matter the Court's order has not led to the relief the Court directed. At this late stage, there simply is not enough time for this cycle to be repeated – for the Court to direct or MDC to agree to a revised plan for allowing access to discovery; to see if that revised plan is workable given the realities and constraints in MDC; and, if not, to seek still another modification.

The need for temporary release is especially acute in light of the government's late-in-the-day productions of substantial volumes of material on May 9 and June 6, 2025 – well after the government twice assured the Court that Rule 16 discovery was largely complete. These productions follow four other government productions since Mr. Kaplan was remanded, comprising well over one million pages of material and dozens of audio and video files, as well as substantial productions from nonparties pursuant to Rule 17(c) subpoenas. And Mr. Kaplan's need to review discovery material will be even more urgent after the government produces 3500 material on August 1, 2025 – the point at which, as the Court noted, "[p]ractically speaking, . . . your [trial] preparation is going to start." (July 23, 2025 Hrg. Tr. at 5:23-24.)

Once trial begins, Mr. Kaplan will have no real ability, given the specific circumstances of this case, to participate in his defense if he remains in custody. He will spend trial dates being transported from MDC, sitting in the courtroom, and being transported back to MDC. There will be little to no time for him to review documents, including voluminous recent and forthcoming productions by the government, or to confer with counsel before or after trial or during lunch breaks, and effectively no time to evaluate the day's events at trial. In addition, based on recent experience, the process of being transported is stressful and deeply exhausting for Mr. Kaplan, further sapping his capacity to participate in his defense.

The unique barriers to Mr. Kaplan's ability to prepare for trial and participate in his defense while detained justify his release. Furthermore, although he does not rely upon it as a separate basis for relief, Mr. Kaplan's temporary release would have the side benefit of finally allowing him to receive proper treatment for his serious, well-documented medical conditions, ███████████████████████████████. Here, again, we appreciate the efforts of the Court and MDC to

2

The Honorable Joan M. Azrack
July 30, 2025
Page 3

address these issues. But the practical reality is that Mr. Kaplan has not received treatment for ▇▇▇▇▇▇▇▇ – or even a medically appropriate diagnosis on which treatment could be based. If continued to be left untreated, Mr. Kaplan's conditions threaten long-term, potentially life-threatening health consequences. Beginning to improve his health is likely to improve Mr. Kaplan's ability to focus on preparing for trial.

Finally, all of the constraints on Mr. Kaplan's ability to prepare for trial are further exacerbated by the appalling conditions in MDC, which have been widely reported in judicial opinions and elsewhere, and have been especially harrowing for Mr. Kaplan.

To ensure that temporary release creates no risk to the public and no risk of flight, his release would be subject to a set of strict conditions, which, as far as counsel can determine, are among the strictest ever imposed by courts in the Second Circuit. These include the following, among others: Mr. Kaplan will only be permitted to be present at his counsel's office in Manhattan or a temporary workspace in Central Islip; a modest temporary residence with 24-hour surveillance and supervision by retired law enforcement personnel; medical offices where Mr. Kaplan has pre-arranged appointments; and the courthouse. When traveling between these locations, Mr. Kaplan will be accompanied by a security guard. He will have no ability to communicate with anyone other than his lawyers, his parents, security guards, and medical providers, and will have no access to the internet or internet-enabled devices. He will be subject to location monitoring by Pretrial Services at all times. Mr. Kaplan will also post a personal recognizance bond, secured by real estate. Costs associated with these conditions will be borne by Mr. Kaplan.

## II. Release under Section 18 U.S.C. § 3142(i) Is Necessary for Mr. Kaplan to Prepare and Participate in His Own Defense.

### A. Inability to Review Discovery Before Trial

Mr. Kaplan's inability to review discovery material and adequately prepare for trial in the period between his remand on September 11, 2024 and early July 2025 was detailed in a letter motion submitted on July 8, 2025 (ECF No. 209) and in briefing on his pretrial motions (ECF No. 184 at 35 & n.19, 36; ECF No. 202 at 18). Among other things, Mr. Kaplan has had no ability to review discovery beyond the material printed by counsel in advance and reviewed during visits to MDC.

Critically, the government (having twice told the Court that it had produced most or all Rule 16 discovery material in its possession)[2] produced a 65-gigabyte forensic extraction of a cellphone belonging to Co-Conspirator-1 on May 9, 2025, and thousands of pages of new material as well as approximately 30 audio recordings on June 6, 2025. Since Mr. Kaplan's initial remand on September 11, 2024, the government has made six total document productions

---

[2] *See* Adam Kaplan's Reply Brief in Further Support of Pretrial Motions (ECF No. 202), at 18 n.22 & 23.

The Honorable Joan M. Azrack
July 30, 2025
Page 4

comprising well over *one million pages* of material – roughly two-thirds of the total amount of Rule 16 discovery. In addition, the defense has received tens of thousands of additional pages from nonparties pursuant to Rule 17(c) subpoenas.

Defense counsel has been able to meet with Mr. Kaplan in person in the MDC visitors' room and virtually through one-hour video conferences on weekdays. However, the conditions in the visiting room in MDC's West Building (where Mr. Kaplan is housed) are often challenging: there are only seven rooms for approximately 1,300 inmates, meaning that many meetings take place in a large common room that, in addition to lacking privacy, is often extremely noisy and crowded with other inmates, attorneys, and families and usually requires attorneys and inmates to work together without use of a table.[3] The rules governing Mr. Kaplan's permission to attend meetings with counsel are unclear to him and, ▮▮▮▮▮ often cause additional delay.

Although these and other frustrations may be common to most inmates who use the MDC visitors' room, Mr. Kaplan is uniquely affected because the visitors' room is currently the only place in MDC in which he can review the voluminous, complex, and late-produced discovery in this case in preparing for the imminent trial. Mr. Kaplan's situation is further distinguished, and the relief he seeks is further justified, by the complexity of the case: he is trying to prepare to defend against a 21-count indictment (designated as a complex case) alleging different conspiracies and substantive counts under different statutes with different participants and alleged victims, including five new counts in the superseding indictment, each of them alleging new and different theories.

In light of these constraints, Mr. Kaplan moved on July 8, 2025 for an order granting him access to an air-gapped laptop in the MDC visitors' room (ECF No. 209). The Court promptly considered the motion and issued the July 9 Order directing that Mr. Kaplan be given extensive access to the MDC law library to review discovery that is not designated "Confidential Material" under the applicable protective order (ECF No. 160). For material subject to the protective order, the Court ordered that Mr. Kaplan be transported to the Central Islip courthouse on request by counsel to review these materials.

Mr. Kaplan is grateful for the Court's efforts in this regard and has made every attempt to capitalize on the July 9 Order. Beginning the next day on July 10, 2025 and for each of the 20 days that followed to date, he asked to be given access to the law library. His requests were consistently refused by MDC staff, even after Mr. Kaplan presented staff with a copy of the July 9 Order. Also on July 10, 2025, counsel provided a copy of the July 9 Order to MDC's Legal Department and asked to discuss how to implement the Court's directed access to the law library.

---

[3] As previously noted in our February 10 letter to the Court, Mr. Kaplan also suffers from ▮▮▮▮▮ which causes him discomfort in loud spaces, like the MDC visitors' room, and makes it difficult for him to concentrate.

The Honorable Joan M. Azrack
July 30, 2025
Page 5

MDC's Legal Department has not responded, despite a follow-up call from Mr. Kaplan's counsel.

We have also communicated frequently with the government regarding the July 9 Order. During a telephone conference on July 17, 2025, the government stated that full compliance would not be practicable (noting, for example, that the law library is closed on weekends), but agreed to work with MDC to ensure compliance with the July 9 Order to the extent possible. (The government also informed us that it would submit a letter to the Court explaining the limitations on MDC's ability to comply fully with the July 9 Order, but to our knowledge it has not yet done so.) Those discussions are ongoing, and we appreciate the government's willingness to engage in them.

Unfortunately, however, these efforts have not yet led to a practical solution or resulted in <u>any</u> improvement in Mr. Kaplan's ability to review discovery materials in the three weeks since the July 9 Order (and with less than six weeks remaining until trial). Again, we respect and appreciate the Court's July 9 Order, but the relief directed by the Court has not materialized as a practical matter, for several reasons.

*First*, Mr. Kaplan has not once been permitted to access the MDC law library. As we understand it, access to the law library is strictly limited. For example, each week, a maximum of eight inmates (never including Mr. Kaplan) from Mr. Kaplan's unit (which typically holds up to 124 inmates) are given access to the library for up to one hour on Friday morning, unless staffing and security issues preclude this, as is often the case. The law library's regular hours end at 3:30 pm, and it is closed on weekends and during lockdowns. As noted above, Mr. Kaplan requested permission to access the library on 20 sequential days, but none of his requests were granted. Although we do not know MDC's rationale, we note that, among other things, Mr. Kaplan understands that [REDACTED]

*Second*, even if Mr. Kaplan could access the law library, the scope of materials he could review there would be very limited. Discovery in this matter has been extensive, including a large volume of material produced since Mr. Kaplan was remanded. The vast bulk of this material is subject to the Protective Order (ECF No. 160) – that is, it consists of financial statements and other documents containing personal identifying information – and cannot be possessed or reviewed by Mr. Kaplan in the law library or otherwise outside the presence of his counsel. In addition, although not all discovery materials contain personal identifying information, the process of identifying non-confidential material or redacting personal identifying information would be prohibitively time consuming.

*Third*, we have carefully considered and tested the option of having Mr. Kaplan produced at the Central Islip courthouse to review confidential discovery material pursuant to the July 9 Order. Among other things, we discussed with the U.S. Marshals Service the logistics of such

The Honorable Joan M. Azrack
July 30, 2025
Page 6

visits. However, it was determined that the time it would take to transport Mr. Kaplan to and from the courthouse and the conditions under which he could review discovery material there (for example, his hands and feet would be shackled and he would be behind a metal screen through which he cannot read documents shown to him by counsel, and it would be difficult to provide him with copies of documents) would make these visits less productive than continuing the already insufficient practice of bringing printed copies of material into MDC so that Mr. Kaplan could review it during visits with his attorneys. As a practical matter, this option would be of no utility to Mr. Kaplan under the circumstances.

*Finally*, even to the extent successful, efforts by the Court and others to maximize Mr. Kaplan's access to discovery material will not enable Mr. Kaplan to meaningfully review such material <u>at all</u> – let alone confer with counsel – during trial, for the reasons discussed below.

In addition, Mr. Kaplan is uniquely acquainted with the complex facts of the case, and "it will be far easier for [him] to assist his counsel in reviewing and responding to discovery if counsel has regular, uninterrupted access to him. Moreover, [Mr. Kaplan] will undoubtedly be crucial to his lawyers' understanding of the complicated financial transactions that are the subject of the indictment." *Bodmer*, 2004 WL 169790, at *3 (granting pretrial release of a defendant facing multiple, serious white-collar charges).

In short, Mr. Kaplan is trying to prepare to defend against 21 serious white-collar charges involving several different allegedly fraudulent schemes.[4] The volume of discovery even since he was remanded to custody is vast, and the government has stated it expects to put on roughly 20 civilian witnesses. (ECF No. 198, at 37.) With the trial starting in less than six weeks, granting temporary pretrial release is the only way to safeguard Mr. Kaplan's right to participate in his own defense. *See Bodmer*, 2004 WL 169790, at *3 (granting pretrial release of a defendant facing multiple, serious white-collar charges and "voluminous" discovery); *Weigand*, 492 F. Supp. 3d at 319 (granting pretrial release eight weeks before trial was scheduled to begin pursuant to 18 U.S.C. 3142(i) in a "complex, document-heavy white collar case"[5]).

As discussed, the short time remaining before trial leaves no room to experiment with additional efforts to improve Mr. Kaplan's access to discovery material and, if those efforts are partly or fully unsuccessful, to run through the cycle again.

---

[4] Mr. Kaplan has moved to sever or dismiss certain of these counts, and the Court is currently deliberating on those motions.

[5] In granting release in *Weigand*, the court cited restrictions on trial preparation in MDC imposed by the COVID-19 pandemic. Although those specific restrictions are no longer in place, we submit that the particular circumstances in this case are equally compelling, including the very short time remaining before trial (indeed, two weeks less time than in *Weigand*) coupled with Mr. Kaplan's limited access to voluminous, recently-produced discovery materials and additional issues discussed in this letter.

The Honorable Joan M. Azrack
July 30, 2025
Page 7

        B.      <u>Inability to Confer with Counsel or Review Discovery During Trial</u>

      Mr. Kaplan's ability to prepare for trial has been severely constrained to date; it will be effectively non-existent if he remains in custody during trial. The practical reality is that Mr. Kaplan will simply be unable to confer with counsel or review discovery material in any meaningful way during the trial. Under the particular circumstances – with Mr. Kaplan facing a 21-count indictment alleging multiple different conspiracies and fraudulent schemes under different statutes and theories, and needing to review extensive discovery, key portions of which were only recently produced, as well as the forthcoming voluminous 3500 material – these constraints severely undermine his ability to prepare and participate in his defense. Consequently, Mr. Kaplan could be unconstitutionally "handicapped in consulting counsel, searching for evidence and witnesses, and preparing [his] defense." *Stack v. Boyle*, 342 U.S. 1, at 8 (1951) (Jackson, *J.*, concurring).

      A brief review of the daily schedule Mr. Kaplan will face during trial illustrates the point. The Court has informed us that on trial days it intends to sit from 9:30 am through 4:45 pm. (July 23, 2025 Hrg. Tr. at 7:13-17). If Mr. Kaplan is still detained, defense counsel will have little to no access to him in the courthouse's holding cells or cells in the U.S. Marshals office before the trial day begins. It might be possible to meet with him during lunch breaks, but only for a short period. And when the trial day ends, Mr. Kaplan will be taken the roughly 60 miles back to MDC and will arrive after visiting hours are over. Meetings in the cells in the Marshals' office take place through a metal screen while Mr. Kaplan's hands and feet are shackled. Mr. Kaplan is unable to view his attorneys' papers or computers through the metal screen, cannot have a pen and paper during these meetings, and there is only limited opportunity to ask the members of the Marshals' staff to provide documents for Mr. Kaplan to review.

      Accordingly, defense counsel will have virtually no opportunity on trial days to meet with Mr. Kaplan, discuss the day's testimony and admitted exhibits, and plan and prepare for the next day's proceedings. And Mr. Kaplan will have no ability to review this material on his own: he is not permitted to hold or review documents with him during transport, and counsel will be unable to bring material to him in MDC on these days because MDC's visiting hours will have ended by the time Mr. Kaplan is returned.

      These constraints are not hypothetical; rather, they have been concretely borne out on the four occasions when Mr. Kaplan has been transported to Central Islip for hearings and status conferences. Each time, he has been woken up at approximately 5:00 am, regardless of the time of the court appearance, and even after counsel has asked the government if later transport could be arranged for afternoon court appearances. He has then been placed into full shackles, loaded into a van with other inmates, and driven to the courthouse, which typically takes between one and a half to two hours or more. On arrival, he typically has been placed in a poorly lit holding cell, often for several hours. At the end of the day, he has been loaded back into the van for the lengthy drive back to MDC, always arriving after the 5:00 pm dinner hour. He generally has not been provided with water (except by counsel at counsel's table in the courtroom) or food.

7

The Honorable Joan M. Azrack
July 30, 2025
Page 8

Even if the schedule and conditions are slightly different during trial, there will be no real opportunity for Mr. Kaplan to confer with counsel. For example, for the most recent hearing on July 23, 2025, counsel requested that Mr. Kaplan be produced in the cells in the Marshals' office used for attorney-client meetings at 8:00 am. Mr. Kaplan's transport did not arrive at the courthouse until approximately 9:30am, and he was not made available to meet with counsel until approximately 10:00 am, leaving little time to productively confer in advance of the hearing. Following the July 23 hearing, counsel was only able to meet with Mr. Kaplan for approximately five minutes before he was rushed to be placed on the only afternoon transport back to MDC.

After each of his trips from MDC to the courthouse and back, Mr. Kaplan has been exhausted and felt ill for one to two days. In connection with his most recent court appearance, he was in leg shackles the entire day, and his ankles were bleeding by the time he returned to MDC. Having to repeat this ordeal on every trial date for four or more weeks will be extraordinarily challenging for Mr. Kaplan.

Mr. Kaplan is also uniquely at risk as a result of being transported in close proximity with other inmates,



C.  Lack of Essential Medical Care and Impairment of Mr. Kaplan's Health

Temporary release of Mr. Kaplan is fully justified by his need to prepare for trial. Although we are not relying on Mr. Kaplan's medical conditions as a separate basis for release, we note that granting his release will have the salutary benefit of allowing Mr. Kaplan to begin receiving appropriate care for his serious and well-documented health issues,

We detailed Mr. Kaplan's most pressing health issues and the lack of treatment in MDC in a letter to the Court submitted on February 10, 2025. On February 12, 2025 the Court issued an Initial Medical Evaluation Request with respect to Mr. Kaplan, directing MDC to examine Mr. Kaplan and provide treatment for his                         . Unfortunately, despite efforts by the Court, Mr. Kaplan and his counsel, and MDC, Mr. Kaplan has still not received adequate medical care—and no care for



The Honorable Joan M. Azrack
July 30, 2025
Page 9



In March and April, 2025, Mr. Kaplan was seen by an optometrist and physician in MDC as well as an outside ophthalmologist, all of whom agreed that Mr. Kaplan is exhibiting symptoms consistent with ▆▆▆▆ The physician and ophthalmologist recommended an "urgent" MRI to confirm the diagnosis and determine the appropriate treatment regimen for Mr. Kaplan's condition. However, although MDC attempted to arrange an MRI, neither an MRI nor treatment for Mr. Kaplan's ▆▆▆▆ have happened to date.

Mr. Kaplan's ▆▆▆▆ seriously threaten his long-term health and undermine his already insufficient ability to prepare for trial in MDC. Mr. Kaplan's release from MDC will enable him to begin receiving proper care, which in turn would improve his ability to focus on preparing for trial.

D.  The Conditions at MDC

As of the date of this letter, Mr. Kaplan has resided in MDC for 323 days. Throughout, he has been subjected to conditions of confinement that courts have decried for their appalling living conditions, high incidence of gang violence, and substandard medical care. *See* Memorandum of Law in Support of Motion to Release Adam Kaplan Pending Trial on Conditions (ECF No. 128) pp. 24-29; *United States v. Chavez*, 710 F. Supp. 3d 227, 230 (S.D.N.Y. 2024) (continuing post-conviction release of defendant on the ground that "the conditions in the MDC qualify as 'exceptional reasons' justifying . . . continu[ed] release" under 18 U.S.C. § 3145(a)(2).).

Although we are not relying on the conditions at MDC as a basis for release, and without belaboring conditions of which the Court is undoubtedly aware, we note that there has been little to no improvement during the many months Mr. Kaplan has been detained in the facility, and recent media reports have raised concern that the recent decision to house more than 100 individuals detained by Immigration and Customs Enforcement officers could further tax resources and worsen conditions within MDC.[6]

Mr. Kaplan's experience in MDC has been particularly harrowing. As detailed in our February 10 letter to the Court, 

---

[6] *See* "ICE Detainees Now Being Held in 'Horrific' MDC Brooklyn Federal Jail," *Daily News*, June 25, 2025 (available at https://www.yahoo.com/news/ice-detainees-now-being-held-211600677.html).

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

The cumulative effect of these incidents and the consistently degrading conditions in MDC has exacted a toll on Mr. Kaplan and diminished his ability to focus on the extensive and complex discovery relating to several different alleged fraudulent schemes – crucial portions of which were only recently produced or will soon be provided.

### III. Mr. Kaplan's Temporary Release on Strict Terms Will Not Pose a Danger to the Community or a Risk of Flight.

Temporary release subject to the conditions outlined in the Annex to this letter motion is necessary for defense counsel to have sufficient access to Mr. Kaplan to properly represent him at trial and for Mr. Kaplan (who maintains his innocence) to prepare and participate in his own defense. These conditions will ensure that Mr. Kaplan can pose no danger to the community and will eliminate any risk of flight.

In brief, the proposed conditions will ensure that Mr. Kaplan's location will be strictly limited to the courthouse; the offices or temporary workspace of his counsel near the Central Islip courthouse; a temporary residence near his counsel's office (for the remaining pretrial period) or near the Central Islip courthouse (during trial) where he will be subject to 24-hour monitoring and visits by only a small number of pre-approved people; medical offices; and transportation between these locations. The temporary residences will be modest and as small as possible to facilitate monitoring and guarding by the security service. His activities will be strictly limited to those necessary to prepare for trial. At all times, he will be under the supervision of either former law enforcement personnel acting as private security guards or his attorneys, and his location will be monitored by GPS or other monitoring technology provided by Pretrial Services. He will have no ability to contact anyone other than his lawyers, his parents, medical providers, and security staff. He will not have a passport or access to any means of travel beyond transport to the few locations identified above. He will only be in the presence of his counsel (and their office staff), security personnel, his parents, medical care providers, Pretrial Services, and persons present in the courthouse.

As far as counsel can determine, these conditions are among the strictest ever applied by courts within the Second Circuit. And the conditions are substantially more restrictive than those proposed in December 2024 in connection with the Motion to Release Adam Kaplan Pending Trial on Conditions. (ECF No. 128 at pp. 7-8.) Specifically, rather than home detention in an apartment owned by Mr. Kaplan's family, he will be confined to temporary residences that may be vetted, pre-approved, and randomly visited by Pretrial Services. While in the residences and traveling between approved locations, Mr. Kaplan will be supervised at all times by retired law enforcement officers who have experience in similar situations.

We submit that these conditions are sufficiently restrictive to address any concerns the Court may have, but we are willing to accept any others the Court deems necessary.

The Honorable Joan M. Azrack
July 30, 2025
Page 11

### Conclusion

For the reasons stated above, we respectfully request that, pursuant to 18 U.S.C. § 3142(i), the Court order the temporary release of Mr. Kaplan beginning on August 8, 2025 or sooner, if practicable, and for the duration of trial on the proposed conditions outlined in the Annex.

Respectfully submitted,

/s/ Mark S. Cohen
Mark S. Cohen
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, New York 10022
(212) 957-7600
mcohen@cohengresser.com

cc: All counsel of record (via ECF)

The Honorable Joan M. Azrack
July 30, 2025
Page 12

## ANNEX
## PROPOSED CONDITIONS OF TEMPORARY RELEASE

The following conditions will be imposed and strictly enforced to ensure that Mr. Kaplan's activities are limited to those necessary to preparing for and attending trial. All of these conditions will be at Mr. Kaplan's expense.

- Confinement to Specific Approved Locations. At all times before or during trial, Mr. Kaplan will be strictly confined to (i) a temporary residence (proposed locations of which are discussed below); (ii) his attorneys' offices in Manhattan or offsite workspace near the Central Islip courthouse; (iii) medical visits for essential medical care or medical emergencies (only within the Southern or Eastern Districts of New York); (iv) transit between approved locations, accompanied at all times by private security; and (v) other locations, if needed for unforeseen reasons, with prior approval by the Court and/or Pretrial Services and subject to strict limitations.

- Location of Temporary Residence. Prior to trial, the temporary residence will be in Manhattan near the offices of Cohen & Gresser. During trial, the temporary residence will be an apartment near the courthouse in Central Islip. Both temporary residences will be inspected in advance by the private security firm. The proposed addresses and reports of those inspections would be provided to the Court and/or Pretrial Services for approval prior to release.

  The temporary residences will be modest studios or other small apartments to allow ease of monitoring, and they will be selected for their proximity to counsel's office and the Central Islip courthouse. All costs of the temporary residences will be borne by Mr. Kaplan.

- Conditions of Temporary Residence.

  - One or more security guards (all of whom would be retired law enforcement) will remain at or immediately outside the temporary residence with Mr. Kaplan at all times when Mr. Kaplan is present and will ensure that the residence remains secure, Mr. Kaplan remains confined, and that visitors are limited to those permitted by the release order and comply with the conditions approved by the Court.

  - Mr. Kaplan will not have access to any computers, cell phones, or other electronic devices (with or without access to the internet). He will be permitted to ask the security guard on duty to relay messages to his legal team, his parents, security staff, and Pretrial Services personnel, and to order food, medication, and essential items for him.

The Honorable Joan M. Azrack
July 30, 2025
Page 13

- o Mr. Kaplan will not be permitted any visitors in his temporary residence other than: his legal team; his parents; retired law enforcement officers and other security staff; building maintenance staff (if necessary, and only in the presence of a security guard); and Pretrial Services personnel, who may visit at random or by appointment. Any other visits will require pre-approval by Pretrial Services. The identity and arrival and departure time of all visitors will be recorded in a log maintained by the private security service and available for inspection by Pretrial Services.

- o A 24-hour video camera will be placed directly outside the temporary residence to monitor Mr. Kaplan's arrivals and departures. Pretrial Services will have access to the real-time feed and recordings to monitor adherence with the conditions of Mr. Kaplan's temporary release.

- <u>Restrictions on Activities at Attorney Offices or Workspaces.</u>

  - o While present in the Cohen & Gresser office in Manhattan or workspace near the Central Islip courthouse, Mr. Kaplan shall be permitted to review discovery material (in the presence of counsel) on a laptop provided by counsel. The laptop will be air-gapped (meaning, with no access to the internet or any network) and installed with only a basic suite of programs to allow Mr. Kaplan to review discovery and prepare materials for his defense (i.e., Microsoft Office, Excel, and PowerPoint, Adobe Acrobat, and software for reviewing audio/video files).

  - o Mr. Kaplan will not have access to any other computers, cell phones, or other internet-enabled or network-connected devices. He also will not be permitted to make calls on landlines or cellphones, except in the case of medical emergencies. When accompanied by a member of his legal team, he will be permitted to join conference calls with his legal team and members of the joint defense team.

  - o Mr. Kaplan will not be permitted any visitors in these locations other than: Cohen & Gresser attorneys, paralegals, and staff; and his parents.

- <u>Transit between Approved Locations.</u> During travel between the temporary residence and the Cohen & Gresser office or workspace, the courthouse, or other location, Mr. Kaplan would be escorted by a security guard.

- <u>Additional Conditions.</u>

  - o At all times Mr. Kaplan would wear an electronic ankle bracelet or monitoring technology provided by Pretrial Services and subject to instructions provided by Pretrial Services relating to such monitoring.

The Honorable Joan M. Azrack
July 30, 2025
Page 14

- o Mr. Kaplan has already surrendered his passport to Pretrial Services. He will be permitted to carry a driver's license or other form of identification.

- o Mr. Kaplan will not have access to credit or debit cards, bank accounts, cash, or other means of engaging in financial transactions.

- <u>Personal Recognizance Bond</u>. Mr. Kaplan will post a personal recognizance bond, secured by property, and financial responsible sureties as the Court deems appropriate.