UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

UNITED STATES OF AMERICA,

**FILED**
**CLERK**

8/1/2025 10:44 am

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**MEMORANDUM & ORDER**
23-cr-00293-JMA-JMW

-against-

ADAM KAPLAN and DANIEL KAPLAN,

Defendants.

------------------------------------------------------------------------X

**AZRACK, United States District Judge:**

Presently before the Court are pre-trial motions filed by Defendants Adam and Daniel Kaplan (the "Kaplans"). (See ECF No. 180; ECF No. 183.) Defendants move to:

1. dismiss Counts 1 and 17 of the Superseding Indictment ("SI");

2. dismiss Counts 13-16 of the SI;

3. dismiss Counts 1, 12, and 17 for failure to satisfy Federal Rule of Criminal Procedure 7(c) or, in the alternative, order the Government to provide a bill of particulars as to these counts and counts 18-21;

4. sever Daniel Kaplan's trial from Adam Kaplan's and sever Counts 17-21;

5. order the Government to produce pre-trial discovery and exculpatory material pursuant to 18 U.S.C. § 3500 immediately[1];

6. compel Cadwalader, Wickersham & Taft, LLP ("CWT") to turn over trial witness statements it collected while representing the Kaplans in connection with the Department of Justice's criminal investigation;

7. suppress evidence as to Adam Kaplan obtained as a result of an unlawful search during Mr. Kaplan's arrest; and

8. suppress evidence as to Adam Kaplan or dismiss counts based upon violations of the Hammad and Massiah doctrines.[2]

---

[1] The Court addressed this request at the July 23, 2025 hearing on these motions, ordering the Government to produce 3500 material by August 1, 2025. (July 23, 2025 Pre-Trial Motion Hearing Tr. at 4.)

[2] Defendants join each other's pre-trial motions to the extent applicable. (See ECF No. 180 at 1; ECF No. 183 at 1.)

The Court will address each of these requests for relief in turn.

## I.    BACKGROUND

### A.    The Original Indictment

On July 18, 2023, twin brothers Adam and Daniel Kaplan were charged in a 16-count Indictment.  (ECF No. 1.)  The Indictment charged the Kaplans with conspiracy to commit wire fraud, wire fraud, investment advisor fraud, and money laundering in connection with a scheme to defraud their financial services clients between May 2018 and November 2022.  (Id.)  The Government alleges that Defendants defrauded at least 50 clients (the "Victims") of at least $5,000,000.  (Id. ¶ 6.)  The Kaplans were associated with a financial services firm which managed the assets of the Victims throughout the relevant period.  (Id. ¶ 5.)

The Government alleges that the Kaplans defrauded their clients through three principal means: (1) the Kaplans fraudulently overbilled advisory fees to their clients (the "Overbilling of Advisory Fees Scheme"); (2) Defendants misappropriated client funds by, inter alia, fraudulently charging their credit cards and forging checks in their names (the "Misappropriation Scheme"); and (3) the Kaplans then concealed the proceeds of these schemes by, among other things, fraudulently representing to financial institutions that the Victims had agreed to the fraudulent transactions.  (Id. ¶¶ 13-21.)

On July 25, 2023, pursuant to this Indictment, the Kaplans were arraigned before Magistrate Judge James M. Wicks.  (ECF No. 10.)  Defendants pled not guilty and were later both released on bond.  (See ECF No. 14; ECF No. 17; ECF No. 18.)

### B.    Adam Kaplan's Conduct While on Bond

According to the Government, while Adam Kaplan was on bond awaiting trial, he committed three further crimes – a wire fraud conspiracy, bank fraud conspiracy, and attempted obstruction of justice .  (See SI, ECF No. 149 ¶¶ 43-50.)  The Government asserts that around April

2

2024, during the interview of an alleged co-conspirator, it obtained information that Adam Kaplan attempted to threaten and harm witnesses and attempted to bribe law enforcement. (See Gov't Opp'n, ECF No. 198 at 5-6.) Additionally, the Government alleges that Adam Kaplan began a separate scheme to defraud some of the same Victims of the initial financial fraud scheme. (SI ¶¶ 43-46.)

On September 9, 2024, based on these alleged acts, the Government moved to revoke Adam Kaplan's bond. (ECF No. 104.) That same day, this Court issued an arrest warrant for Adam Kaplan. (ECF No. 106.) On September 11, 2024, Adam Kaplan was arrested at his parents' home by Federal Bureau of Investigation ("FBI") agents. Upon Adam Kaplan's arrest, the FBI seized Adam Kaplan's burner cell phone (the "Subject Phone"). Five days later, on September 16, 2024, the Government obtained a search warrant, signed by Magistrate Judge Steven I. Locke, to search the Subject Phone. Later, on September 11, 2024, this Court revoked Adam Kaplan's bond and detained him pending trial. (ECF No. 109; ECF No. 110.)

## C.  **The Superseding Indictment**

On February 20, 2025, a grand jury in the Eastern District of New York returned the SI. The SI again charges Defendants with conspiracy to commit wire fraud, wire fraud, investment advisor fraud, and money laundering in connection with a scheme to defraud their financial services clients between May 2018 and November 2022, but adds Count Seventeen against both Defendants, which alleges a conspiracy to commit money laundering. (SI ¶¶ 41-42.)

As described above, the SI also charges Adam Kaplan only with another conspiracy to commit wire fraud; a conspiracy to commit bank fraud; and two counts of attempted obstruction of justice. (Id. ¶¶ 43-50.) On March 5, 2025, the Kaplans were arraigned on the SI and pled not guilty. (ECF No. 152.) The Court also scheduled trial to begin on September 8, 2025.

**D.**    **The Instant Motions**

On May 16, 2025, the Kaplans filed the pre-trial motions described above, which are now fully briefed.  (ECF No. 180 ("D. Kaplan Br."); ECF No. 183 ("A. Kaplan Br.").)  On July 23, 2025, the Court held oral argument on the pre-trial motions.  (ECF No. 219.)  The eight requests for relief are addressed in turn below.

## II.    DISCUSSION

**A.**    **Defendants' Motion to Dismiss Counts One and Seventeen**

Count One of the SI charges the Kaplans with the advisory fraud scheme, which involved Defendants' plan to defraud their clients of funds through several mechanisms, such as overbilling, use of credit information, forgery, misappropriation of client funds, as well as use of fraudulent representations to third-party financial institutions to conceal their conduct.  (SI ¶¶ 8-24.)  Count Seventeen of the SI charges the Kaplans with a scheme to commit money laundering to conceal the proceeds and facilitate the continuation of the advisory fraud scheme.  (SI ¶¶ 41-42; see also Gov't Opp'n at 18-19.)

Daniel Kaplan moves to dismiss Counts One and Seventeen as impermissibly duplicitous.  (See D. Kaplan Br. at 7-13.)  Daniel argues that Count One improperly charges "three separate crimes as a single conspiracy . . . [which] will foster juror confusion and invite the jury to return a general verdict of guilt, even if it is not unanimous as to any one of those three offenses."  (Id. at 7.)  As to Count Seventeen, Daniel asserts that it charges two separate crimes – a conspiracy to launder money that ended in November 2022, and a separate money laundering conspiracy "*post-dating* November 2022."  (Id. at 8.) (emphasis in original).  To address the purported issues with these two Counts, Daniel asks this Court to either dismiss these counts, or alternatively, sever the separate alleged offenses within each Count.  For the following reasons, the Court denies Daniel's requested relief as to these Counts.

4

As a preliminary matter, dismissal of an indictment before trial "is an extraordinary remedy reserved for extremely limited circumstances implicating fundamental rights." United States v. Bustos de la Pava, 268 F.3d 157, 165 (2d Cir. 2001) (internal quotations and citations omitted); see also United States v. Khalil, No. 13-CR-386, 2014 WL 1599943, at *1 (E.D.N.Y. Apr. 21, 2014), aff'd, 692 F. App'x 14 (2d Cir. 2017) ("A defendant faces a high standard in seeking to dismiss an indictment . . . This is because an indictment need only consist of a plain, concise, and definite written statement of the essential facts constituting the offense charged.") (internal quotations and citations omitted.) "An indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction that bars future prosecutions for the same offense." Id. (citing United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998)).

Defendant argues that Counts One and Seventeen are duplicitous because they contain multiple distinct crimes charged in the same count. An indictment is "impermissibly duplicitous where: 1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be 'a separate count for each offense,' and 2) the defendant is prejudiced thereby." United States v. Sturdivant, 244 F.3d 71, 75 (2d Cir. 2001) (internal quotations omitted). However, a count is not duplicitous if it charges a single crime committed by more than one means. See Fed. R. Crim. P. 7(c) ("It may be alleged in a single count that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means.")

In the conspiracy context, the Second Circuit has held that "acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme." United States v. Tutino, 883 F.2d 1125, 1141 (2d Cir. 1989). Furthermore "[i]t is well established in this Circuit that the allegation in a single

count of a conspiracy to commit several crimes is not duplicitous, for the conspiracy is the crime and that is one, however diverse its objects." United States v. Peters, 543 F. App'x 5, 7–8 (2d Cir. 2013).

Here, Counts One and Seventeen are permissibly charged as described in the SI. Count One charges one interconnected conspiracy to defraud clients of their funds. In Count One, the SI charges Defendants with three distinct means of defrauding their clients: (1) Defendants overbilled their clients; (2) Defendants misappropriated client funds; and (3) Defendants made false representations to financial institutions to conceal this conduct. (SI ¶¶ 8-24.) Taken together though, these three means of defrauding clients encompass a single interconnected conspiracy to commit wire fraud – not three distinct ones. As the Government correctly points out, these schemes were "different weapons used to commit the same crime." (Gov't Opp'n at 21.) The bare fact that Defendants allegedly used several distinct means of defrauding their clients does not establish that Count One impermissibly combines multiple conspiracies into one charge. See Tutino, 883 F.2d at 1141 ("As long as the essence of the alleged crime is carrying out a single scheme to defraud, then aggregation is permissible."); see also United States v. Barret, 824 F. Supp. 2d 419, 445 (E.D.N.Y. 2011) ("a single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance.") (internal quotation and citation omitted); United States v. Tuzman, 301 F. Supp. 3d 430, 447 (S.D.N.Y. 2017) ("[a] single conspiracy may be found where there is mutual dependence and assistance among the [participants], [and] a common aim or purpose . . .") (quoting United States v. Vanwort, 887 F.2d 375, 383 (2d Cir. 1989).

For similar reasons, Count Seventeen is also not impermissibly duplicitous. Daniel attempts to argue that Count Seventeen contains two money laundering schemes – one that "ended

completely in, at the latest, November 2022," and "a second agreement to launder money that arose in November 2022, and in which Daniel did not participate." (D. Kaplan Reply at 4.) Upon review of the SI, however, the Court concludes that there are not two separate money laundering conspiracies charged. In fact, Count Seventeen alleges that between "May 2018 and July 2023" Defendants knowingly conspired to engage in financial transactions designed to "promote the carrying on of [wire fraud]." (SI ¶ 42.)

Daniel attempts to contradict this plain language by arguing that according to the SI, "the last substantive wire fraud transaction that could have involved Daniel occurred on April 12, 2022, the last substantive money laundering transaction that could have involved him occurred on June 2, 2020, and his purported conspiracy to commit wire fraud with Adam ended in November 2022." (D. Kaplan Br. at 10.) (internal citations omitted.) Essentially, Daniel argues that there are two money laundering conspiracies here: one that involved him, which ended in November 2022, and one that involved Adam and a separate co-conspirator, which took place after November 2022. (Id.) It is unclear, however, how the financial transactions cited in the SI demonstrate in any way that the original conspiracy to commit money laundering ended in November 2022, and a second conspiracy then began. Instead, the Government alleges that the original conspiracy between the brothers to launder money did not end before at least July of 2023. (SI ¶ 42; see also Hearing Tr. at 58-59 ("the entire money laundering conspiracy is only related to -- is only involving Adam and Daniel. There will be no evidence that will be introduced at trial of any money laundering financial transactions that were involved that Adam – Adam Kaplan and co-conspirator one were involved in, in support of the Government proving Count Seventeen.").) The Court therefore sees no merit to Daniel's argument that Count Seventeen charges multiple money laundering conspiracies.[3]

---

[3] Daniel also argues that "to the extent the Superseding Indictment alleges any conduct after November 2022, its allegations relate only to Adam and are wholly separate from any conduct attributed to Daniel." (D. Kaplan Reply at 4). Daniel remains free, of course, to argue at trial that he stopped participating in or withdrew from any conspiracy

Moreover, the Court rejects Daniel's argument that the money laundering count is impermissibly duplicitous because it contains both a money laundering conspiracy to "promote continued 'carrying on' of unlawful activity" and a separate conspiracy to "conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." (D. Kaplan Reply at 9.) As Daniel correctly points out, though, "[t]he Superseding Indictment [] expressly charges only a conspiracy to launder money to *promote* continued 'carrying on' of unlawful activity, 18 U.S.C. § 1956(a)(1)(A)(i)." (Id.) And, as the Government explained at oral argument,

> Adam and Daniel Kaplan continued to try to solicit advisory victims -- or not advisory victims, but advisory clients into 2023 . . . And so that, those financial transactions in paying off clients, it goes to promoting their ongoing criminal activity because it allows -- there were payments made in furtherance of being able to continue to get additional clients and continue to commit fraud.

(Hearing Tr. at 63.) The SI thus alleges a promotional money laundering conspiracy that lasted until July 2023, not two separate conspiracies. To the extent Daniel argues that the Government cannot prove a promotional money laundering conspiracy after November 2022 due to a lack of evidence, the proper place for that argument is in a post-trial motion. As of now, any such contention is premature.

Therefore, the Court denies Daniel's motion to dismiss Counts One and Seventeen as duplicitous and does not order that the Counts be severed.

## B.    Defendant Adam Kaplan's Motion to Dismiss Money Laundering Counts 13, 14, 15, and 16

Adam next moves to dismiss Money Laundering Counts 13, 14, 15, and 16 of the Superseding Indictment pursuant to Federal Rule of Criminal Procedure Rule 12(b). According to

---

at any time. See United States v. Leslie, 658 F.3d 140, 143 (2d Cir. 2011) ("withdrawal from a conspiracy is an affirmative defense for which the defendant bears the burden of proof at trial.") (citing United States v. Pizzonia, 577 F.3d 455, 466 (2d Cir. 2009)).

Adam, the Court should dismiss these counts because "the money transactions in question are not linked to any of the substantive wire fraud counts . . . or any other predicate wire fraud" and, if they stem from the same transactions as those alleged in Counts Two through Eleven, they should be dismissed because the "alleged depositing of forged checks cannot be both the underlying wire fraud and the unlawful monetary transaction."  (A. Kaplan Br. at 25-26.)  The Government responds that the counts should not be dismissed because it does not need to allege with specificity the unlawful activity underlying the money laundering charges and because it did not use the same transactions to allege both wire fraud and money laundering.  (Gov't Opp'n at 19-20, 28-30.)  For the following reasons, Adam's motion to dismiss counts 13, 14, 15, and 16 is denied.

Federal Rule of Criminal Procedure 12 states that a defendant may move before trial to dismiss an indictment that lacks "specificity" or "fail[s] to state an offense."  Fed. R. Crim. P. 12(b)(3)(B)(iii), (v).  "The dismissal of an indictment is an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights."  United States v. Raniere, 384 F. Supp. 3d 282, 299 (E.D.N.Y. 2019) (quoting United States v. De LaPava, 268 F.3d 157, 165 (2d Cir. 2001)).  It is an "extreme sanction" and "the most drastic remedy available."  United States v. Fields, 592 F.2d 638, 647 (2d Cir. 1978).  The Second Circuit accordingly has held that dismissals should be reserved for "the truly extreme cases."  United States v. Broward, 594 F.2d 345, 351 (2d Cir. 1979).

The Federal Rules of Criminal Procedure require only that an indictment set forth a "plain, concise, and definite written statement of the essential facts constituting the offense."  Fed. R. Crim. P. 7(c); United States v. Benjamin, No. 11-CR-24, 2011 WL 4929534, at *1 (D. Vt. Oct. 17, 2011) (citing United States v. Tramunti, 513 F.2d 1087, 1113 (2d Cir. 1975) ("[A]n indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.")).  Where a motion to dismiss an indictment "raises

dispositive evidentiary questions, a district court must defer resolving those questions until trial." United States v. Sampson, 898 F.3d 270, 279 (2d Cir. 2018) (cleaned up).

As the Government correctly notes, a money laundering count need not provide elements or other details of the specified unlawful activity. See United States v. Hwa, 15-CR-538, 2021 WL 11723583 (E.D.N.Y. 2021) (quoting United States v. Cherry, 330 F.3d 658, 667-68 (4th Cir. 2003)); Raniere, 384 F. Supp. 3d at 307 (same); United States v. Caldwell, 302 F.3d 399, 413 (5th Cir. 2002) (finding that an indictment sufficiently charged a defendant with money laundering even though it did not allege elements of the specified unlawful activity); United States v. McGauley, 279 F.3d 62, 70 (1st Cir. 2002) ("[W]e do not require the indictment to specify the predicate offense underlying a money laundering charge.") (internal quotation omitted). Here, the Superseding Indictment sufficiently alleges that contrary to 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(h), and 1957(a), the defendants (i) knew that their transactions "were designed in whole and in part to promote the carrying on of specified unlawful activity" and (ii) "engage[d] in one or more monetary transactions in and affecting interstate commerce in criminally derived property of a value greater than $10,000 . . . that was derived from specified unlawful activity." (SI ¶¶ 39-42.) Adam's arguments regarding the need for the government to explain "how the forged checks could possibly be proceeds of the crime of wire fraud" is one of fact that is properly addressed at trial and not the motion to dismiss stage. See Sampson, 898 F.3d at 279 (where a motion to dismiss an indictment "raises dispositive evidentiary questions, a district court must defer resolving those questions until trial").

Separately, Adam argues that the Government "improperly merged" the money laundering offenses with the wire fraud offenses. (A. Kaplan Br. at 26.) In support of this argument, Adam cites to United States v. Shellef, 732 F. Supp. 2d 42, 72-73 (E.D.N.Y. 2010) for the proposition that "the transaction charged as money laundering cannot be the same transaction through which

the funds became tainted by crime." Id.  However, in Shellef, the Government had acknowledged post-trial that the same transactions served as the bases for the money laundering and wire fraud charges.  Id.  Here, the Government has not alleged that the same transactions serve as the bases for both money laundering and wire fraud, and unlike in Shellef, which was briefed post-trial, Adam here makes his claim in a pre-trial dismissal motion before any evidence has been introduced.

Adam also cites to United States v. Kwok, 2024 WL 1407057, at *10 (S.D.N.Y. Apr. 2, 2024) for the proposition that "[t]o be considered 'criminally derived property,' the funds must have been obtained from a prior, separate criminal act other than the unlawful transaction itself."  Id.  In Kwok, the indictment alleged that the defendant had made a wire transfer of $100 million with funds derived from the wire fraud offenses charged in the indictment, and, like here, the defendant argued that the transaction could not serve as the basis for the money laundering charge in the indictment.  Id.  The court disagreed with the defendant's analysis and explained that under United States v. McCarthy, 271 F.3d 387, 395 (2d Cir. 2001), "funds derived from a crime become 'proceeds' within § 1957 when they are either 'derived from an already completed offense, or a completed phase of an ongoing offense.'"  Kwok, 2024 WL 1407057, at *10 (citing McCarthy, 271 F.3d at 395).  The court further elaborated that the Second Circuit had ruled in United States v. Szur that funds derived from a wire fraud scheme were considered proceeds, and therefore, wire fraud was "sufficiently distinct" from the money laundering offense.  Kwok, 2024 WL 1407057, at *10 (citing United States v. Szur, 289 F.3d 200, 214 (2d Cir. 2002)).

As in Kwok, the Government in this case alleges that the defendants used the funds obtained through their wire fraud scheme to deposit forged checks and complete wire transfers. This is a separate crime and is "sufficiently distinct" from the crime of wire fraud.  Therefore, Adam's motion to dismiss the money laundering charges in the Superseding Indictment is denied.

**C.**    **Defendants' Motion for a Bill of Particulars as to Counts One, Twelve and Seventeen and Counts Eighteen to Twenty-One**

Defendants next move for dismissal or a bill of particulars as to Counts One, Twelve and Seventeen.    Daniel argues that these Counts violate Fed. R. Crim. P. 7(c), which requires indictments to contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c).  Daniel asserts these Counts violate Rule 7(c) because the SI: (1) conflates Adam Kaplan and Daniel Kaplan; (2) fails to identify the "unspecified group of at least 50 clients" that are victims of the defendants' conspiracy; (3) lacks clarity as to the dates, locations, and means by which Daniel Kaplan employed devices to defraud the victims; and (4) fails to provide information on how or when he promoted the illegal activity with Adam Kaplan.  (D. Kaplan Br. at 13-19.)  Adam, meanwhile, argues that a limited bill of particulars with respect to Counts Eighteen through Twenty-One is warranted because Adam is unable to "fully understand the nature and context of these charges" as they currently stand.  (A. Kaplan Br. at 35.)  For the following reasons, Defendants' various arguments are unavailing.

Additional details in the form of a bill of particulars are appropriate only when the indictment is too vague to inform the defendant of the nature of the charges to allow the preparation of a defense, avoid unfair surprise, and preclude double jeopardy.  See United States v. Chen, 378 F.3d 151, 163 (2d Cir. 2004); see also United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990) (bill of particulars required "only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.")

Additionally, "'[t]he Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crime charged, or a preview of the Government's evidence or legal theories.'"  United States v. Perryman, 881 F. Supp. 2d 427, 430 (E.D.N.Y. 2012) (quoting United States v. Mitlof, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001)).  For instance, requests by a defendant

for the "whens," "wheres" and "with whoms" of the acts of conspirators have been rejected by the Second Circuit as impermissible attempts to force the government to particularize its evidence. See Torres, 901 F.2d at 233-34 (district court properly denied defendant's request for the particulars of the identity of the other persons "known and unknown," as alleged in the indictment); see also United States v. Carroll, No. 19 CR 545, 2020 WL 1862446, at *6 (S.D.N.Y. Apr. 14, 2020) (same) (internal quotations and citation omitted.)   Finally, "[i]f the information the defendant seeks is provided in the indictment or some acceptable alternate form, such as discovery or a criminal Complaint, no bill of particulars is required."   United States v. Morgan, 690 F. Supp. 2d 274, 284 (S.D.N.Y. 2010).

Here, the Court finds that the SI complies with the requirements of Rule 7(c).   First, the SI sufficiently puts Defendants on notice of the specific acts charged.   Defendants' requests are nothing more than demands for information about which of the multitude of alleged acts the Government intends to focus on at trial.   Essentially, Defendants request that the Government preview its theories and the evidence it intends to highlight from the vast number of documents it has turned over in discovery.   As stated above, courts in this Circuit have consistently held that this is an impermissible ground for a bill of particulars in conspiracy cases.   See, e.g., United States v. Carroll, 510 F.2d 507, 509 (2d Cir. 1975) ("There is no general requirement that the government disclose in a bill of particulars all the overt acts it will prove in establishing a conspiracy charge."); United States v. Walker, 922 F.Supp. 732, 739 (N.D.N.Y. 1996) ("[D]etailed evidence of a conspiracy is generally unavailable to defendants through a bill of particulars, and overt acts in furtherance of the conspiracy need not be disclosed."); United States v. Feola, 651 F.Supp. 1068, 1132 (S.D.N.Y. 1987), aff'd, 875 F.2d 857 (2d Cir. 1989) ("It is well settled that defendants need not know the means by which it is claimed they performed acts in furtherance of the conspiracy nor the evidence which the Government intends to adduce to prove their criminal acts.")

Second, the Government has turned over more than sufficient information through discovery to put Defendant on notice of the acts charged. The Government has disclosed the names of the 12 victims mentioned in the Superseding Indictment and has provided emails and texts that indicate specific instances of attempts to defraud. (See Gov't Opp'n at 26) ("Here, the government has produced Rule 16 discovery which included, inter alia, emails and text messages which evidence both brothers' tactics to defraud their victims, the dates of those emails and text messages, fraudulent documents sent to victims, and communications with the defendants and their employer. . . the government has provided the names of each of the victims identified in the Superseding Indictment as Victims 1 through 12, as well as the names of the corporate entities identified in the Superseding Indictment.")[4] This discovery, in concert with the SI, is more than enough to put Defendants on notice and allow them to prepare a defense. A bill of particulars at this point would only serve to impermissibly require the Government to lay out its proof before trial. See United States v. Abakporo, 959 F. Supp. 2d 382, 393 (S.D.N.Y. 2013); see also United States v. Carpenter, No. 18- CR-362, 2018 WL 6933160, at *6 (E.D.N.Y. Dec. 28, 2018) (denying motion for bill of particulars because "[t]he Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crimes charged, or a preview of the Government's evidence or legal theories.")

Finally, the Court rejects Defendants' overarching concern that "the vague Superseding Indictment and extensive volume of complex discovery threatens a trial by surprise or confusion." (D. Kaplan Reply at 9; see also A. Kaplan Reply at 18.) Defendants both cite to United States v. Bortnovsky, 820 F.2d 572, 575 (2d Cir. 1987), for the proposition that the Government cannot

---

[4] Moreover, as to Adam, the Government represents that it "walked through the evidence by phone on numerous occasions with Adam Kaplan's prior counsel and provided detailed descriptions of the allegations and the evidence the government will show at trial to prove the defendants' guilt." (Gov't Opp'n at 26.)

fulfill its obligation under Rule 7 "merely by providing mountains of documents to defense counsel who were left unguided . . ."  Defendants, however, ignore that the basis of the ruling in <u>Bortnovsky</u> was that the "relevance of key events was shrouded in mystery at the commencement of and throughout the trial."  <u>Id.</u> at 575.  Here, on the contrary, Defendants have been apprised of the relevance of key events and the specific nature of their alleged crimes.  Again, Defendants were made aware of the names of the 12 victims and of the corporate entities described therein, as well of the date ranges of the alleged criminal acts.  (<u>See</u> Gov't Opp'n at 26.)

Moreover, the SI defines limited periods over five years as to when the acts took place. (<u>See, e.g.</u>, SI ¶¶ 8-24) (alleging that the Advisory Fraud Scheme took place from May 2018— November 2022 and describing the 12 Victims and relevant financial institutions); (<u>id.</u> ¶¶ 41-42) (alleging that the Kaplans conspired to commit money laundering  from May 2018 to July 2023 to conceal the proceeds of wire fraud activity); (<u>id.</u> ¶¶ 43-46) (describing the period from January 2023 to September 2024 where Adam Kaplan allegedly defrauded Victims 9 through 12); (<u>id.</u> ¶¶ 47-50) (alleging that between May 2023 and October 2023, Adam Kaplan attempted to obstruct justice.)   The SI thus describes the acts alleged against Defendants with enough specificity to provide the necessary context for the Government's "voluminous" discovery.  <u>See</u> <u>United States v. Hashmi</u>, No. 06 CRIM. 442, 2009 WL 4042841, at *4 (S.D.N.Y. Nov. 18, 2009) ("Moreover, in addition to providing language that goes beyond the statute in the elements of the charge, the Indictment provides a fairly narrow date range of approximately two and a half years in which Hashmi's conduct allegedly occurred.")[5]   Therefore, the Court is satisfied that the

---

[5] Daniel cites <u>Hashmi</u> for the proposition that "[c]ases rejecting challenges to the specificity of an indictment typically involve time periods of days, weeks, or months—or *at most* a couple of years—and include other facts that give the defendant sufficient notice of the specific crimes charged."  (D. Kaplan Br. at 15 n.6.) (emphasis in original) The Court, however, rejects the notion that <u>Hashmi</u> in any way stands for the proposition that "a couple of years" sets an outer bound as to the extent of time an indictment must be constrained.  This conclusion should be evident due to the <u>Hashmi</u> court's finding that the indictment's date range of two and a half years was "<u>a fairly narrow date range.</u>"  <u>See id.</u> (emphasis added).  Similarly, the Court here finds the SI's four-year date range as to the Advisory Fraud Scheme to be well within the boundary to put Defendants on notice of the specific acts charged against them.

Government is not attempting to satisfy its obligations under Rule 7 by simply throwing mountains of discovery at Defendants without context, as proscribed by <u>Bortnovsky</u>. The specificity of the SI, in conjunction with the Government's productions, provides sufficient notice to Defendants to prepare a defense at trial. The Court therefore rejects Defendants' request for a bill of particulars or for dismissal as to these counts.

### D.    **Defendants' Motion for Severance of Counts and Trials**

Defendants next move for severance of their trials, or, in the alternative, severance as to Counts 17–21 with respect to Adam. Daniel argues that holding a joint trial with Adam would result in "'unacceptable spillover prejudice.'" (D. Kaplan Br. at 20 (quoting <u>United States v. Spinelli</u>, 352 F.3d 48, 55 (2d Cir. 2003)).) Daniel thus seeks to sever his trial from Adam's. Adam seeks to sever Counts 17-21, arguing that these counts lack factual overlap with the underlying financial fraud scheme such that a joined trial would purportedly "risk substantial prejudice." (A. Kaplan Br. at 32.) The Court addresses each of these requests for severance in turn.

### 1.    **Applicable Law**

Joinder under Rule 8(a) is appropriate where the counts "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). Counts that have a "sufficient logical connection" to each other can be tried together, <u>United States v. Ruiz</u>, 894 F.2d 501, 505 (2d Cir. 1990), as can those "where the same evidence may be used to prove each count," <u>United States v. Blakney</u>, 941 F.2d 114, 116 (2d Cir. 1991). Joinder of counts also is appropriate where the evidence proving the counts is "interconnected and overlapping," <u>United States v. Amato</u>, 15 F.3d 230, 236 (2d Cir. 1994), such as through "some substantial identity of facts or participants" or because they "arise out of a common plan or scheme," <u>United States v. Pizarro</u>, No. 19-CR-2391, 2023 WL

16

3332539, at *2 (2d Cir. May 10, 2023).  These considerations amount to courts using a "common sense approach when considering the propriety of joinder."   United States v. Feyrer, 333 F.3d 110, 114 (2d Cir. 2003).  Finally, Courts in this Circuit have "interpreted Rule 8(a) as providing a liberal standard for joinder of offenses," United States v. Wilson, 512 F. App'x 75, 76 (2d Cir. 2013), which "reflects a policy determination that gains in trial efficiency outweigh the recognized prejudice that accrues to the accused" when offenses are tried together, United States v. Turoff, 853 F.2d 1037, 1042 (2d Cir. 1988).

Rule 8(b) permits "joinder of two or more defendants 'if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions, constituting an offense or offenses.'"   United States v. Rittweger, 524 F.3d 171, 177 (2d Cir. 2008) (quoting Fed. R. Crim. P. 8(b)).  "[J]oinder is proper where two or more persons' criminal acts are unified by some substantial identity of facts or participants, or arise out of a common plan or scheme."  United States v. Cervone, 907 F.2d 332, 341 (2d Cir. 1990) (cleaned up).  Courts also "apply a 'commonsense rule' to decide whether, in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice to either or both of the defendants resulting from the joinder."  United States v. Shellef, 507 F.3d 82, 98 (2d Cir. 2007).

If the joinder of offenses "appears to prejudice a defendant or the government, the court may order separate trials of counts . . . or provide any other relief that justice requires."  Fed. R. Crim. P. 14(a).  When one defendant seeks to be severed from a co-defendant's trial, severance is warranted where "the sheer volume and magnitude of the evidence against one defendant so dwarfs the proof presented against his co-defendant[s] that a severance is required to prevent unacceptable spillover prejudice."  Spinelli, 352 F.3d at 55.  Because Rule 8 joinder inherently "authorizes some prejudice," a defendant who "seeks separate trials under Rule 14 carries a heavy burden of showing

17

that joinder will result in 'substantial prejudice.'" <u>Amato</u>, 15 F.3d at 237.  The defendant must show prejudice that is "unfair," and "not merely that [the defendant] might have had a better chance for acquittal at a separate trial." <u>United States v. Page</u>, 657 F.3d 126, 129 (2d Cir. 2011); <u>see also</u> <u>United States v. Werner</u>, 620 F.2d 922, 929 (2d Cir. 1980) (substantial prejudice requires more than "the adverse effect of being tried for two crimes rather than one").  Furthermore, the prejudice must be "sufficiently severe to outweigh the judicial economy" of a joint trial.  <u>Page</u>, 657 F.3d at 129.

Because Rule 14 explicitly permits a district court to "provide any other relief that justice requires," Fed. R. Crim. P. 14(a), the rule "does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." <u>Zafiro v. United States</u>, 506 U.S. 534, 538-39 (1993).  Even in the rare circumstances where "the risk of prejudice is high," severance is not required, as "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." <u>Id.</u> at 539.

### 2.     The Court Denies Daniel's Request to Sever Trials

Here, Daniel argues that a joint trial risks unfair prejudice "[b]ecause the government will present far more evidence of Adam's alleged wrongdoing—which will also be of a different quality than its evidence against Daniel and as to wholly separate counts . . ." (D. Kaplan Br. at 20.   Additionally, Daniel raises concerns that because "Adam and Daniel Kaplan are indistinguishable twins" who "appear and sound the same," a jury is likely to confuse them for one another.  (<u>Id.</u> at 21.)  Furthermore, Daniel raises the possibility that the brothers will present "mutually antagonistic defenses," each claiming the other twin was the perpetrator.  (<u>Id.</u>)  Daniel argues that absent severance, he will be denied his constitutional right to confront Adam, who cannot be compelled to take the stand.  (<u>Id.</u>)  For these reasons, Daniel concludes that the Court should order separate trials for the two brothers.

Upon consideration of these arguments, the Court finds that Daniel has not met his "heavy burden" to compel severance. The unity of facts in the advisory fraud and money laundering schemes militates heavily in favor of trying the brothers together. Their charges involve the same witnesses, evidence, and experts—judicial economy will be served well by a singular trial. See Bruton v. United States, 391 U.S. 123, 134 (1968) (joint trials conserve state funds, diminish inconvenience to witnesses and avoid delays). None of Daniel's concerns overcome this strong interest in a joint trial.

Daniel's arguments ultimately stem from the concern that a jury will mistake Adam's more serious conduct for his own, leading to unfair spillover prejudice. This argument alone, however, is insufficient to warrant severance. See United States v. Hawit, No. 15-CR-252, 2017 WL 2271352, at *5 (E.D.N.Y. May 22, 2017) ("Indeed, the Second Circuit has long recognized that, differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials.") (internal quotations and citations omitted). Moreover, Daniel ignores the fact that most of the evidence against Adam would be admissible against Daniel in his own individual trial. See United States v. Rosa, 11 F.3d 315, 341 (2d Cir. 1993) ("A defendant's right to a fair trial does not include the right to exclude relevant and competent evidence. Thus, the fact that testimony against a codefendant may be harmful is not a ground for severance if that testimony would also be admissible against the moving defendant tried separately.") Furthermore, the Court is satisfied that evidence that would not be admissible against Daniel at his own trial, specifically with respect to Counts 18–21, can be sufficiently addressed by limiting instructions to the jury. See Zafiro, 506 U.S. at 538-39 (in circumstances where "the risk of prejudice is high, less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice"). The risk of unfair spillover prejudice, therefore, is minimal and would not be reduced by severed trials.

Additionally, insofar as Daniel believes that the conduct charged in Counts 20–21 (which only implicates Adam) would create spillover prejudice for him due to the similarities of the twin brothers, those concerns are allayed by the fact that the obstruction of justice charges against Adam are distinct from Daniel's underlying financial fraud in the time period they allegedly occurred, the nature of the conduct, and the evidence presented against Adam. Put another way, one reason that the jury will be able to distinguish the brothers is because Adam is charged with far different and arguably more nefarious conduct with respect to these counts. See United States v. Hernandez, 85 F.3d 1023, 1029 (2d Cir. 1996) (affirming district court's denial of defendant's motion for severance where the Government "introduce[ed] [] evidence concerning his codefendants' attempt to intimidate [a witness]" in part because "[t]he crimes for which [codefendants] were alone charged were adequately distinct from the crimes of which [the defendant seeking severance] was accused so that the evidence relating to each could be presented without any confusion or spillover effect.") Thus, the Court does not find that Daniel's concern on this ground overcomes the strong interest in proceeding with a joint trial, and the Court is satisfied that any risk of unfair prejudice can be overcome with limiting instructions.[6]

Finally, mutually antagonistic defenses do not raise substantial prejudice concerns here.

---

[6] Daniel disputes this point, citing to United States v. Monge, No. CR10863, 2011 WL 13176072, at *2 (D. Ariz. July 14, 2011). In Monge, the Magistrate Judge recommended severing the trial of two identical twins based on an argument the twins would assert mutually antagonistic defenses. The Court, however, finds Daniel's argument with respect to Monge unavailing. First, although the Magistrate Judge did recommend severance, District Court Judge Raner C. Collins overruled this decision, and ultimately decided to join the twins' trials. (See United States v. Monge et al, 4:10-cr-00863-RCC-CRP, ECF No. 311.) Second, even assuming the Magistrate Judge's reasoning had not been overruled, the Court does not share the same concerns here. Much of the evidence at trial will be in the form of documents and emails, which identify either Daniel, Adam, or both. Unlike Monge, this case does not contain the sort of eyewitness testimony that would result in confusion in the identification of one brother from the other. But see id. (describing this sort of concern in a drug distribution case, where "there is the possibility the witness misidentified which sister was involved in a given incident. Both sisters contend the other sister engaged in the criminal behavior and witnesses misidentified the innocent one.") Thus, the same concerns that led to the recommendation for severance in Monge are not applicable here, and the Court finds that any risk of prejudice with respect to the jury and trial witnesses can be cured with limiting instructions. See Monge, 2011 WL 13176072, at * 2 ("Jury instructions will often cure any risk of prejudice . . ."); see also United States v. Johnson, 219 F.3d 349, 357 (4th Cir. 2000) (upholding district court's refusal to sever a case involving identical twin defendants where, inter alia, "the district court provided a cautionary instruction to the jury to prevent it from grouping all of the evidence against both defendants. . .")

As the Second Circuit has made clear, "an adversarial stance by a codefendant clearly does not, alone, require trials to be severed.  Were this true, a virtual ban on multidefendant conspiracy trials would ensue since coconspirators raise many different and conflicting defenses."  United States v. Cardascia, 951 F.2d 474, 484-85 (2d Cir. 1991); see also United States v. Aronson, No. CR-12-0245, 2013 WL 868200, at *4 (E.D.N.Y. Mar. 7, 2013) (same).  Rather, to warrant severance, a Defendant must make "a factual demonstration that acceptance of one party's defense would tend to preclude the acquittal of [the] other."  United States v. Salameh, 152 F.3d 88, 116 (2d Cir. 1998).

Daniel makes no such showing here.  He provides a cursory argument "that Daniel will likely argue the government cannot prove beyond a reasonable doubt whether it was Daniel or Adam who engaged in any given act, and Adam is likely to argue the converse."  (D. Kaplan Reply at 11.)  These kinds of finger-pointing arguments, however, do not provide a basis for severance. See, e.g., United States v. Hameedi, No. 17-CR-137, 2017 WL 5152991, at *4 (S.D.N.Y. Nov. 3, 2017) ("The Second Circuit Court of Appeals has repeatedly rejected 'fingerpointing' arguments of this sort as a basis for severance."); United States v. Harwood, 998 F.2d 91 (2d Cir. 1993) (affirming denial of a motion for severance by two co-defendants who were arrested after the police found illegal narcotics in a van in which the defendants were traveling where each defendant argued that he did not know of the narcotics in the van and that the other defendant must have placed them there).  Additionally, Daniel's concern that he will be "denied his constitutional right to confront Adam, who cannot be compelled to take the stand under the Fifth Amendment" would not be cured by ordering separate trials.  (D. Kaplan Reply at 12.)  Even if the Court were to sever the trials, Adam could assert his Fifth Amendment right to avoid taking the stand.  Thus, Daniel's assertion that he would be materially prejudiced by a joint trial due to a denial of his right to confront Adam is unavailing, and there is no "serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment

about guilt or innocence." United States v. Schlegel, 687 Fed. App'x 27, 28 (2d Cir. 2017).

The Court therefore rejects Daniel's request to sever the brothers' trials.

### 3.    Counts 18 and 19 are Properly Joined and Are Not Subject to Mandatory Severance

Adam argues that Counts 18 and 19 must be severed under Fed. R. Crim. P. 8(b) or 8(a) because "Counts 18 and 19 do not share a 'substantial identity of facts or participants' or 'arise out of a common plan or scheme' with the other counts in the [SI]." (A. Kaplan Br. at 27-31.)  Adam further argues that Counts 18 and 19 are not "of the same or similar character" such that joinder is permissible under Rule 8(a).  (Id. at 31.)  In response, the Government argues that all of the counts in the SI are properly joined, as they are interconnected, share significant factual and evidentiary overlap, and reflect the continuation of criminal conduct by Adam Kaplan and his co-conspirators.  (Gov't Opp'n at 32.)  For the reasons that follow, Adam's motion to sever Counts 18 and 19 pursuant to Rule 8 is denied.

The Court finds that Counts 18 and 19 are properly joined, as they are interconnected, share significant factual and evidentiary overlap, and reflect the continuation of alleged criminal conduct by Adam Kaplan and his co-conspirators.  As the Government correctly notes:

> [T]he [SI] tells one story of how the defendants stole from their clients and attempted to cover up their fraud (Counts One through 17), and then, when law enforcement started closing in, Adam Kaplan took desperate measures to shield himself and his brother from the consequences of their illegal actions.  Adam Kaplan did that by (i) defrauding individuals and financial institutions to pay back (among others) their Advisory Fraud Scheme victims (Counts 18 and 19) and (ii) attempting to obstruct justice, including by attempting to threaten and bribe (among others) their Advisory Fraud Scheme victims (Counts 20 and 21).

(Gov't Opp'n at 32; see also SI.)

Despite Adam's arguments that Counts 18 and 19 do not share a "substantial identity of facts or participants" or "arise out of a common plan or scheme" with the other counts in the SI, the Court finds that there is a sufficient relationship between the counts such that joinder is

appropriate.[7]  (See Gov't Opp'n at 32.)  First, as the Government argues, the evidence that will be used to convict the defendants of Counts 1 through 17 and Counts 18 and 19 is interconnected and overlapping – there are overlapping facts and participants, including victim witnesses.  (See id. at 32-34.)  For example, Count 18 charges Adam with participating in a fraud scheme between January 2023 and September 2024 (the "Flower Fraud Scheme").  That scheme allegedly victimized some of the same individuals that were victims of the Advisory Fraud scheme, including the individual identified as Victim-12 in the Superseding Indictment, who is expected to testify that he was a victim of both the schemes.  (Id.)  Other individuals who may testify at trial are also alleged victims of both the Advisory Fraud Scheme and Flower Fraud Scheme.  (See Gov't Opp'n at 33 (citing SA Iannuzzi's September 9, 2024 affidavit attached to the Government's motion to revoke Adam Kaplan's bail ("the Affidavit"), ECF No. 105 ¶ 78).)

Additionally, the Government expects that CC-1 will testify at trial that one of the purposes behind the Flower Fraud Scheme charged in Count 18 and the bank fraud scheme charged in Count 19 was to generate funds to pay back, among others, victims of the Advisory Fraud Scheme (Counts One through 17), including the individual listed as Victim-8 in the Affidavit.  (See, e.g., Affidavit ¶¶ 79-82, 96, 115.)  And the identities of victims of the Advisory Fraud Scheme (Counts One through 17) were also used to perpetuate Adam's alleged credit card

---

[7] Even if the Court were to accept Adam's argument that under Rule 8(b) the Court is "limited to the language" in the indictment in evaluating whether severance is mandated, (see A. Kaplan Br. at 28, 30), the Court finds that joinder is appropriate.  The SI alleges and describes a series of fraud conspiracies used to victimize purported investment clients by stealing their money and concealing the fact that money was being stolen.  (SI ¶¶ 1-32.)  The Advisory Fraud conspiracy in Count 1 is alleged to have ended in or about November 2022, and shortly after, beginning in January 2023, Adam is alleged to have participated in the fraud conspiracies charged in Counts 18 and 19.  (Id. ¶¶ 33-34; 43-46.)  Adam is alleged to have worked with CC-1 in furtherance of these later fraudulent schemes partly in order "to pay back other individuals."  (Id. ¶¶ 25-27.)  Adam is also alleged to have paid CC-1 in an attempt to "influence, obstruct, and impede the EDNY Grand Jury investigation through attempts to threaten, injure, and pay off witnesses, and destroy evidence."  (Id. ¶¶ 28-32.)  Therefore, a fair reading of the SI demonstrates that Counts 18 and 19 are part of the "same series of acts or transactions," "are unified by some substantial identity of facts or participants," and "arise out of a common plan or scheme" such that joinder is appropriate.  See United States v. Valentin, 23-CR-292, 2024 WL 4444417, at *1 (E.D.N.Y. Oct. 8, 2024) (quoting Fed. R. Crim. P.8(b)).

fraud.  (See, e.g., Affidavit at ¶ 112.)  Thus, proof of the Advisory Fraud Scheme is "indispensable" for a "full understanding" of the crimes charged in Counts 18 and 19.

Second, there are overlapping witnesses regarding Counts 18-19 and Counts 20-21.  As noted by the Government, CC-1 is expected to testify that (i) he conspired with Adam to commit the crimes charged in Counts 18 and 19; and (ii) Adam attempted to obstruct justice (the crimes charged in Counts 20 and 21).  (See Gov't Opp'n at 33.)  Furthermore, many of the individuals that Adam allegedly attempted to bribe, threaten, or injure were victims of the Advisory Fraud Scheme, which is the basis for many of the charges in Counts 1 through 17.  For example, in the Affidavit, SA Iannuzzi explains how Adam directed CC-1 to create a "fictitious email," which was created to look like it was written by a specific Advisory Fraud Scheme victim.  (See Affidavit ¶¶ 10-13.) That victim is expected to testify at trial that he was a victim of the Advisory Fraud Scheme as well.  (See Gov't Opp'n at 33.)  Adam also allegedly directed CC-1 to threaten or bribe Advisory Fraud Scheme victims.  (See Affidavit ¶ 79.)  Additionally, several other bank frauds that Adam allegedly committed were purportedly for the purpose of paying CC-1 for CC-1's supposed efforts to obstruct justice.  (See id. ¶ 61.)

Therefore, Counts 18 and 19 are properly joined under Rule 8 and will not be severed.

### 4.    Counts 17-21 are Properly Joined and Will Not Be Severed

Adam next argues that the Court should exercise its discretion to sever Counts 17–21 pursuant to Fed. R. Crim. P. 14(a) to avoid undue prejudice to him and to address judicial economy and practical concerns.  (A. Kaplan Br. at 32-34.)  Despite Adam's arguments to the contrary, Counts 17–21 will not be severed because proof of the Advisory Fraud Scheme charged in Counts 1-17 is "indispensable" for a "full understanding" of the crimes charged in Counts 18, 19, 20, and

21.[8] (See Gov't Opp'n at 39.) Furthermore, evidence of the Advisory Fraud Scheme is highly relevant to establishing Adam's motive, knowledge, and intent for committing the crimes charges in Counts 18, 19, 20, 21. See United States v. Butler, No. 04-CR-340, 2004 WL 2274751, at *5–6 (S.D.N.Y. Oct. 7, 2004) (upholding joinder under Rule 8(b) where evidence relating to underlying shooting was likely admissible to prove motive and lack of mistake on an obstruction charge). Furthermore, separate trials would not promote judicial economy in this case as the evidence in each of the trials would overlap significantly, imposing undue burdens on the Court, jurors, and witnesses—some of whom are elderly, disabled, and have already expressed fear about testifying at one trial. (See Gov't Opp'n at 40); United States v. Lyles, 593 F.2d 182, 191 (2d Cir. 1979) (listing these factors). The burdens of a marginally longer trial on the defendants are thus significantly outweighed by these corresponding burdens from holding separate trials.

Finally, the joinder of Counts 17–21 does not create the risk of substantial prejudice to Adam, and even if there is a risk of prejudice, severance is not required because "less drastic measures, such as limiting instructions, [] will suffice to cure any risk of prejudice." Zafiro at 539. Based on this principle, courts in the Second Circuit have routinely rejected defendants' motions to sever obstruction counts from other counts in criminal trials. See, e.g., United States v. Hester, No. 19-CR-324, 2020 WL 3483702, at *22 (S.D.N.Y. June 26, 2020) (rejecting motion to sever obstruction count from felon-in-possession count); United States v. Riddles, No. 12-CR-556, 2013 WL 3975775, at *2 (S.D.N.Y. Aug. 5, 2013) (denying motion to sever despite defendant's argument that he would be unfairly prejudiced by "admission of graphic evidence" relating to kidnapping offenses in trial for narcotics conspiracy). This is especially true here, where evidence

---

[8] While Adam argues that he is unaware of the Government's theory as to Count 17, (see A. Kaplan Br. at 32), the Government notes that the money laundering conspiracy charged in Count 17 was related to the Advisory Fraud Scheme charged in counts 1-16 and involved conducting financial transactions with the proceeds of wire fraud. (See Gov't Opp'n at 32.) Adam's other arguments regarding dismissal and a bill of particulars as to Count 17 are addressed supra Sections II.A and II.C.

of the conduct underlying the obstruction charges would be admissible in a severed trial on the charges in Counts 1-17 to prove consciousness of guilt. See, e.g., United States v. Roldan-Zapata, 916 F.2d 795, 803-04 (2d Cir. 1990) (holding defendant's apparent attempt to limit a witness's testimony against him was relevant to show consciousness of guilt in narcotics prosecution); United States v. Triumph Capital Group, Inc., 544 F.3d 149, 160 (2d Cir. 2008) ("[Defendant]'s efforts to obstruct the investigation evidence a consciousness of guilt . . ."); United States v. Carpenter, 372 F. Supp. 3d 74, 80 (E.D.N.Y. 2019), aff'd, No. 21-837-CR, 2022 WL 16960577 (2d Cir. Nov. 16, 2022) ("The Second Circuit has found that evidence of obstructive conduct is admissible to demonstrate a Defendant's consciousness of guilt.").

Similarly, evidence of Counts 1–17 would be admissible in a severed trial on the obstruction of justice charges.  See United States v. Willoghby, 860 F.2d 15, 24 (2d Cir. 1988) ("When a defendant has been charged with attempted or actual obstruction of justice with respect to a given crime, evidence of the underlying crime and the defendant's part in it is admissible to show the motive for his efforts to interference with the judicial processes.")  Thus, trying these counts together with the rest of the counts in the SI serves judicial economy without causing unfair prejudice, and Adam's motion to sever Counts 17–21 is denied.

**E.**    **Defendants' Motion for Partial Release of the CWT File**

Defendants also ask this Court to Order the Kaplans' former counsel, non-party CWT, to release part of its case file (the "File") that it generated while representing Defendants in the period from August 2021 to November 2022.  Defendants claim to seek a "limited subset" of the File, which according to them, contains the interview notes of thirty-three potential trial

witnesses.[9]  (D. Kaplan Br. at 24.)  For the following reasons, the Court denies Defendants' request for the Court to order CWT to turn over part of its file.

The Court assumes familiarity with the background of the CWT file saga and recapitulates only the relevant details here.  CWT began representing Defendants in August 2021, two years prior to the original Indictment.  CWT claims that during this period, the Kaplans refused to pay about $1.2 million in outstanding fees and had started to engage separate counsel, which led to CWT terminating its representation of November of 2022.  (See ECF No. 197 (("CWT Br.") at 4.)  In March 2023, the SEC sued the Defendants.  See SEC v. Adam S. Kaplan and Daniel E. Kaplan, No. 2:23-CV-01648 (JMA) (ARL).  Separately, in June of 2023, the Kaplans brought a state court action (the "State Court Action") against CWT and a former CWT partner, alleging malpractice, challenging CWT's fees, and demanding CWT turn over the File.  See Kaplan v. Cadwalader Wickersham & Taft, LLP, No. 609236/2023 (Sup. Ct. Nassau Cnty. June 26, 2023).  The State Court Action remains pending, with a trial date set for March 2026.  Defendants are currently represented by private retained counsel in the instant criminal case, the SEC Action, and the State Court Action.

Throughout the course of these separate litigations, CWT has refused to turn over any part of the File, maintaining that it has a valid retaining lien based on the Kaplans' refusal to pay their fees.  (See CWT Br. at 4.)  The existence of this retaining lien has been the basis for at least five separate rulings rejecting Defendants' request for the File over the last three years, including by the undersigned.  (See, e.g., ECF No. 30 (Judge Wicks denying Kaplans' motion to compel release of the File); ECF No. 43 (the undersigned denying objections for the same relief and adopting

---

[9] CWT disputes the total number of witness interviews, claiming that there were "far fewer than thirty-three interviews and they were all conducted more than nine months before the criminal indictment was issued in EDNY and more than two years before the Superseding Indictment."  (CWT Br. at 5.)  The Court assumes, arguendo, that there are notes from thirty-three witness interviews, although for the following reasons, the exact number of interviews is irrelevant.

Judge Wicks' opinion); <u>SEC v. Adam S. Kaplan and Daniel E. Kaplan</u>, No. 2:23-CV-01648, ECF No. 35 (Judge Lindsay denying motion to compel); State Court Action, Dkt. No. 90 (Judge Driscoll denying immediate relief on the Kaplans' motion to compel release of the File); Dkt No. 111 (same).) Most importantly, Judge Wicks denied the Kaplans' earlier to motion compel production of the file and this Court adopted Judge Wicks' decision and denied the Kaplans' objections.

Now, Defendants ask this Court again for the same relief. They advance the same primary arguments along with two additional considerations: (1) they now only seek a subset of the File, instead of its entirety; and (2) Defendants' criminal trial is swiftly approaching. For the following reasons, however, neither these two developments nor any of the arguments advanced by Defendants persuade the Court to disturb its prior ruling.

As the undersigned made clear almost two years ago in the adoption of Judge Wicks' Order denying the original motion to compel, the instant dispute is governed by the precedent set forth in <u>Pomerantz v. Schandler</u>, 704 F.2d 681 (2d Cir. 1983). There, the Second Circuit explained that to defeat an otherwise valid retaining lien where a former client demands it to pursue his criminal defense, the client must show "(1) the urgent need (other than generalized statements of need), (2) the prejudice that would occur, and (3) their inability to pay fees or at least post security." (ECF No. 30 at 15.) The Court adopted Judge Wicks' holding that the "Defendants here fail to satisfy the three relevant factors articulated in <u>Pomerantz</u>." (<u>Id.</u>)

If—as Defendants assert—the <u>Pomerantz</u> framework evaporated as trial approached, the intended pressure of the retaining lien would vanish. A defendant could simply refuse to pay his attorney on the eve of trial and demand all the work produced over the course of the representation. This would defeat the point of retaining liens. <u>See</u> <u>Pomerantz</u>, 704 F.2d 681 at 683 ("The purpose of the lien is to assist the attorney in preventing a client from refusing or failing to pay charges justly due. To permit a client in arrears to obtain the use of the papers would rob the lien of its

intended force."); see also In re San Juan Gold, 96 F.2d 60, 60 (2d Cir. 1938) ("The attorney's lien cannot be disregarded merely because the pressure it is supposed to exert becomes effective.")

Here, the Kaplans do not meet the first, second, or third Pomerantz factors. With respect to the first and second factors, Defendants have not demonstrated an urgent need and prejudice by merely asserting in a brief that "CWT attorneys advised the Kaplans that the thirty-three witnesses had provided information that was exculpatory or useful at trial to impeach their testimony." (D. Kaplan Br. at 31.) Defendants have not provided an affidavit, declaration, or any other evidence supporting this purported statement. That conclusory assertion in Daniel's brief is insufficient to demonstrate an urgent need or that Defendants would be prejudiced if the witness interviews are withheld. These witness interviews occurred nearly four years ago, and Defendants provide no information on their content or their purported relevance at trial, save the sole assertion above. It is also notable that—in what is now their third bite at the apple in this criminal case—Defendants have never even asked this Court to conduct an in-camera review of the CWT File to determine whether it contains any materials that are necessary for their defense. In sum, Defendants' threadbare assertion that CWT attorneys at some time allegedly stated that there were some materials useful for Defendants' trial defense is not sufficient to meet the first and second Pomerantz factors.

Additionally, as explained in this Court's original Order, even assuming Defendants could meet the other Pomerantz factors, Defendants still refuse to even attempt to satisfy the final factor, which is "standing alone, fatal to their motion." (ECF No. 43 at 4.)

Crucially, Defendants did not attempt to make any showing of an inability to pay, claiming that this showing might potentially implicate their Fifth Amendment right to avoid self-incrimination. (Id. at 17.) Both Judge Wicks and the undersigned, however, rejected this argument, holding specifically that:

29

there were other avenues to address Defendants' purported Fifth Amendment concerns that they never pursued. Defendants could have offered to submit affidavits concerning their finances under seal for the Court to review in camera. Defendants also could have asked the Court to rule, prior to the submission of financial affidavits, that the Government be precluded from using such filings to prove Defendants' guilt at trial. Defendants never pursued either of these options . . . Defendants' failure to meet this element of Pomerantz is, standing alone, fatal to their motion.

(ECF No. 43. at 3-4)

In their renewed motion to compel, Defendants do not seek to pursue any of the avenues suggested above.  Nor do they propose any other potential mechanisms to address their purported Fifth Amendment concerns.  Instead, Defendants insist that they cannot be required to make any showing with respect to their ability to pay.  They insist that "nothing in Pomerantz suggests courts may—let alone must—compel a financial showing where doing so would threaten the defendant's Fifth Amendment rights."  (D. Kaplan Br. at 34.)  Defendants further argue that "Pomerantz is silent as to how courts should assess a defendant's ability to pay where doing so presents constitutional problems."  (Id.)

The Court finds no merit to these arguments.[10]  The undersigned has already held that "[t]he Pomerantz framework controls here and is applicable even after a defendant has been indicted.  In applying Pomerantz, the Court has considered—in the context of this specific case—the potential impact of Cadwalader's retaining lien on Defendants' constitutional rights, including their rights under the Fifth and Sixth Amendments."  (ECF No. 43 at 3.)

Here, Defendants refuse to submit any type of sealed ex parte affidavits about their ability to pay and refuse to even ask the Court to conduct an in camera review regarding Defendants'

---

[10] Defendants point out that the briefs in Pomerantz—which they obtained after the original motion to compel—did not raise any Fifth or Sixth Amendment concerns.  As such, Defendant assert that "[t]he [Fifth and Sixth Amendment] issue[s]" that they are raising now were "not before the Circuit" in Pomerantz.  (D. Kaplan Br. at 34.)  Although Pomerantz did not address potential Fifth Amendment challenges to its framework, this Court already did and adheres to its earlier determination that Defendants' arguments concerning the Fifth Amendment do not eliminate Pomerantz's third prong, particularly given the multiple avenues for addressing any Fifth Amendment concerns set out herein.

financial status.  Instead, Defendants summarily argue that "[r]equiring Daniel to make a financial showing, when that showing could indicate loss amounts different from what the government expects, would violate his Fifth Amendment rights at sentencing.  And neither the government nor the Court could unsee the financial information produced."  (D. Kaplan Br. at 36-37.)  Neither of these concerns, however, seriously implicate Defendants' Fifth Amendment rights.[11]    And Defendants cite no legal authority demonstrating that making such a financial showing to the Court would violate their Fifth Amendment rights.  With respect to Defendants' arguments about the Government obtaining Defendants' financial information, Defendants could have filed any affidavit ex parte and under seal for an in camera review by the Court.  As for Defendants' arguments the Court, judges routinely have access to evidence that they find inadmissible under the Fifth Amendment (or that they suppress on various other grounds) yet can still sentence defendants without violating their rights.  Defendants' vague and conclusory statement that the Court cannot "unsee the financial information produced" is not sufficient to raise a genuine Fifth Amendment concern.[12]  (Id.)  The Court finds these arguments unavailing.

Defendants are entirely within their rights to continue to refuse to pursue any of the numerous alternatives offered by CWT to resolve the retaining lien.  They are also entirely within their rights to continue pursuing relief in the State Court Action to recover the File.  This Court, however, will not fashion a remedy for Defendants that they are not entitled to simply because trial is approaching.

---

[11] Defendants assert that if they were to show that they are unable to pay fees or post security, that such a showing could somehow be used at sentencing to establish "loss amounts different from what the government expects."  (D. Kaplan Br. at 37.)  Defendants never explain this confusing assertion.  In any event, as explained infra, the Court would not permit the Government to use (or even see) any such submission by Defendants and the Court would not consider, in any fashion, such a submission at sentencing.

[12] Furthermore, were this a legitimate concern, the Court could have a different judge review any financial affidavit under seal and in camera in order to determine if Defendants meet the third Pomerantz factor.

Finally, there is nothing of import in the fact that Defendants now seek only a subset of the File, as opposed to its entirety. The retaining lien applies to the entire File and, for the foregoing reasons, CWT is within its rights to refuse to turn over any portion. Therefore, the Court does not see any merit to ordering partial release of the File.

For the foregoing reasons, Defendants' request to compel a portion of the CWT File is once again denied.

### F.    Defendant Adam Kaplan's Motion to Suppress Cell Phone Evidence Obtained During His Arrest

Adam next moves to suppress the Subject Phone and all evidence derived from it, claiming that its seizure during his arrest violated his Fourth Amendment rights. (A. Kaplan Br. at 5-15.) In response, the Government argues that Adam lacks standing to challenge the seizure and search of the Subject Phone and that regardless, it was lawfully seized because it was in plain view during his arrest. (Gov't Opp'n at 46.) Furthermore, the Government argues that since Adam has failed to establish a material issue of fact, his suppression motion should be denied without a hearing. (Id.) For the reasons that follow, Adam's motion to suppress the Subject Phone and related evidence is denied without the need for a hearing.

#### 1.    Relevant Facts

On September 11, 2024, pursuant to a judicially authorized warrant, FBI agents arrested Adam Kaplan at his parents' home (the "Residence"), where Adam was living. While the FBI was executing the arrest warrant at the Residence, law enforcement agents saw the Subject Device in the living room and seized it. Adam's arrest and the discovery of the Subject Device was captured on the body cameras worn by the FBI agents executing the arrest warrant, including SA Iannuzzi and the FBI special agent who discovered the Subject Device ("SA-1").[13]

---

[13] The Court will refer to the Iannuzzi's body camera video as Ex. 1 and to the SA-1's body camera video as Ex. 2, which is the same way they are referenced in Adam's brief and the government's opposition brief.

After agents knocked and announced their presence, Adam's father answered the door and eventually let them into the Residence. (Ex. 1 at 3:58–4:36.) SA Iannuzzi and another agent were the first to enter and followed Adam's father towards the back of the Residence. (Id. at 4:36–4:50.) After Adam's father first answered the door, SA Iannuzzi asked multiple times for Adam's location in the Residence. (Id. at 4:02–4:42.) Adam's father was initially unresponsive until he finally stated, "he's either here [referencing a room at the very back of the Residence, behind the kitchen] or downstairs." (Id. at 4:46.) As SA Iannuzzi went to the back of the Residence to search for Adam, SA-1, who was the third agent to enter the Residence, immediately began searching for Adam in the front of the house. (Ex. 2, 4:40–5:00.)

SA-1 first shined his flashlight up the stairs before walking into the living room, which adjoined the foyer through an open entryway. (Id. at 4:45–5:00.) SA-1 then searched the living room, shining the flashlight throughout the room. (Id. at 5:00–5:30.) During the course of scanning the room, SA-1 observed several items (the "Subject Items"), including the Subject Phone, a Florida driver's license belonging to Adam Kaplan, two other cell phones, a bank card in the name of co-defendant Daniel Kaplan, and various keys that were placed on the cushioned windowsill that was no more than several feet from where SA-1 was standing at the time. (Id. at 4:58–5:20; see A. Kaplan Br., Exhibit 10 (photo of Subject Items as they were found when SA-1 observed them).) Immediately after glancing at the Subject Items, SA-1 called another agent over to look at the items. (Ex. 2, 5:43.) As the other agent looked them over, SA-1 drew the agent's attention to the driver's license by saying "Adam Kaplan." (Id. at 5:43–5:54.) At approximately the same time, SA Iannuzzi and several other agents made their way to the basement, located Adam, and placed him under arrest. (Ex. 1, 4:58–6:00.)[14]

---

[14] After Adam was arrested, the FBI agents turned their body cameras off.

After arresting Adam, SA Iannuzzi was directed to the Subject Items, where he observed the three cell phones, including the Subject Phone (collectively, the "Cell Phones"). SA Iannuzzi knew the color, make and model of the burner phone from CC-1 but called the burner phone's number to confirm that he had correctly identified Adam's phone, as there also was a second black iPhone next to Adam's driver's license.[15] The Subject Phone rang after being called and was seized as evidence. On September 16, 2024, five days after it was seized, the Government obtained a search warrant for the Subject Phone, signed by the Honorable Steven I. Locke, United States Magistrate Judge.

## 2. Applicable Law

The Fourth Amendment to the Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. Consequently, "searches and seizures inside a home without a warrant, are presumptively unreasonable." United States v. Delva, 858 F.3d 135, 147 (2d Cir. 2017). However, a warrantless search of a dwelling is lawful under certain conditions. In Maryland v. Buie, the Supreme Court identified three types of searches that are permissible during an in-home arrest. 494 U.S. 325, 332-333 (1990). First, when agents with an arrest warrant have probable cause to believe that the target is in a subject premises, they are "entitled to enter and to search anywhere in the house in which [the arrestee] could be found." Id. at 333. Second, "because of the risks inherent in taking an individual into custody, officers are automatically justified in searching as 'an incident to the arrest' the area adjoining the arrest 'from which an attack could immediately be

---

[15] Prior to the Government obtaining the arrest warrant for Adam Kaplan, CC-1 informed law enforcement that he had provided Adam and Daniel with burner phones for the purpose of avoiding detection by law enforcement. (Affidavit ¶ 6.) The phones were in the name of CC-1. (Id.) Adam was known to be using a burner phone with a phone number ending in 3046 and a separate burner phone with a phone number in 2879 to communicate with CC-1. (Id. ¶¶6, 132.) The Subject Phone had the phone number ending in 2879, and Adam started using this phone on January 12, 2024 while he was on bond. (Id. ¶ 132.)

launched.'" <u>United States v. Moran-Vargas</u>, 376 F.3d 112, 115 (2d Cir. 2004) (quoting <u>Buie</u>, 494 U.S. at 334). Third, "for officers to search further in a protective sweep, 'there must be articulable facts which, taken together with the rational inferences from those facts would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" <u>Id.</u> (quoting <u>Buie</u>, 494 U.S. at 334).

During the course of the searches outlined above, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant[,]" under the "plain view doctrine." <u>Minnesota v. Dickerson</u>, 508 U.S. 366, 375 (1993); <u>see also</u> <u>United States v. Babilonia</u>, 854 F. 3d 163, 179-180 (2d. Cir. 2017). When an officer, during a justified intrusion, encounters incriminating evidence, "[t]he doctrine serves to supplement the prior justification— whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused— and permits the warrantless seizure." <u>Horton v. California</u>, 496 U.S. 128, 135-36 (1990).

The plain view exception authorizes seizure not only of apparent contraband, but also of cell phones or other everyday items that officers have probable cause to believe may contain evidence of a crime. <u>Babilonia</u>, 854 F.3d at 180-81 (affirming denial of suppression of phone evidence seized in plain view and noting that "[s]eizure of everyday objects in plain view is justified where the officers have probable cause to believe that the objects contain or constitute evidence"); <u>see also</u> <u>United States v. Cushnie</u>, No. 14-CR-119, 2014 WL 7447149, at *12 (S.D.N.Y. Dec. 31, 2014) (upholding warrantless seizure of defendant's cell phone, keys, and wallet where marshals had reason to believe they would provide evidence of defendant's interstate travel and failure to register as a sex offender). Seizure does not require "an unduly high degree of certainty as to the incriminatory character of evidence[,]" but rather a "practical, nontechnical

probability that incriminating evidence is involved." Texas v. Brown, 460 U.S. 730, 741-42 (1983); see also United States v. Delva, 12-CR-802, 13 F. Supp. 3d 269, 276 (S.D.N.Y. March 11, 2014) ("It is not necessary that an officer know with certainty that an object seized is or contains evidence of a crime at the moment of seizure; it is enough that there be probable cause to associate the object with criminal activity.").

### 3.    Discussion

Adam moves to suppress the Subject Phone and all evidence derived from it, claiming that its seizure during his arrest violated his Fourth Amendment rights. (A. Kaplan Br. at 5-15.) The Government responds that SA-1 observed the Subject Items in plain view while searching the living room looking for Adam Kaplan, pursuant to a lawfully obtained warrant for his arrest that entitled SA-1 and the other agents at the scene "to enter and search anywhere in the house in which [Adam Kaplan] might be found." See Buie, 494 U.S. at 333; see also Moran Vargas, 376 F.3d at 115. For the reasons that follow, the Court agrees with the Government.[16]

As demonstrated by the body camera footage, SA-1 observed the Subject Items, including the Subject Phone, less than 30 seconds after entering the Residence, while he was in the living room searching for Adam Kaplan. (Ex. 2, 4:40–5:08.) As outlined above, (see supra pp. 32-34), when SA-1 walked towards the large bay window in the living room to search that corner of the room, he was positioned next to the Subject Items, which he clearly observed before Adam was in custody. Indeed, the radio call to deactivate the body cameras—given once Adam was secured by agents in the basement—was more than one minute after SA-1 first observed the Subject Items. (Ex. 2, 6:13.) Thus, the record reflects that the Subject Items were discovered while SA-1 was lawfully searching for Adam, not during a protective sweep after Adam was in custody. See United

---

[16] With regards to the Government's argument that Adam lacks standing to challenge this seizure, the Court finds that Adam has a reasonable expectation of privacy in the premises searched that is sufficient to confer standing to challenge the seizure of the phone. (See ECF No. 203, Declaration of Adam Kaplan; id. Exs. A, B.)

States v. Olejniczak, 2017 U.S. Dist. LEXIS 189898, *17 (W.D.N.Y. August 17, 2017) (in denying a motion for suppression, the court held that "the government has shown that the SWAT team discovered the evidence while searching for the defendant in his residence . . .").

Here, the three prongs of the plain view doctrine are satisfied, as: (1) SA-1 was lawfully in a position from which he could view the Subject Phone; (2) its incriminating character was immediately apparent; and (3) SA-1 and the law enforcement officers on the scene had a lawful right of access to the Subject Phone.  See Dickerson, 508 U.S. at 375.  As previously noted, SA-1 first observed the Subject Phone during a search to locate and arrest Adam Kaplan.  Accordingly, SA-1 was "lawfully in a position from which [he] could view" the Subject Phone and had a "lawful right of access" to it, the first and third prongs of the doctrine.  See id. at 375.  Furthermore, SA-1's Body Camera confirms that no extra steps to alter or disturb the area occurred before SA-1 first observed the Subject Phone.

Adam retorts that the incriminating nature of the Subject Phone was not immediately apparent.  (A. Kaplan. Br. at 12-14.)  However, as detailed in the Affidavit—which was drafted before the search and was attached to the Government's motion to revoke Adam Kaplan's bail (the "Affidavit"), (ECF No. 105), the Government already had substantial evidence establishing that Adam used cell phones to commit the alleged crimes underlying the arrest warrant.  The Affidavit outlines roughly 50 pages worth of evidence demonstrating Adam's reliance on cell phones to facilitate his alleged criminal activities for approximately a year, ending in September 2024, just prior to his arrest.  (See ECF No. 105.)  The evidence includes various cell-phone communications between CC-1 and Adam.  For instance, the Affidavit recounts that Adam used cell phones to communicate with CC-1 in connection with a flower selling scheme to defraud investors; attempts to tamper with, threaten and pay off witnesses; attempts to bribe law enforcement and court personnel; a credit card fraud scheme; as well as other unlawful and violative conduct (i.e.,

fabricating evidence to cover up his crimes and continuing to solicit financial services clients). (See id.)  Based on this evidence, an arrest warrant was issued for Adam.  (ECF No. 106.)  Thus, the evidence set forth in the Affidavit supported probable cause for the aforementioned warrant and certainly provided sufficient probable cause for the seizure of the Subject Phone.

Several courts have denied motions to suppress where law enforcement seized a phone found in plain view during an arrest and subsequently obtained a warrant to search that phone's digital contents.  See Babilonia, 854 F.3d at 180 ("Based on this record, we are not troubled by the agents' warrantless seizure of Key's cell phones, iPad, and address book, particularly as the agents did not search the electronic devices until after a warrant had been obtained."); United States v. Mejia, No. 24-CR-212, 2025 WL 934343, at *9 (S.D.N.Y. Mar. 27, 2025) (finding seizure was appropriate given evidence that cell phones were used to commit the underlying crime and "[l]ike in Babilonia, law enforcement officers did not search the iPhone until several days later after obtaining a search warrant.").

In Babilonia, the Second Circuit affirmed the seizure of numerous cell phones under the plain view doctrine during the execution of an arrest warrant at the defendant's residence.  854 F.3d at 180-181.  The defendant in Babilonia was the subject of a months-long investigation into narcotics dealing and his involvement in a murder-for-hire conspiracy, which revealed that he used multiple cell phones in connection with his criminal activities.  Id. at 180.  Agents executing the arrest warrant at the defendant's residence observed "a number of cell phones" on a table in the living room.  Id. at 172.  The Second Circuit held that the evidence "established probable cause to believe the items in question would contain evidence of [the defendant's] criminal activity" and that the arresting agent was justified in seizing all of the phones under the plain view doctrine.  Id. 180-181.  The Court further explained that the "[s]eizure of everyday objects in plain view is justified where the officers have probable cause to believe that the objects contain or constitute

evidence." Id. at 180; see also United States v. Chierchio, No. 20-CR-306, 2022 WL 523603, at *11 (E.D.N.Y. Feb. 22, 2022) (finding that probable cause was present where "the government's investigation had persisted for months; multiple cell phones were involved in the conspiracies charged; wiretaps had suggested the defendant and his co-conspirators were using their phones to advance the conspiracies; and there was reason to believe that additional evidence might be located on the phones.")

Similarly, in this case, federal agents had been investigating Adam's crimes for months, including through interviewing witnesses and reviewing cell phone evidence. (See Gov't Opp'n at 57.) The Affidavit established that Adam used multiple cell phones to communicate with CC-1 in furtherance of his alleged criminal activity, which occurred over an extended period of time. (See Affidavit.) Accordingly, the incriminating character of the Subject Phone was readily apparent. Indeed, like in Babilonia, agents would have been justified in seizing all of the phones on the windowsill, not just the Subject Phone.

Moreover, "[t]he Second Circuit has held that the temporary seizure of electronic devices 'is justified where the officers have probable cause to believe [they] contain or constitute evidence' so long as the government does not search a device 'until after a warrant [has] been obtained.'" Chierchio, 2022 WL 523603, at *10 (quoting Babilonia, 854 F.3d at 180.) Here, the Subject Phone was seized on September 11, 2024, and the Government waited just five days, including a weekend, to apply for a search warrant. Thus, the Court finds that the Government promptly sought and obtained a search warrant for the Subject Phone after its seizure, complying with the dictates set forth by the Circuit in Babilonia.

Adam argues that the seizure violated the plain view doctrine because there was no way for SA Iannuzzi to discern the Subject Phone from the other phones in the immediate area, which Adam claims belonged to family members. (A. Kaplan Br. at 12-13.) Adam argues that SA

Iannuzzi's call to the Subject Phone "undercuts any suggestion that it was 'immediately apparent' which device allegedly contained incriminating evidence" and the call was "an additional action" outside the scope of plain view justification.  (Id.)  However, the substantial evidence in the Affidavit supporting probable cause of Adam's crimes and his use of cell phones in furtherance thereof made the incriminating nature of the cell phones in the Residence immediately apparent, particularly given the fact that the cell phones were found in such close proximity to Adam Kaplan's Florida driver's license.[17]  (See A. Kaplan Br., Ex. 10); see also United States v. Delva, 13 F. Supp. 3d 269, 276 (S.D.N.Y. March 11, 2014) ("It is not necessary that an officer know with certainty that an object seized is or contains evidence of a crime at the moment of seizure; it is enough that there be probable cause to associate the object with criminal activity."); Mejia, 2025 WL 934343, at *9 (holding that law enforcement was justified in seizing a subject cell phone in plain view where there was probable cause linking a phone to the crime even though cell phones are ubiquitous objects whose presence alone in a home is not inherently incriminating).

Furthermore, Adam's argument that SA Iannuzzi's call to the Subject Phone was legally impermissible is unavailing, as the Subject Phone's incriminating nature was already immediately apparent before the call.  Adam cites to United States v. Mejia-Velasquez, 2023 WL 120621 (N.D. Ga. January 6, 2023), a case in which an officer was found to have seized cell phones while exceeding the scope of a protective sweep.  Id. at 7.  Critically, the officer in Mejia-Velasquez was not lawfully present in the arrestee's bedroom when he called the subject phone before seizing it. Id. at 7.  There, the Government also conceded that the officers did not have probable cause to seize the phone until the agent took the additional action of calling it.  Id. at 9.  Based on the unlawful presence of the officer in the bedroom at the time the phone was seized and the

---

[17] SA Iannuzzi also knew the color, make and model of the burner phone provided to Adam Kaplan by CC-1, which matched the color, make, and model of the Subject Phone.  (Gov't Opp'n at 11.)

Government's concession, the court granted suppression of the phone.  Id.  Mejia-Velasquez is distinguishable from this case given that the agents here were lawfully present in the room and the incriminating nature of the Subject Phone was immediately apparent before SA Iannuzzi called it.

Similarly, Adam cites to Arizona v. Hicks, 480 U.S. 321 (1987) and United States v. Londono, 659 F. Supp. 758 (E.D.N.Y. May 4, 1987) for the proposition that physically moving or manipulating objects to discern their incriminating nature is prohibited.  But here, as discussed above, the Subject Phone's incriminating nature was immediately apparent and the call was not necessary to establish the requisite probable cause.  SA Iannuzzi's act of calling the Subject Phone and seizing only that phone was a reasonable step to ensure accuracy and limit the scope of the seizure—it did not constitute an impermissible manipulation of the phone or "additional action" that went beyond the scope of the plain view exception.[18]

In sum, SA-1 lawfully observed the Subject Phone in plain view, the evidence established that cell phones were the primary tool utilized by Adam to commit the underlying crimes, SA Iannuzzi's knowledge of the evidence in the case gave him probable cause to seize the Subject Phone, and the fact that he called the Subject Phone did not violate the plain view doctrine. Accordingly, Adam's motion to suppress the Subject Phone is denied.

---

[18] Adam's conclusory assertion in his brief that it is the "Kaplan family's custom to turn off the ringer and vibrate function of phones left in common areas of the home," (A. Kaplan Br. at 13), does not change this analysis or require the Court to hold a hearing.  First, as explained above, the call to the Subject Phone was not necessary to establish probable cause for its seizure.  Probable cause of the Subject Phone's incriminating nature had already been established before SA Iannuzzi called it, regardless of whether he was completely certain of whether it was the specific burner phone provided to Adam Kaplan by CC-1.  Probable cause was established here by the evidence set forth in the Affidavit—including Adam's use of multiple phones to commit crimes—as well as the fact that the phones were found in such close proximity to Adam's Florida driver's license.

Second, Adam's assertion about his family's alleged custom is unsupported by an affidavit or any other evidence and therefore insufficient to create a disputed issue of material fact.  The Court also notes that, as the court in Mejia-Velasquez recognized, a dialed cell phone not only rings and/or vibrates when called, but it also lights up.

#### 4.      A Hearing is Not Required

A defendant is entitled to a hearing on a motion to suppress only where there are disputed material facts that can only be resolved through a hearing.  See, e.g., United States v. Mottley, 130 F. App'x 508, 509-10 (2d Cir. 2005); United States v. Martinez, 992 F. Supp. 2d 322, 325-26 (S.D.N.Y. 2014).  Ordinarily, such contested issues of fact must arise from affidavits that are based on personal knowledge.  United States v. Gillette, 383 F.2d 843, 848 (2d Cir. 1967) (defense counsel's affidavit insufficient to raise an issue of material fact); United States v. Watson, 404 F.3d 163, 167 (2d Cir. 2005) (similar).   The defendant "bears the burden of showing the existence of disputed issues of material fact."  Martinez, 992 F. Supp. 2d at 326.

Here, the Court finds that a hearing is not required because Adam has failed to present any evidence, through affidavit or otherwise, establishing a disputed material fact in support of his motion.  The factual record derived from the body camera footage and the Affidavit provide a sufficient basis to determine that the plain view exception applies.  Accordingly, Adam has failed to meet his burden and is not entitled to a hearing.

#### G.      Defendant Adam Kaplan's Motion to Suppress His Incriminating Statements and Dismiss the Related Counts Under the Hammad and Massiah Doctrines

Adam next moves to suppress statements that CC-1 alleged elicited from him while CC-1 was acting as an informant at the direction of the Government.  (A. Kaplan Br. at 15-24.) According to Adam, these statements were elicited in violation of the Hammad and Massiah doctrines and should therefore be excluded as evidence of any of the charges.  (Id. at 15.) Additionally, Adam argues that Counts 17-21 of the S1 Indictment should be dismissed because these charges are based upon the evidence provided by CC-1.  (Id.)  The Government responds that it is permitted to conduct investigations of uncharged and ongoing conduct and to communicate with defendants through third parties even when that defendant is represented on separate charged conduct.  (Gov't Opp'n at 62.)  The Government stressed that the FBI did not

make contact with CC-1 until approximately April 2024, well after CC-1 and Adam allegedly defrauded several individuals and institutions, and well after Adam allegedly instructed CC-1 to bribe, threaten and injure witnesses and to bribe Government officials.  (Id.)

At the Court's July 23, 2025 hearing on these motions, Adam's counsel noted that the parties' briefs had narrowed the disputed issues before the Court to only the statements made by Adam to CC-1 between April 2024 and September 2024.  (Hearing Tr. at 26-27.)  Adam's argument is that any statements elicited from him by CC-1 between April 2024 and September 2024 regarding the charges in the original indictment (Counts 1-16) should be suppressed because CC-1 was purportedly acting as a Government agent during that time period.  (Id.)  Since the 3500 material that will be produced by the Government on August 1 may shed light on the specific statements that the Government intends to offer at trial, the Court and the parties agreed that this motion is more appropriately addressed after that production and may be renewed along with Adam's motions in limine.  (Id. at 30-31.)  Therefore, Adam's motion to suppress his incriminating statements and dismiss the related counts under the Hammad and Massiah doctrines is denied without prejudice and without the need for a hearing, and Adam may renew this motion after reviewing the relevant 3500 material.

### III.    CONCLUSION

For the reasons stated above, Defendants' motions are denied without need for a hearing, and Adam's motion to suppress evidence or dismiss counts based upon violations of the Hammad and Massiah doctrines is denied without prejudice to renew after reviewing the 3500 material.

**SO ORDERED.**

Dated:    August 1, 2025
          Central Islip, New York

                                        /s/ JMA
                                        _____
                                        JOAN M. AZRACK
                                        UNITED STATES DISTRICT JUDGE