

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

_____

CMM:AT/PS                                   *610 Federal Plaza*
F. #2022R00047                              *Central Islip, New York 11722*


December 6, 2024


<u>By E-mail and ECF</u>

The Honorable Joan M. Azrack
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

       Re:    United States v. Adam Kaplan
                <u>Criminal Docket No. 23-293 (JMA)</u>

Dear Judge Azrack:

        The government respectfully submits this letter in opposition to Adam Kaplan's motion for bail (the "Bail Motion"). (Dkt. No. 131). The Bail Motion should be denied. Based on the evidence in the record, the defendant poses serious risks of danger, flight, and obstruction of these proceedings. For these reasons, the Court should deny the defendant a new bail hearing. <u>See</u> 18 U.S.C. § 3142(f). To the extent the Court decides to reopen the bail hearing, however, the defendant's application for bail still must fail under the Bail Reform Act. His motion ignores the significant evidence presented by the government at the prior hearing showing that the defendant is a serious risk of danger, flight, and obstruction. In light of the well-documented danger posed by the defendant, the proposed conditions of release are woefully insufficient to assure the safety of the community and integrity of these proceedings.

I.      <u>Background</u>

     A.     <u>The Indictment, Arrest, and Bail Hearing</u>

        On July 18, 2023, the defendant Adam Kaplan, along with his brother, was charged in a sixteen-count Indictment with conspiracy to commit wire fraud, wire fraud, investment advisor fraud, and money laundering in connection with a scheme to defraud at least 50 victims of more than $5 million. (<u>See</u> Dkt. No. 1). The defendant was charged with perpetuating several schemes, including fraudulently overbilling advisory fees, misappropriating his victims' funds in several ways, and concealing and continuing his schemes through Ponzi-style payments.

        After arrest, Adam Kaplan was released on a $2.5 million dollar bond secured by his parents' home and an apartment in Manhattan. At his arraignment, Adam Kaplan was

warned by Magistrate Judge Wicks that there could be severe consequences, including detention, if he violated the bond:

> THE COURT: Okay. And you understand that the two people that were just on under oath on the witness stand here are people who love and care for you, your parents. And they've now put their financial wellbeing in your hands, okay, because they're putting faith in you that you're going to comply, that you will comply with these conditions and show up to court when you're supposed to, and cooperate with Pretrial Services, and all of the other conditions. **If you violate any of these conditions, any of them, you could have the bond revoked immediately and you could be held in jail pending your trial.** And in addition, your parents will be on the hook for the $5 million. And in addition, there could be additional charges for you, additional from the ones that are in this indictment, for bail jumping. Okay.

July 25, 2023 Transcript of Arraignment before Honorable James M. Wicks, at 29:16-30:4 (emphasis added) (Attached hereto as Exhibit 1). Adam Kaplan was warned specifically that there could be consequences for his parents, and that he could be detained:

> THE COURT: Okay, so it's critically important you comply with this. And if you comply there will [be] no consequences for your parents, all right. Okay, you're also not to commit any, needless to say, new crimes while on bond. If you're found to have done that, it's also grounds for revoking, apart from the conditions that are in the bond. And it's, one of the conditions is that you're not to have any association of contact with any victims or witnesses to the case. **So needless to say, don't threaten to attempt to influence anyone's testimony that you might think could be a witness. Again, that could lead to revocation of the bond and detention**.

Id. at 30:11-22 (emphasis added).

      B.     The Defendant's Remand

      Despite Judge Wicks's warnings, and the obvious potential consequences of not complying with the conditions of his bond, Adam Kaplan repeatedly and flagrantly violated those conditions throughout his time on pretrial release, and so, on September 9, 2024, the government moved to revoke Adam Kaplan's bond. This was because, as outlined in the government's motion to revoke bail (Dkt. No. 104):

> based on the evidence set forth in the Affidavit in Support of the Government's Motion to Revoke Bail by Special Agent John Iannuzzi of the Federal Bureau of Investigation (the "Affidavit"), there is sufficient evidence for this Court to find, following a hearing, that: (a) there is probable cause that the defendant Adam Kaplan committed several crimes in violation of Federal and State law while on release, including conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, and attempts to bribe a government official, in violation of Title 18, United States Code, Section 201; (b) there is clear and convincing evidence that the defendant Adam Kaplan violated several other conditions of his release, including that (i) the defendant Adam Kaplan not have any contact with

any victims or witnesses; (ii) the defendant Adam Kaplan refrain from employment pertaining to investment advisement; and (iii) that the defendant Adam Kaplan not commit any crimes while on release; and (c) based on the factors set forth in Title 18, United States Code, Section 3142(g), (i) there is no condition or combination of conditions that will assure that the defendant Adam Kaplan will not flee or pose a danger to the safety of any other person or the community; and (ii) the defendant Adam Kaplan is unlikely to abide by any condition or combination of conditions of release.

As explained in detail in the Affidavit, which is incorporated by reference herein, Adam Kaplan, before his arrest, and while he was aware of a Federal Bureau of Investigation ("FBI") and Eastern District of New York ("EDNY") grand jury investigation into his crimes, and after his arrest, while released on a very stringent, multimillion-dollar bond secured by his parents' properties and with his parents acting as suretors, attempted to threaten and injure victims and witnesses and bribe law enforcement officials. And furthermore, Adam Kaplan violated that multimillion-dollar bond by communicating with victims and continuing to defraud other victims.

Highlighted below are just a few instances of Adam Kaplan's illegal conduct, all of which was carried out by Adam Kaplan while he knew that the FBI and EDNY were investigating him, and while he knew that the consequences of his actions would ultimately be arrest and detention:

1. Adam Kaplan ordered an associate (defined as "CC-1" in the Affidavit), to create a fake email from a victim so that Adam Kaplan could use the fake email as evidence at trial and to impeach that victim's credibility (Affidavit ¶¶ 7-13);

2. Adam Kaplan engaged in a months'-long (conducted daily) fraudulent Ponzi scheme to steal money from victims (Affidavit ¶¶ 14-22);

3. Adam Kaplan attempted to tamper with, threaten, and pay off witnesses (Affidavit ¶¶ 23-46), including, telling his associate that a victim needed "to fear" (¶ 24), that a victim should be "peeing blood / missing teeth and another visited / scared" (¶ 27), that a victim should be sent skull and crossbones imagery (¶¶ 36-39), and that his associate should "put [a victim's] phone on fire . . . Seriously, please blow it up" (¶ 40);

4. Adam Kaplan attempted to bribe law enforcement and court personnel (Affidavit ¶¶ 47-59);

5. Adam Kaplan committed credit card fraud (Affidavit ¶¶ 60-62);

3

Frankly, Adam Kaplan's conduct, both pre-arrest and post-arrest, while released on bond, is too extensive to repeat at any length in this letter. Adam Kaplan used multiple burner phones to avoid detection and monitoring by law enforcement (¶ 6), used aliases (¶ 129), attempted to break into his victims' (and prior lawyers') email accounts (¶¶ 10, 40 fn. 12), used CC-1 as a go-between to hide his own involvement with victims (e.g., ¶ 69), attempted to destroy evidence (¶ 35), paid off victims (e.g., ¶¶ 45-46), attempted to gather intelligence on his prosecutors (¶¶ 51-52), attempted to cover his tracks by talking in code or not using text-based communications (¶ 57 – "I think we shouldn't text about this"); and even stole funds from his own parents using their credit cards, seemingly without their authorization (e.g., ¶ 120).

Given the extensive evidence outlined above and in the Affidavit, on September 11, 2024, Your Honor detained Adam Kaplan, finding that there was clear and convincing evidence that no condition or combination of conditions would reasonably assure the safety of any other person and the community. (See Dkt. No. 110). Your Honor also found that the weight of evidence against the defendant was strong and that the defendant participated in criminal activity while on pretrial supervision. (Id.). The defendant was remanded to the Metropolitan Detention Center ("MDC"), a Bureau of Prisons ("BOP") facility, where he has remained in pretrial custody to the present.

C.    The Defendant's Time at the MDC

In the Bail Motion, the defendant does not contest the merits of the Affidavit (see Dkt. No. 131 at 1 fn. 1 –"In this memorandum, we do not contest the merits of the factual allegations set forth in the [Affidavit]"). Nor can he. As the defendant knows, the Affidavit is extensively corroborated by text-based messages, toll records, recorded phone calls, interviews with over a dozen individuals, and bank records. Instead, the defendant premises his entire motion on the conditions at the MDC and ███████████████. The defendant has been at the MDC for under three months.

Although the defendant makes several complaints regarding conditions at the MDC and ████████████, those complaints are either not corroborated, overstated, or irrelevant to a bail determination. For example, Adam Kaplan complains extensively that he has been "confined to his cell for over 85% of the time," which apparently includes "from 9 p.m. to 8 a.m." (i.e., bedtime) (Bail Motion at 1). This is obviously not a compelling reason to release someone that is a serious danger to others or a flight risk. Even so, this is wrong. According to MDC officials, inmates are recalled at 9:15 p.m. for the 9:30 p.m. count and are locked in starting at 10:00 p.m. They are allowed out of their cells starting at 6:00 a.m. and must be dressed for the standing count at 7:00 a.m. This is bureau-wide policy. In addition, the defendant complains that he has not been "outdoors" for the entire time he has been incarcerated, and the windows to his unit are "blocked by crude obstructions[.]" (Id. at 2). Again, this is not a compelling reason to release the defendant. But even so, each unit has an outdoor recreation deck that allows inmates fresh air and sunlight, and the defendant has not lodged any complaints regarding obstructions in his unit.

The defendant also complains of . He claims that he has been ███████████████████████. To be clear, none of this is corroborated. ████████████████████████████████████████████

The government, however, reached out to MDC officials regarding these complaints and others in the Bail Motiom, and received the following response:



Moreover, in recent months, officials at BOP have worked tirelessly to improve conditions for inmates and staff. For example, according to public MDC records, an "Urgent Action Team" has facilitated the following positive changes at MDC, as of September 19, 2024:

**Significantly increased staffing levels, particularly for Corrections Officers (COs) and medical personnel:** 70% of CO positions are filled compared with 55% in January. About 90% of medical positions are filled compared to 69% in January. Notably, in January, MDC Brooklyn had one nurse on staff. It now employs six nurses on staff.

**Increased pay for employees at MDC, which is critical to maintaining and increasing staffing levels.** The base starting salary for COs in the New York City area is $57,340. FBOP offers a 25% recruitment incentive to all new COs. In spring 2024, MDC Brooklyn was approved by the Office of Personnel Management (OPM) to pay a 35% retention incentive to all employees. This significantly increased CO pay, which has allowed MDC Brooklyn to retain experienced employees.

**New tools to streamline and accelerate CO hiring:**  Since January, MDC Brooklyn has received approval to use Direct Hire Authority, a hiring authority that streamlines and accelerates the hiring process for COs.  This has allowed us to hire more quickly and was a key tool in raising the staffing levels at MDC Brooklyn.

**Improved the ratio of COs to adults in custody:**  FBOP has taken several steps to manage the population at MDC Brooklyn to do more with existing resources.  Although we cannot detail these steps for safety and security reasons, they have had a significant impact.  In January, MDC Brooklyn had about 1580 adults in custody.  Currently, the population is about 1220.  Increasing the number of COs and decreasing the number of adults in custody has improved the ratio of COs to adults in custody.

**Initiated the use of telehealth at MDC Brooklyn.**  MDC Brooklyn has partnered with a local hospital to begin providing telehealth services for some medical needs.  In addition, MDC Brooklyn utilizes telehealth to allow FBOP medical providers to offer certain types of care to adults in custody.  In spring 2024, new telehealth equipment was installed in each housing unit.  The Urgent Action Team is working with MDC Brooklyn to expand its telehealth program to new specialties.  The use of telehealth has a dynamic impact on staffing needs.  For example, we are able to provide 9 AICs with specialist consults during a telehealth day.  Prior to the use of telehealth, each of these AICs would need to be escorted to an outside medical facility by two employees.  With telehealth, each of these appointments frees up approximately 8 hours of custodial staff time.

**Completed significant facilities repairs and improvements.**  In spring 2024, over four weeks, two teams deployed to MDC Brooklyn to make a wide range of repairs at the facility.  The teams completed over 800 work orders, including electrical and plumbing upgrades and repairs to food service, maintenance to HVAC systems, repair and replacement of broken windows, installation of lighting and security cameras, and upgrades to equipment in control centers.  During this period, the facilities teams went cell to cell and resolved all plumbing and most electrical issues that were identified.

**Installed dozens of new computers in housing units to facilitate individual's access to legal documents.**  More than 40 new computers were installed to allow adults in custody greater access to review their legal documents.[1]

---

[1]    See    https://www.bop.gov/resources/pdfs/mdc_bro_uat_fact_sheet.pdf?v=1.0.0) (Last Visited, December 6, 2024)

II.    Argument

    A.    <u>Applicable Law</u>

        Under the Bail Reform Act, the district court has discretion to reopen a bail hearing "if information comes to light that is both new and material to the detention question." <u>United States v. Zhang</u>, 55 F.4th 141, 147 (2d Cir. 2022).  Specifically, a bail determination "may be reopened . . . before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f)(2)(B).  However, "[a] bail hearing should not be reopened on the basis of information that was available to the defendant at the time of the hearing." <u>United States v. Lewis</u>, No. 16 Cr. 212 (LAK), 2016 WL 6902198, at *2 (S.D.N.Y. Nov. 16, 2016) (citing <u>United States v. Hare</u>, 873 F.2d 796, 799 (5th Cir. 1989)); <u>see</u> <u>United States v. Mizell</u>, No. 14 Cr. 212 (RJS), 2014 WL 12769113, at *2 (S.D.N.Y. July 25, 2014).  Courts in the Second Circuit have found that "[n]ew and material information for Section 3142(f)(2)(B) purposes consists of something other than a defendant's own evaluation of his character or the strength of the case against him: truly changed circumstances, something unexpected, or a significant event." <u>United States v. Esposito</u>, 354 F. Supp. 3d 354, 358-59 (S.D.N.Y. 2019) (citation omitted).

        Moreover, because the Bail Reform Act states only that a hearing "may" be reopened if new and material information is presented, it "leaves the decision to reopen a hearing to the sound discretion of the district court." <u>Zhang</u>, 55 F.4th at 148.  Therefore, even if the defendant's arguments for reopening the hearing met the standard—which they do not—this Court may still decide in its discretion not to reopen the hearing. <u>Id.</u>

    B.    <u>The Defendant Should Remain Detained Because He Defrauded Victims While Out on Release</u>

        The defendant should remain detained because he defrauded victims while out on pretrial release – that is enough.  In direct violation of his conditions of release, and despite repeated warnings from the Court, the defendant communicated with his victims, and defrauded them further. (Affidavit ¶¶ 63-107).  He defrauded individuals and financial services companies. (Affidavit ¶¶ 108-120).  Through his schemes, the defendant has shown that he cannot be trusted and cannot be monitored while on pretrial release.  The defendant did not make a one-time mistake.  Instead, he flagrantly violated this Court's orders, on a near daily basis, because of his greed.

        As this Court is aware, defendants, including those charged with white-collar crimes, are regularly detained when they commit crimes while on pretrial release. <u>See, e.g.</u> <u>United States v. Dupree</u>, 833 F. Supp. 2d 241, 247 (E.D.N.Y. 2011) (denying pretrial release to defendant that was originally charged with fraud and then detained for participating in another fraud while on release); <u>United States v. Alli</u>, No. 2:22-CR-00395 (GRB)(JMW), 2024 WL 3520450, at *2 (E.D.N.Y. July 24, 2024) (denying pre-sentence release and forfeiting bond for white-collar defendant who engaged in wire fraud post-plea); <u>United States v. Romano</u>, 2013 U.S. Dist. LEXIS 125574, *7 (noting that the defendant's bail was revoked when the defendant participated in a second "coin fraud scheme" while on pretrial release); <u>United States v. Singh</u>, 15-CR-450, Dkt.

No. 25 (JMA)(AKT) (defendant remanded to BOP custody by Judge Tomlinson for committing additional acts of wire fraud while on pretrial release); <u>United States v. Ciccone</u>, 12-CR-357, Dkt. No. 154 (defendant remanded to BOP custody by Judge Tomlinson for committing crimes while on pretrial release; <u>see also</u> <u>United States v. Khan</u>, No. 19-CR-00511 (ENV) (E.D.N.Y. July 25, 2024) (post-conviction, while violation of supervised release was pending, defendant committed additional fraud crimes and was remanded). There is nothing unusual about the defendant's detention, especially given his flagrant violations of his bond and the danger he poses to victims and witnesses.

      C.    <u>The Defendant Should Remain Detained Because He Attempted to Bribe Government Officials While Out on Release</u>

Of course, the defendant's conduct here is much more egregious than "only" defrauding individuals. The defendant also attempted to bribe government officials while on pretrial release – he spent tens of thousands of dollars to pay off government officials. (Affidavit ¶ 121). Again, this alone is enough to detain the defendant. Months after he was detained, Adam Kaplan was still attempting to use CC-1 to bribe "Chief" with cash in an envelope – of course, if successful, that would not be traceable. His actions to avoid the standard judicial process show that this defendant cannot be trusted outside of the MDC.

      D.    <u>The Defendant Should Remain Detained Because He Is a Physical Danger to Others</u>

But, of course, for this defendant, there is so much more. The defendant has shown through his actions that he is a real, <u>physical</u> danger to others, including victims and witnesses. It is clear from the Affidavit that this defendant tried to physically harm people. (Affidavit ¶¶ 24-44). He tried to intimidate them, scare them, and physically harm them because they were victims of his crimes and because they could serve as witnesses against him. There is a bright line that individuals are either willing to cross or not, and this defendant has shown, repeatedly, that when he is backed into a corner, he is willing to cross that line.

As noted throughout the Affidavit, the defendant told CC-1, who he believed was a violent person with connections to violent people, that he should "kaboom," meaning hurt people. He told CC-1 that someone needed to "fear." He wanted someone to be "peeing blood." He wanted someone "missing teeth." He wanted people to be "scared." "Fear must be instilled." He had skull and crossbones imagery sent to people. He said, "I like the sound of a wake-up blow." He said, "put her phone on fire. Let her block that. Seriously, please blow it up." The defendant is someone that wanted to, and attempted to, hurt people. It is by pure luck that the defendant did a poor job choosing his coconspirator on these occasions. It is by pure luck that CC-1 was able to trick the defendant into believing that CC-1 could carry out these tasks. Again, the defendant cannot be trusted to refrain from this conduct outside of the MDC.

      E.    <u>The Defendant Should Remain Detained Because He Is a Significant Threat to Obstruct Justice or Flee</u>

The defense argues that because the defendant "would never wish to return to the inhumane conditions at MDC Brooklyn, any chance that he might seek to engage in witness

intimidation or tampering has been reduced to zero" (Bail Motion at 19). The exact opposite is true. Now, as we get closer to trial, and assuming, _arguendo_, what the defendant has said about MDC is true[2], the defendant will get only more desperate. The defendant is, more than ever, backed into a corner. The evidence in this case is absolutely overwhelming. Dozens of witnesses are prepared to testify that the defendant defrauded them. Bank records, records from other financial institutions, including the defendant's financial services firm, communication records (including emails and texts), and phone recordings will prove beyond a reasonable doubt that this defendant is guilty. And the defendant understands that his United States Sentencing Guidelines range is well over a decade given the crimes charged in the Indictment, not including what has not yet been charged – attempting to threaten and injure witnesses, bribe law enforcement officials, committing crimes while on release, and continuing to defraud others. Given the overwhelming evidence, the high probability that the defendant will spend a significant amount of time in prison, and the defendant's subjective "frightening" experience at the MDC, the defendant will only further be incentivized to flee or engage in obstructive conduct.

F.   The Defendant Should Remain Detained Because He Cannot Be Adequately Monitored by Pretrial Services

This defendant has shown, repeatedly, that he will do anything to avoid the consequences of his actions. And given the defendant's capabilities and prior conduct, it would be impossible for pretrial services to adequately monitor him. The defendant, while on release, was using not one, but multiple "burner" phones that were not in his name – even if the defendant were confined to his home and "permitted" only one cellular device, pretrial services would have no way to know what the defendant was doing. The defendant used CC-1 to speak to his victims – again, even if the defendant were confined to his home and allowed only one cellular device, pretrial services would still have no way to know what the defendant was doing. The defendant used aliases and repeatedly told CC-1 to avoid using the defendant's name. The defendant paid others to put up fake, irrelevant press releases to hide the Indictment and Securities and Exchange Commission charges from his victims. The defendant's money laundering in this case was incredibly extensive. The defendant used several different email addresses. He hid cash payments in chocolate boxes. None of these actions would be prevented, or will be prevented in the future, by the proposed release conditions. Each of the defendant's crimes was possible from the comfort of his home while using a burner phone. These are not hypotheticals. The defendant, on a $2.5 million bond, secured by his parents, and with the threat of incarceration at the MDC, engaged in this conduct.

The other proposed conditions offer no comfort. Pretrial services does not have the resources to monitor a "live feed" at all hours of the day, nor would that prevent the defendant from committing crimes from a burner phone or internet-capable device from his home. The defendant was already subject to pretrial supervision, and was not permitted to communicate with his victims. Instead, he used others to communicate with them on his behalf.

---

[2]    There is no record of the defendant complaining to medical services at MDC of being bitten by rats, ████████████████████████.

Frankly, the proposed release conditions appear to basically mirror the prior conditions, which the defendant flagrantly and repeatedly violated for over a year. The defendant appears to even state that the Court should use the same properties that the government has moved to forfeit based on the defendant's prior conduct. And even the "strict" home detention is not strict – the defendant will apparently constantly leave his apartment for "attorney visits" or "medical appointments" or "religious services" or "other activities" approved by pretrial services. Further, the conditions allow the defendant to be visited, with no oversight, by his parents, who are either victims or coconspirators (or both) of his fraudulent conduct[3], and his brother, who has been indicted as a coconspirator with the defendant.

The defendant continues to engage in concerning conduct with his parents. When speaking to them from the MDC, the defendant has routinely spoken in code (and, since September, almost exclusively in broken Hebrew), apparently to avoid law enforcement's understanding. For example:

| | |
|---|---|
| Adam Kaplan: | "I'm at a loss here." |
| Adam Kaplan's Mother: | "My ink writing instrument will no longer be operational." |
| Adam Kaplan: | "Not that…gasoline." |
| Adam Kaplan's Father: | "Alright. We should stop." |
| Adam Kaplan: | "He goes for gas." |
| Adam Kaplan's Father: | "OK. Everything is good." |

(September 15, 2024 at 1:00 PM).

The defendant has even reminded his parents to watch what they say because jail calls are monitored:

| | |
|---|---|
| Adam Kaplan: | "Did you speak with everyone . . . You're on the radio here." |

(September 15, 2024 at 8:25 AM).

The defendant has shown, time and again, that he cannot be supervised effectively. He is a serious danger to others and the judicial process. He should remain detained.

---

[3]     The defendant used his parents' credit cards as part of the fraud against certain credit card companies. (Affidavit ¶¶ 108-111, 115-118, 120). During the relevant period of the scheme, the defendant's mother also sent the defendant's brother altered receipts from a victim that she seems to have manipulated, which were used as part of the fraud scheme.

The defense does not even attempt to articulate who could serve as a suretor for the defendant, given that much of his extended family has been victimized by his crimes, and the current suretors (his parents) are subject to a $2.5M forfeiture, which they apparently oppose.

G.     The Defendant's Complaints About MDC and ▮▮▮▮▮▮▮▮▮▮▮▮ Do Not Change the Calculation

Unable to contend with any of the above, the defendant instead focuses on the MDC and ▮▮▮▮▮▮▮▮▮▮▮.  Regarding the MDC, following the logic of the defense's arguments here, no individual should be subject to incarceration pending trial.  That is wrong.  If a Court finds, as this Court has found, that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, the defendant must be detained.

i.     The Defendant Can Adequately Prepare for His Defense

The government adds the following additional information for the record given that the defendant argues in the Bail  Motion that he should be released to prepare for trial (Bail Motion at 29-32).  The MDC has provided the defendant with more than reasonable accommodations to meet with counsel.  The defendant is permitted to meet with counsel each day.  Records also indicate that the defendant frequently communicates with his attorneys by telephone and written communication.  MDC's procedures do not infringe on the defendant's constitutional right to effective counsel or to participate in his defense.  See United States v. El-Hage, 213 F.3d 78, 81-82 (2d Cir. 2000) (holding pretrial detention conditions, which included solitary confinement, restricted phone access, and a chair to review discovery more comfortably were reasonably related to defendant's specific security concerns and did not impermissibly infringe the defendant's ability to prepare his own defense); United States v. Mohamed, 103 F. Supp. 3d 281, 289-96 (E.D.N.Y. May 1, 2015) (same); United States v. Hashmi, 621 F. Supp. 2d 76, 86-87 (S.D.N.Y. 2008) (same); United States v. Kassir, No. S2 04 Cr. 356 (JFK), 2008 WL 2695307, at *2-5 (S.D.N.Y. July 8, 2008) (same).

Moreover, defense counsel's proposal that the defendant must be released in order to prepare his defense is inconsistent with the Bail Reform Act, which contemplates that courts will weigh dangerousness and risk of flight against a defendant's opportunity to prepare for trial.  In this case, the significant danger that the defendant poses weighed against the opportunities the MDC has provided the defendant to meet privately with his attorneys clearly counsels in favor of the defendant's continued detention.  See United States v. Argraves, 2010 WL 283064 (D. Conn. Jan. 22, 2010) at *6 ("Pre-trial detention will always interfere with preparation for trial to some extent, but the  Bail Reform Act clearly contemplates this problem and allows for detention provided that the defendant is 'afforded reasonable opportunity for private consultation with counsel.'" (quoting 18 U.S.C. § 3142(i)(3))).

Finally, voluminous discovery alone is not a basis for release under either the Bail Reform Act or the Sixth Amendment.  The defendant does not point to any case law suggesting that discovery of the kind produced in this case requires the defendant's release under 18 U.S.C. § 3142(i), nor can he.  See Dupree, 833 F. Supp. 2d at 249 ("While this [fraud] case may, in fact, be complicated and require Defendant to review hundreds if not thousands of documents and meet with his lawyers for dozens of hours, that fact, standing alone, simply does not justify Defendant's release . . . .  Indeed, accepting such an argument would mean that the more complicated the crime, the more likely a defendant should be released prior to trial. This is clearly an absurd result." (citation omitted)).  The Bail Reform Act does not mandate the defendant's release even if review

11

of discovery would be more convenient outside the MDC.  See id. at 248 (holding that even where "release would certainly make it more convenient for him and his counsel to prepare his defense," release was not "necessary" given substantial accommodations for discovery review).

ii. 

Respectfully submitted,

BREON PEACE
United States Attorney

By:        /s/
Adam Toporovsky
Paul Scotti
Assistant U.S. Attorneys
(631) 715-7846 (Toporovsky)

```
                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF NEW YORK


UNITED STATES OF AMERICA,  . Criminal No. 23-cr-00293-JMA-JMW
                           .
            Vs.            .
                           . 100 Federal Plaza
ADAM KAPLAN and            . Central Islip, NY  11722
DANIEL KAPLAN              .
                           . DATE: July 25, 2023
. . . . . . . . . . . . . .

                     TRANSCRIPT OF ARRAIGNMENT
                 BEFORE HONORABLE JAMES M. WICKS
                   UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:       UNITED STATES ATTORNEYS OFFICE
                          EASTERN DISTRICT OF NEW YORK
                          BY:   ANTHONY BAGNUOLA, ESQ.
                          271 Cadman Plaza East
                          Brooklyn,  NY   11201


For Defendant:            SHER TREMONTE, LLP
Daniel Kaplan             BY:  MICHAEL TREMONTE, ESQ.
                          41 Madison Avenue, 41st Floor
                          New York, NY  10010


For Defendant:            MORRISON COHEN, LLP
Adam Kaplan               BY:  ERIC CREIZMAN, ESQ.
                               (Telephonically)
                          909 Third Avenue, Fl. 27
                          New York,  NY  10022




Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.
```

**TRACY GRIBBEN TRANSCRIPTION, LLC**
**PO BOX 688**
**Middletown, NJ 07748**
**(732) 263-0044    Fax No. 732-865-7179**
**800 603-6212**
**www.tgribbentranscription.com**

2

```
 1                      I N D E X

 2

 3                                      PAGE

 4  ARRAIGNMENT                          9

 5  BAIL CONDITIONS                     13/29

 6

 7  SURETOR, IDIDA KAPLAN, SWORN         20

 8  SURETOR, STUART KAPLAN, SWORN        21

 9

10  WITNESSES

11  STUART KAPLAN

12       Examination by the Court       22

13  IDIDA KAPLAN

14       Examination by the Court       23

15

16  SPEEDY TRIAL WAIVER                  35

17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  Calling criminal case 2023-293, United

2  States of America versus Adam Kaplan and Daniel Kaplan.

3  Counsel, please state your appearances for the record.

4          MR. BAGNUOLA:  Good afternoon, Your Honor, Anthony

5  Bagnuola for the United States. To my left is FBI Special Agent

6  John Iannuzzi.  And to his left is US Pretrial Services

7  Officer, Christina Deprimo. Good afternoon, Judge.

8          THE COURT:  And good afternoon to all of you.

9          MR. TREMONTE:  Good afternoon, Your Honor, Michael

10 Tremonte of Sher Tremonte LLP. To my right is my client Daniel

11 Kaplan. To Daniel Kaplan's right is his brother, Adam Kaplan,

12 represented by Mr. Creizman who is on the phone.

13         THE COURT:  Okay. Good afternoon to all of you. And

14 --

15         MR. CREIZMAN:  (indiscernible)

16         THE COURT:  Go ahead, Mr. Creizman.

17         MR. CREIZMAN:  I just wanted to say, I'm appearing

18 (indiscernible) for Adam Kaplan, I'm from the firm of Morrison

19 Cohen.

20         THE COURT:  All right, good afternoon, as well.  All

21 right, Mr. Creizman, could you just state name again, we just

22 moved the microphone a little bit closer to the phone.

23         MR. CREIZMAN:  Sure, It's Eric, E R I C, Creizman, C

24 R E I Z M A N.  Eric Creizman.

25         THE COURT:  Okay, great, thank you.

4

1          MR. CREIZMAN:  Thank you.

2          THE COURT:  And can everyone at counsel table hear

3  Mr. Creizman?

4          MR. TREMONTE:  Yes, Your Honor.

5          THE COURT:  And Mr. Bagnuola, you as well?

6          MR. BAGNUOLA:  Yes, Your Honor.

7          THE COURT:  Okay, More importantly, both Mr. Kaplans,

8  are you able to hear him?

9          DEFENDANT ADAM KAPLAN: Yes.

10          DEFENDANT DANIEL KAPLAN: Yes.

11          THE COURT:  All right, just do me a favor, you just

12  use the mic.  And you don't have to -- nobody has to stand or

13  rise, just use the mic, make sure the mics are on when we

14  speak, all right?

15          Okay, so good afternoon, I am Magistrate Judge Wicks,

16  and you're both here today before me because you're charged

17  with certain crimes in an indictment that's been filed against

18  both of you.  Have you both been provided a copy of the

19  indictment?

20          UNIDENTIFIED DEFENDANT:  No.

21          THE COURT:  No, all right.

22          MR. TREMONTE:  Your Honor, the indictment was emailed

23  to counsel, as we were on our way to court today.

24          THE COURT:  All right.

25          MR. TREMONTE:  If I may have just two minutes with --

5

```
1          THE COURT:  I can give you more than two minutes.
2  You can take as much as you need.  And we'll silence the mics
3  and you can spend as much time as you need to go over the
4  indictment.
5          MR. TREMONTE:  Thank you.
6          THE COURT:  All right?
7          MR. TREMONTE:  Yes.
8          THE COURT:  Let me ask you this though, Mr. Creizman,
9  have you reviewed the indictment?
10         MR. CREIZMAN:  I have no.  I've been driving from
11 Asbury Park, New Jersey, actually.  So I'm still, I've been
12 driving the whole time.
13         THE COURT:  All right.  Let me ask you this then.  Is
14 it possible, and I look at the Marshals for this, if counsel
15 and clients can go in the attorney's room right outside here.
16 And perhaps get MR. Creizman on his cell phone and you can have
17 a call, all four of you.  Is that acceptable?
18         MR. TREMONTE:  It is for the defense, Your Honor.
19         OFFICER:  (indiscernible)
20         THE COURT:  You tell me, I look to you.
21         OFFICER:  (indiscernible)
22         THE COURT:  Wherever you want.  Okay.  As long as
23 they get reception and can call.
24         OFFICER:  Yes.
25         MR. TREMONTE:  Thank you.
```

```
 1              (Recording silenced @ 4:31:17)
 2              (Recording resumed @ 4:37:01)
 3          THE COURT:  Okay, Mr. Creizman, we're just about
 4  ready to go, although I lost my courtroom deputy.  She'll be
 5  back in in a minute.  Can you hear me okay?  All right, can you
 6  hear us, Mr. Creizman?
 7          THE CLERK:  He may be trying to join the call.
 8          THE COURT:  He did, he joined already.
 9          THE CLERK:  Oh he did.
10          THE COURT:  Yes.
11          MR. CREIZMAN: I'm on, I'm on, sorry.  I hear you.
12          THE COURT:  You can hear us okay?  Mr. Creizman, can
13  you hear us okay?
14          MR. CREIZMAN:  I do, thank you.
15          THE COURT:  Okay.  Okay, ready to proceed?
16          MR. TREMONTE:  Yes, Your Honor.
17          MR. BAGNUOLA:  Yes, Your Honor.
18          THE COURT:  Okay, did you have, Mr. Tremonte, did you
19  have sufficient time to speak with both of the defendants?
20          MR. TREMONTE:  Yes, Your Honor.
21          THE COURT:  Okay.  And Mr. Creizman, did you have an
22  opportunity to participate in that discussion?
23          MR. CREIZMAN:  Yes, I did.
24          THE COURT:  Okay, and did you have sufficient time to
25  review the indictment with your clients, both of you, Mr.
```

1  Creizman first?

2         MR. CREIZMAN:  Yes, Your Honor.

3         THE COURT:  All right, and Mr. Tremonte?

4         MR. TREMONTE:  Yes, we did, Your Honor.

5         THE COURT:  Okay.  And I understand since Mr.

6  Creizman is stuck in traffic and he's participating by

7  telephone, is that agreeable to the Government, that Mr.

8  Creizman participates by phone?

9         MR. BAGNUOLA: Absolutely, Your Honor.

10         THE COURT:  All right. And Mr. Adam Kaplan, your

11  lawyer is on the phone, as you've heard, and he's stuck in

12  traffic.  Are you agreeing to allow him to participate by

13  phone?

14         DEFENDANT ADAM KAPLAN:  Yes.

15         THE COURT:  You consent to that?

16         DEFENDANT ADAM KAPLAN:  Yes.

17         THE COURT:  All right.  I understand that Mr.

18  Tremonte, Mr. Creizman has given you authority to sign papers

19  on his behalf for Mr. Adam Kaplan in this proceeding?

20         MR. TREMONTE:  Yes he has, Your Honor.

21         THE COURT:  All right.  And Mr. Adam Kaplan, you,

22  that's acceptable to you?

23         DEFENDANT ADAM KAPLAN:  Yes.

24         THE COURT:  To have Mr. Tremonte, for purposes of

25  this proceeding, sign papers on your lawyer's behalf?

8

1          DEFENDANT ADAM KAPLAN:  Yes.

2          THE COURT:  Okay, Mr. Creizman, and that's acceptable

3    to you too, right?

4          MR. CREIZMAN:  Yes, Your Honor.

5          THE COURT:  Okay, all right.  So let's proceed.  All

6    right, so now, both Adam and Daniel, if you don't mind me

7    calling you by your first names, because you have the same last

8    names, do you -- have you had the opportunity to review the

9    indictment Adam?

10         DEFENDANT ADAM KAPLAN:  Yes.

11         THE COURT:  All right, Daniel?

12         DEFENDANT DANIEL KAPLAN:  Yes.

13         THE COURT:  Okay, have you both had sufficient time

14   to review it with your lawyers?

15         DEFENDANT ADAM KAPLAN:  Yes.

16         DEFENDANT DANIEL KAPLAN:  Yes.

17         THE COURT:  Okay.  All right, so we're here for the

18   initial appearance on the indictment and the arraignment on the

19   indictment.  And what that means is several things. First, I'm

20   going to advise you of the charges in the indictment, which

21   you've just gone over with your lawyers.  Second, I'll advise

22   you of your rights with respect to the indictment.  I'll then

23   take your plea to the charges of the indictment. And then we'll

24   consider bail or detention.

25         The indictment was sealed previously. I issued an

1  order earlier today unsealing it.  Mr. Bagnuola, you got that

2  order already?

3       MR. BAGNUOLA:  Yes, Your Honor.

4       THE COURT:  Okay, so it is unsealed.  Okay, so first

5  I'm going to explain your rights.  You have certain

6  constitutional rights.  Of course first and foremost you have

7  the right to remain silent.  You're not required to make any

8  statements whatsoever. Even if you've already started to make

9  statements you don't have to continue.  You can stop, you can

10 stop at any time, you don't have to make any further

11 statements.  You don't have to say anything more.  Any

12 statements that you've made or make in the future could be used

13 against you.  Do you understand that, Adam?

14      DEFENDANT ADAM KAPLAN:  Yes.

15      THE COURT:  All right, Daniel?

16      DEFENDANT DANIEL KAPLAN:  Yes.

17      THE COURT:  Okay. Any questions to me, as to your

18 right to remain silent?

19      DEFENDANT ADAM KAPLAN:  No.

20      DEFENDANT DANIEL KAPLAN:  No.

21      THE COURT:  All right.  You have the right to be

22 represented by a lawyer, by counsel, during all phases of this

23 court proceeding, both today and throughout the entire case.

24 And during any and all questioning by authorities.  So you have

25 the right to hire your own attorney, or if it comes a point in

1    time where you can't afford an attorney, I will appoint one for

2    you.  The Court will appoint one for you for every step of the

3    case.  Do you understand that?

4            DEFENDANT DANIEL KAPLAN:  Yes.

5            THE COURT:  Okay.  And Daniel? Oh that was Daniel.

6    Adam?

7            DEFENDANT ADAM KAPLAN:  Yes.

8            THE COURT:  Okay. And today, Daniel, your lawyer is

9    Mr. Tremonte, correct?

10           DEFENDANT DANIEL KAPLAN:  Yes.

11           THE COURT:  And you have had an opportunity to speak

12   with him about today's proceedings?

13           DEFENDANT DANIEL KAPLAN:  Yes.

14           THE COURT:  All right. And how about you, Adam?  Have

15   you had sufficient opportunity to speak with Mr. Creizman about

16   today's proceedings?

17           DEFENDANT ADAM KAPLAN:  Yes.

18           THE COURT:  Okay.  Now, you have the right to be

19   released either conditionally or unconditionally, pending

20   trial, unless I find that there are no conditions that would

21   reasonably assure your presence at future court appearances, or

22   the safety of the community is at risk.  If you're not citizens

23   of the United States, you have the right to have a law

24   enforcement official notify a consular of your country of

25   origin that you've been arrested. Do you understand your rights

1    as I've explained them to you so far?

2                DEFENDANT ADAM KAPLAN:  Yes.

3                DEFENDANT DANIEL KAPLAN:  Yes.

4                THE COURT:  All right, any questions of me so far

5    about that?

6                DEFENDANT ADAM KAPLAN:  No.

7                DEFENDANT DANIEL KAPLAN:  No.

8                THE COURT:  All right.  Mr. Bagnuola, under Rule

9    5(f), Criminal Rules of Criminal Procedure, I do direct the

10   prosecution to comply with its obligations under Brady against

11   Maryland and progeny, and that is to disclose to the defense

12   all information, admissible or not, that might be favorable to

13   the defendants that's material either to guilt or punishment,

14   and known to the prosecution.  Of course possible consequences

15   for noncompliance could include dismissal of charges, dismissal

16   of the case, professional discipline  and sanctions.

17               I will enter an order more fully describing the

18   obligations and the consequences, but in the interim, I would

19   like the prosecution to confirm that it understands these

20   obligations and will fulfill them.

21               MR. BAGNUOLA:  We do and we will, Your Honor.

22               THE COURT:  All right, thank you.  I will enter an

23   order to that effect as well.  All right, I have before me the

24   indictment.  And I'm just going to advise now of the charges.

25               Mr. Creizman, you've now at least discussed the

12

1  indictment with your co-counsel and your client?

2         MR. CREIZMAN:  I have.

3         THE COURT:  All right, and have you reviewed it with

4  your client, Adam Kaplan?

5         MR. CREIZMAN:  Yes, I have.

6         THE COURT:  All right, and do you waive its public

7  reading?

8         MR. CREIZMAN:  I do.

9         THE COURT:  Okay.  Mr. Tremonte, how about you, have

10 you reviewed it with your client, Daniel Kaplan?

11        MR. TREMONTE: Yes, Your Honor.

12        THE COURT:  All right.  And do you waive its public

13 reading?

14        MR. TREMONTE:  We do.

15        THE COURT:  All right.  Now, I'm going to summarize

16 briefly what the indictment is for and what you've been charged

17 with.  And it charges you both with 16 counts, including

18 conspiracy to commit wire fraud, wire fraud itself, investment

19 advisor fraud and money laundering.  And it also includes a

20 criminal forfeiture allegation, all arising out of your

21 activities as financial investment advisors from May of 2018 to

22 November of 2022.  Do you both understand my summary?  I'm not

23 asking you to admit to it.  Just do you understand my summary

24 of the indictment?  Daniel?

25        DEFENDANT DANIEL KAPLAN:  Yes.

1          THE COURT:  Adam?

2          DEFENDANT ADAM KAPLAN:  Yes.

3          THE COURT:  All right.  Now that you've been advised

4    of the charges against you, how do you wish to plead at this

5    time?

6          DEFENDANT DANIEL KAPLAN:  Not guilty.

7          THE COURT:  All right. Adam?

8          DEFENDANT ADAM KAPLAN:  Not guilty.

9          THE COURT:  Okay.  Now, I understand as to bail,

10   detention or release, that there is an agreed upon package, is

11   that correct?

12         MR. TREMONTE:  Yes.

13         MR. BAGNUOLA:  Yes, Your Honor.  Earlier this

14   afternoon the Government filed a factual recitation under

15   docket entry number 6, that sets forth various bases that the

16   Government contends establish sufficient circumstances to

17   justify stringent conditions of release.  In this case I'm

18   pleased to say Mr. Tremonte and I have come to agreement on

19   broad terms of the conditions of release that would be

20   necessary to satisfy the Bail Reform Act.

21         In sum and substance, that include a $5 million bond,

22   two and a half million per defendant.  Fully secured by two

23   properties owned by the defendants' parents.  One in Great

24   Neck, one in New York City.  And that bond will be cosigned by

25   the defendants' parents, making each of them jointly and

14

1  severally liable for the 5 million in the event either of the

2  defendants should flee from the jurisdiction, or otherwise

3  violate any condition of their release.

4       The Government would also ask the Court to impose the

5  special conditions of release that Pretrial Services has

6  recommended that are set forth on page 3 of the Pretrial

7  Services report, for both Adam and Daniel Kaplan, they're

8  numbered 1 through 6 on both of those documents.

9       THE COURT:  All right, I see that.  Let me just ask

10  you a couple of questions.  So the $5 million bond, that would

11  be what, joint and several or we're doing two separate bonds

12  here? You can remain seated.

13       MR. BAGNUOLA:  Thank you, Your Honor.

14       THE COURT:  Thank you though, I appreciate it.

15       MR. BAGNUOLA:  I would propose two separate bonds

16  here.

17       THE COURT:  Yes, so would I.

18       MR. BAGNUOLA:  Each separately and independently --

19       THE COURT:  Yes.

20       MR. BAGNUOLA:  -- guaranteed by the properties.

21  We've taken the liberty, Officer Deprimo and I, to prepare two

22  bonds which I've provided to Mr. Tremonte for his review.

23       THE COURT:  Okay.

24       MR. BAGNUOLA:  I think each defendant should have his

25  own bond.

1           THE COURT:  In the amount of two and a half million

2   each.

3           MR. BAGNUOLA:  That's right, Your Honor.

4           THE COURT:  And both bonds will be secured by two

5   suretors, the parents?

6           MR. BAGNUOLA:  Yeah, as the beneficial owners of the

7   properties, I would propose that both parents sign both bonds.

8   Which adds, in addition to this collateral security, the moral

9   suasion that the Court typically looks to in order to guarantee

10  the defendants' appearance, and compliance with the terms of

11  release in cases like this.

12          THE COURT:  Okay. But who owns the properties, the

13  two properties, that is the New York City, just to be clear for

14  the record, is the 400 East 70th Street property.

15          MR. BAGNUOLA:  I'm going to defer to Mr. Tremonte if

16  the Court permits.

17          THE COURT:  Yes, of course.

18          MR. BAGNUOLA:  Because I think he can speak in

19  greater, with greater precision than I can, as to the ownership

20  of the properties.

21          THE COURT:  Okay, let me ask you, Mr. Tremonte then.

22  As to the property, the 400 East 70th Street property, first of

23  all, is it a condo or is it a co-op?

24          MR. TREMONTE:  That property is a condominium.

25          THE COURT:  It's a condominium, okay.  And what is

1  the value of that condominium?

2           MR. TREMONTE:  It's in excess of $3 million.

3           THE COURT:  3 million. And what is the equity in it

4  at this point?

5           MR. TREMONTE:  In excess of 3 million.

6           THE COURT:  No debt on it?

7           MR. TREMONTE:  There's no debt on that property.

8           THE COURT:  Okay.  And who are the fee owners of the

9  condominium?

10          MR. TREMONTE:  Stuart and Idida Kaplan.

11          THE COURT:  And --

12          MR. TREMONTE:  My client's parents.

13          THE COURT:  Those are your client's parents.

14          MR. TREMONTE:  Yes, Your Honor.

15          THE COURT:  Okay.  That's property one.  Property two

16  is Great Neck. And that, let me just see here, what's the

17  address of the Great Neck property?

18          MR. TREMONTE:  19 Gateway Drive, G A T E W A Y,

19  Drive, Great Neck, New York.

20          THE COURT:  All right, thank you.  And who are the

21  fee owners of that?

22          MR. TREMONTE:  That property is held by a trust, the

23  sole trustees of which are Stuart and Idida Kaplan.

24          THE COURT:  It's held by a trust.  Why did I think

25  the property -- where did I read that it was held by -- hold on

17

1   a second.  I thought I read somewhere in the Pretrial Services

2   report that it was, that property was held by either Daniel and

3   Adam, and/or a sister?  Did I misread that?

4          MR. TREMONTE:  I don't think that's right.  The Great

5   Neck, the 19 Gateway Drive property is owned by a trust, and

6   the sole trustees are the parents.

7          THE COURT:  They're the trustees, okay, so who are

8   the beneficiaries of the trust?

9          MR. TREMONTE:  The trustees, the parents.

10          THE COURT:  Okay.  Ms. Deprimo, did I misread

11   something in the Pretrial Services report?

12          MS. DEPRIMO:  No, I don't think we any information

13   regarding that property.

14          THE COURT:  Okay, on the Great Neck property?

15          MS. DEPRIMO:  Correct.

16          THE COURT:  All right.  Sole trustees, beneficiaries.

17   Okay.  What's the value of the Great Neck property?

18          MR. TREMONTE:  It's in excess of 3 million, and it is

19   not encumbered.

20          THE COURT:  Not encumbered.  Okay.  Great, thank you.

21   Okay, and just so the record is clear, we still don't have any

22   financial information of the defendants at this point?

23          MR. TREMONTE:  That's correct, Your Honor.

24          THE COURT:  Okay.  So we're really I'm going on this

25   solely on the suretors.

1      MR. TREMONTE:  Correct, Your Honor.  And to be clear,

2 the lack of financial information is on the advice of counsel

3 because there may be, there's likely to be overlap between that

4 information and the charged -- the allegations.

5      THE COURT:  So how do I make a determination on

6 flight without the defendants offering up their assets?

7      MR. TREMONTE:  So the -- I guess which side of it, so

8 the defendants will be maintained by their parents.  So in

9 terms of you know, having sufficient resources to live.

10      THE COURT:  If I -- hypothetically if these

11 defendants have much more than the value of these properties

12 and -- the whole purpose of the conditions and the bail

13 conditions, the bond amount, is to insure compliance in terms

14 of court appearances.  So how -- I understand it puts the

15 suretors at risk, and it's their parents, I don't know the

16 relationship, but how, what assurances do I have that these

17 numbers are a deterrent from skipping for the defendants?

18      MR. TREMONTE:  Well I don't believe there's an

19 allegation that either my client or Adam Kaplan possesses

20 resources in excess of what's available to their parents in the

21 value of these residences.

22      THE COURT:  Okay.  Yes, so I'm looking at page 2 of

23 the Pretrial Services report for Adam.  And under finances, it

24 says, according to a Lexus Nexis inquiry, it appears that

25 defendant Adam, and his sister Michelle Kaplan, are the current

1  owners of their parents residence at 19 Gateway Drive in Great

2  Neck.  I thought I read that somewhere.

3      MR. TREMONTE:  Your Honor, may I have a moment to

4  confer?

5      THE COURT:  Of course you can.

6          (Recording silenced @ 4:54:15)

7          (Recording resumed @ 4:55:40)

8      MR. TREMONTE:  Thank you, Your Honor, for the

9  additional time.

10     THE COURT:  Yes, of course.

11     MR. TREMONTE:  So my understanding is is that that is

12  just -- it's just inaccurate. The property has a, sort of a

13  complex ownership history. And for a period of time, more than

14  ten years ago, ownership was with the children.  But in a

15  formally recorded transaction sale it was sold back to the --

16  who since that time have been and continue to be the sole

17  owners. And Your Honor, to address the Court's prior question,

18  not only is there no allegation of resources of that magnitude.

19  But the moral suasion of course is that if either of Adam or

20  Daniel abscond and fail to show up to court --

21     THE COURT:  Oh I get that part, yes.

22     MR. TREMONTE:  Okay.

23     THE COURT:  And hopefully they do too.  But I just

24  wanted to clarify that in terms of -- because I have no

25  financial information about Adam or Daniel.

20

1          Okay, so now, the trust instrument itself, are you

2    able to provide that at some point to Pretrial Services?

3          MR. TREMONTE:  Yes.

4          THE COURT:  Okay.

5          MR. TREMONTE:  We can do that within a week.  Yes,

6    Your Honor.

7          THE COURT:  Okay.  Because that would be part of it.

8    All right, suretors are here, I'd like to -- I'd like them to

9    perhaps -- it's probably easier if they come to the witness

10   stand.  I want to ask them a few questions.  You can either

11   stand or sit up there, whatever is easiest for you. Just use

12   the microphone.  Okay, I'm going to ask Doreen, my courtroom

13   deputy, to sworn both of you, all right, so I can ask you a few

14   questions.

15         THE CLERK:  If you could stand and raise your right

16   hand.  I'll swear you in each individually.

17              SURETOR, IDIDA KAPLAN, SWORN

18         THE COURT:  Thank you, you may be seated.  Hold on a

19   second.  Did we --

20         THE CLERK:  Mr. Creizman, did we lose you?  I think

21   we might have lost him.

22         THE COURT:  Sure did.  Okay, why don't you swear in

23   --

24         THE CLERK:  He may try and dial back in.

25         THE COURT:  Yes, and then we'll -- yes.

1                    SURETOR, STUART KAPLAN, SWORN

2              THE COURT:  All right, thank you, you may be seated

3    as well.

4              THE CLERK:  Mr. Creizman, are you back?

5              MR. CREIZMAN:  I am back, I somehow dropped off, but

6    I'm back.

7              THE CLERK:  Okay.

8              THE COURT:  Okay, good the only thing you missed is

9    we just administered the oath to the proposed suretors.  That

10   is the parents, okay?

11             MR. CREIZMAN:  Okay, thank you.

12             THE COURT:  You're welcome.  Okay, I just, I want to

13   ask you a few questions.  Is it your intention to act as the

14   suretors for the bond here in the amount of $5 million total,

15   that is two and a half for each of your sons. First Missus?

16             MS. KAPLAN:  Yes.

17             THE COURT:  Okay.  And Mister?

18             MR. KAPLAN:  Yes.

19             THE COURT:  Okay.  Do me a favor, pull the mic close.

20   Put it right between you.  Make sure that little light is on

21   and just speak into the mis so we can all hear you.  And this

22   is a very important responsibility.  So I want to make sure you

23   understand what it means, okay, before you agree to do it.

24   Because I'm going to ask you some questions and that's why I

25   asked Doreen to put you under oath.

22

1          So could you just state your full names for the

2     record.

3          MS. KAPLAN:  Idida A. Kaplan.

4          THE COURT:  Okay.

5          MR. KAPLAN:  Stuart Kaplan.

6          THE COURT:  Okay.

7          SURETOR, STUART KAPLAN, PREVIOUSLY SWORN

8     EXAMINATION BY THE COURT:

9     Q    And Mr. Kaplan, are you currently working?

10    A    Yes.

11    Q    What is your occupation?

12    A    I'm a physician and allergist.

13    Q    At where?

14    A    Massapequa, New York.

15    Q    Okay, are you affiliated with a group or a practice?

16    A    Private practice.

17    Q    Okay. And for how long have you been doing that?

18    A    41 years.

19    Q    Okay, and what is your annual income?

20    A    Net, gross?

21    Q    Either way, just clarify which you're telling me.

22    A    About $500,000.

23    Q    Net or gross?

24    A    Net.

25    Q    Okay.

23

```
 1              SURETOR, IDIDA KAPLAN, PREVIOUSLY SWORN
 2   EXAMINATION BY THE COURT:
 3   Q    How about Missus.  Could you tell me what your occupation
 4   is?
 5   A    I'm a physician, ophthalmologist in private practice.
 6   Q    Okay, are you affiliated with a group or a practice?
 7   A    Solo practice.
 8   Q    And where do you practice?
 9   A    My practice is located in Great Neck, on Northern
10   Boulevard.
11   Q    All right, and for how long have you been in practice?
12   A    Over three decades.
13   Q    All right.  And what is your annual income?
14   A    Roughly the same, over 500.
15   Q    And that would be net?
16   A    Net.
17   Q    Okay.  Now, could you describe your home, we heard earlier
18   in Great Neck, that is owned by you through a trust?
19   A    Yes.  That's correct, Your Honor.
20              THE COURT:  All right, pause for a second.  Let's
21   just make sure he's --
22              THE CLERK:  Mr. Creizman, did we lose you? I think we
23   lost him again.
24              THE COURT:  All right, just bear with us a second
25   until he gets back on, all right?
```

24

```
 1                    (Court and Clerk confer)
 2            THE CLERK:  Mr. Creizman, are you back?
 3            MR. CREIZMAN:  Yes, I'm back, I'm so sorry.  I don't
 4   know what happened but I'm back.
 5            THE COURT:  Don't worry about it.  As soon as you got
 6   off we knew you got off and we didn't do anything further.  So
 7   you didn't miss anything this time, all right?
 8            MR. CREIZMAN:  Okay, thank you.
 9            THE COURT:  Okay, so both parents are now on the
10   stand and I'm just asking them a few questions about assets.
11   And they were just about to tell me about the home in Great
12   Neck.  Is that held -- are you both trustees of the trust that
13   holds the title to the home in Great Neck?
14            MR. KAPLAN:  Yes.
15            MS. KAPLAN:  Yes.
16            THE COURT:  All right.  And that is 19 Gateway Drive,
17   Great Neck?
18            MR. KAPLAN:  Yes.
19            MS. KAPLAN:  That's correct.
20            THE COURT:  And for how long has the trust owned that
21   home?
22            MR. KAPLAN:  Well that's a -- I took approximately,
23   let's see -- over ten years.
24            THE COURT:  Okay, and are you both the beneficiaries
25   of that trust?
```

1             MR. KAPLAN:  Yes.

2             THE COURT:  Sole beneficiaries?

3             MR. KAPLAN:  Sole beneficiaries.  It's a revocable

4    living trust.

5             THE COURT:  Does any other person or entity have an

6    interest in that property other than the trust?

7             MR. KAPLAN:  No, just myself and my wife.

8             THE COURT:  Okay. And counsel represented that the

9    value of the property was roughly $3 million, is that correct?

10            MS. KAPLAN:  It's probably more than 3 million.

11            THE COURT:  All right.  And is there any debt on that

12   property?

13            MS. KAPLAN:  No.

14            MR. KAPLAN:  No.

15            THE COURT:  Any mortgages or encumbrances or liens?

16            MR. KAPLAN:  There's no liens.

17            MS. KAPLAN:  No.

18            THE COURT:  Nothing?

19            MR. KAPLAN:  No.

20            THE COURT:  Okay, and how about the New York City

21   property, the East 70th Street, 400 East 70th Street property,

22   is that held by you?

23            MS. KAPLAN:  Yes.

24            MR. KAPLAN:  It's held by both of us.

25            MS. KAPLAN:  Both of us.

1           THE COURT:  Both of you. Okay, and it's a condominium

2  not a co-op.

3           MR. KAPLAN:  Condominium.

4           MS. KAPLAN:  Condominium

5           THE COURT:  And the value of that?

6           MS. KAPLAN:  Over 3 million.

7           THE COURT:  Okay. Again, is there any debt, mortgage,

8  lien or encumbrance on that property?

9           MS. KAPLAN:  No encumbrances.

10          MR. KAPLAN:  No.

11          THE COURT:  And for how long have you owned that

12 property?

13          MS. KAPLAN:  Over two decades.  20 years, since --

14          MR. KAPLAN:  Yeah, about 20 years.

15          MS. KAPLAN:  A little over 20 years.

16          THE COURT:  Okay. And I'm asking, I'm sorry for

17 prying, but I'm asking you these questions because the bond is

18 going to be in the amount of $5 million.  It's a significant

19 bond.

20          MS. KAPLAN:  I understand.

21          THE COURT:  That means if your sons do everything

22 they're supposed to do, and comply with the conditions which

23 Mr. Bagnuola outlined for the Court, then there's nothing going

24 to happen to the property you're pledging.  Okay, do you

25 understand that?

1          MS. KAPLAN:  Yes.

2          THE COURT:  By the way, did you hear the conditions

3   that Mr. Bagnuola outlined?

4          MS. KAPLAN:  Yes.

5          THE COURT:  Okay, did you understand the conditions?

6          MS. KAPLAN:  Yes, we did.

7          MR. KAPLAN:  Yes.

8          THE COURT:  Do you have any questions for me about

9   the conditions?

10         MS. KAPLAN:  No questions.

11         MR. KAPLAN:  No.

12         THE COURT:  Okay.  They've got to return to court

13  when they're required to.  They have to cooperate with Pretrial

14  Services as directed.  Their travel is going to be restricted

15  to the Eastern and Southern Districts of New York.  What does

16  that mean?  Nassau, Suffolk and the five Boroughs, and

17  Westchester too, I guess, right. They're going to have to

18  surrender their passports.  Okay?  They may be subject to

19  random home visits.  And no contact whatsoever with victims or

20  potential witnesses in the case.  And they're to refrain from

21  any employment at this juncture associated with investment

22  advising.  Do you understand that?

23         MS. KAPLAN:  Yes, I do, Your Honor.

24         THE COURT:  Okay.  So what that means is if they

25  violate -- either one of them violate these conditions, that

28

1  puts you at risk.  Puts you at great risk.  It means the

2  Government can come in and they can -- you will owe them two

3  and a half million dollars for each of your sons.  So, and it's

4  not just limited to the homes. When you're pledging and acting

5  as a suretor for the 5 million total, they can go after any

6  other assets, bank accounts, bonds, property, up to that

7  amount. They can garnish wages if they have to.  So by signing

8  this bond that you're both -- you're going sign bonds for both

9  of them, you're telling the Court that you're willing to take

10 this risk that they're going to comply and show up and comply

11 with the conditions. Otherwise you will owe the Government $5

12 million.  Do you understand that?

13          MS. KAPLAN:  We do, we understand.

14          MR. KAPLAN:  Yes.

15          THE COURT:  Okay.  And as I say, taking this on is a

16 serious responsibility.  And has serious consequences for you.

17 So, do you agree to act as a suretor, Mrs. Kaplan?

18          MS. KAPLAN:  Yes, I do, Your Honor.

19          THE COURT:  All right, Mr. Kaplan?

20          MR. KAPLAN:  Yes.

21          THE COURT:  Okay. Do you have any questions of me

22 about what it means to be a suretor or the conditions?

23          MS. KAPLAN:  No, I think you explained it well, thank

24 you.

25          MR. KAPLAN:  No questions.

1    THE COURT:  Okay.  All right.  So you can go back --

2    you can sit at counsel table if that's okay, or the audience,

3    whichever you prefer. Thank you very much I appreciate that.

4    And take the water with you.

5         All right, so Daniel and Adam, I just want to make

6    sure that you understand the conditions of your release, Adam?

7         DEFENDANT ADAM KAPLAN:  Yes, I understand them.

8         THE COURT:  Okay, you heard Mr. Bagnuola recite what

9    the conditions of the release are?  You have to report as

10   directed.

11        DEFENDANT ADAM KAPLAN:  Yes.

12        THE COURT:  This is to both of you.  All right, I'm

13   going to ask both of you, make sure -- and Daniel understand

14   that as well?

15        DEFENDANT DANIEL KAPLAN:  Yes.

16        THE COURT:  Okay.  And you understand that the two

17   people that were just on under oath on the witness stand here

18   are people who love and care for you, your parents. And they've

19   now put their financial well being in your hands, okay, because

20   they're putting faith in you that you're going to comply, that

21   you will comply with these conditions and show up to court when

22   you're supposed to, and cooperate with Pretrial Services, and

23   all of the other conditions.  If you violate any of these

24   conditions, any of them, you could have the bond revoked

25   immediately and you could be held in jail pending your trial.

1 And in addition, your parents will be on the hook for the $5

2 million.  And in addition there could be additional charges for

3 you, additional from the ones that are in this indictment, for

4 bail jumping.  Okay.  Do you understand that?  Daniel?

5              DEFENDANT DANIEL KAPLAN:  Yes.

6              THE COURT:  Adam?

7              DEFENDANT ADAM KAPLAN:  Yes.

8              THE COURT:  Okay, do you have any questions of me?

9              DEFENDANT DANIEL KAPLAN:  No.

10             DEFENDANT ADAM KAPLAN:  No.

11             THE COURT:  Okay, so it's critically important you

12 comply with this.  And if you comply there will no consequences

13 for your parents, all right.  Okay, you're also not to commit

14 any, needless to say, new crimes while on bond.  If you're

15 found to have done that, it's also grounds for revoking, apart

16 from the conditions that are in the bond.

17             And it's, one of the conditions is that you're not to

18 have any association of contact with any victims or witnesses

19 to the case.  So needless to say, don't threaten to attempt to

20 influence anyone's testimony that you might think could be a

21 witness.  Again that could lead to revocation of the bond and

22 detention.

23             Do you understand that, Daniel?

24             DEFENDANT DANIEL KAPLAN:  Yes.

25             THE COURT:  Adam?

1          DEFENDANT ADAM KAPLAN:  Yes.

2          THE COURT:  Okay.

3          MR. TREMONTE:  Your Honor, may I be heard on that

4  point?

5          THE COURT:  Of course, Mr. Tremonte.

6          MR. TREMONTE:  So, on that condition, which is

7  condition 7(e), the indictment of course does not identify --

8          THE COURT:  Witnesses.

9          MR. TREMONTE:  -- alleged victims or witnesses by

10  names. And my understanding is that we have an agreement as

11  between the parties that the Government will in short order

12  supply us with a list of names so that we have some guidance as

13  to compliance with this provision.

14          And just to complete the record, Your Honor.

15          THE COURT:  Yes.

16          MR. TREMONTE:  I will be brief.

17          THE COURT:  Okay.

18          MR. TREMONTE:  But just a few things.  Number one,

19  although we agree upon the bail package, we of course

20  vigorously contest all of the allegations in the Government's

21  bail letter.

22          THE COURT:  Well let me just pause you there for a

23  second.  Because this is for your clients' benefit.  Just

24  because we have discussion about a bail package, whether you're

25  detained, that has no impact on your presumption of innocence.

1    Do you understand that? You are presumed to innocent in this

2    Court.

3                UNIDENTIFIED DEFENDANT:  Yes.

4                THE COURT:  You're presumed innocent, this is by

5    statute, I have to do what I'm doing here today, determine

6    whether you're detained or there's bail, and if so how much

7    would assure your appearance.  That's it. It has -- you should

8    take nothing from it that affects your presumption of

9    innocence.  Okay? Sorry, Mr. Tremonte.

10                MR. TREMONTE:  Thank you, Your Honor. And then

11    separately, just so the record is clear.  This indictment has

12    been on the horizon for some time.  This investigation has been

13    known to us for the better part of two years.  We volunteered

14    to have both Adam and Daniel self-surrender, and they did in

15    fact self-surrender today.

16                THE COURT:  I know that.  Thank you, I appreciate you

17    pointing that out.

18                MR. TREMONTE:  Thank you, Your Honor.

19                THE COURT:  I appreciate that.  Okay, so I understand

20    the next date before Judge Brown is August 31, 11 a.m.  And

21    it's in person, right, Doreen, as far as we know.

22                THE CLERK:  Yes, in person.

23                THE COURT:  Okay, in person.  Is there untying else

24    that we need to do at this point, Mr. Bagnuola?

25                MR. BAGNUOLA:  Yes, Your Honor, just a few

1  housekeeping issues.  I'm advised that whatever electronic

2  system the US Marshals use for processing folks, is either down

3  or not functioning today, such that the processing of Mr. Adam

4  and Mr. Daniel Kaplan was unsuccessful.  We would ask, I

5  believe on consent, that as a condition of their release they

6  be directed to report back for the completion of their

7  processing tomorrow.

8       THE COURT:  Yes, I mean that I think is subsumed in

9  the condition that they report to Pretrial Services as

10 directed.  But it's good to have it expressed and agreed upon.

11      MR. TREMONTE:  It is on consent, Your Honor.  Yes.

12      THE COURT:  All right, thank you.

13      MR. BAGNUOLA:  As Mr. Tremonte has indicated, the

14 Government will provide a list of victims. I'll also note

15 however, just the Pretrial Services reports do not contain any

16 indication that either defendant is currently -- or any

17 acknowledgment that either defendant is currently involved in

18 investment advisory services.  And so I don't expect that there

19 will be contact with any clients of their investment advisory

20 business. But in an abundance of caution, we will provide the

21 names of folks that we ask Mr. Kaplan and Mr. Kaplan not to

22 associate with pending trial.

23      THE COURT:  Yes, I think you should because part of

24 the -- at least in looking at your letter from, on document

25 entry 6 on the docket that you filed today, indicates that some

34

1   of the victims were friends.  So that's a little bit unclear as

2   to who they can contact, who they can't. So I think the sooner

3   the better.

4              MR. BAGNUOLA:  Understood, Your Honor.

5              MR. TREMONTE:  Thank you, Your Honor.

6              THE COURT:  All right.

7              MR. BAGNUOLA:  Pretrial has recommended, or has

8   requested, and Your Honor has ordered, that the Kaplans

9   surrender their passports. We would ask that that be done

10  immediately.

11             THE COURT:  Yes, that should be done forthwith. Any

12  reason -- is there any obstacle to that, Mr. Tremonte?

13             MR. TREMONTE:  There's not an obstacle, Your Honor,

14  can we do that at the same time that --

15             THE COURT:  Do the processing?

16             MR. TREMONTE:  Yes.  So tomorrow.

17             THE COURT:  Makes sense, yes.  Agreeable?

18             MR. TREMONTE:  Agreeable, Your Honor, yes, thank you.

19             THE COURT:  Okay.

20             MR. BAGNUOLA:  And lastly, Your Honor --

21             THE COURT:  Hold on a second.  I just heard something

22  from the phone.  Mr. Creizman, do you agree with that?

23             MR. CREIZMAN:  I do, Your Honor.

24             THE COURT:  Okay, very well, thanks.

25             MR. BAGNUOLA:  Lastly Judge, between today and August

1  31st, the Government will be providing voluminous discovery to

2  counsel.  And I anticipate engaging in good faith negotiations

3  with an eye toward resolving some or all of this case without

4  the need for a trial.  Understand those circumstances I would

5  respectfully submit that Mr. Kaplan and Mr. Kaplan's interest

6  in a speedy trial is outweighed by the -- or the public's

7  benefit in a speedy trial rather is outweighed in the interest

8  between counsel and clients in trying to resolve this case. So

9  I would move for an exclusion from the computation of speedy

10  trial time, the period from today until August 31st.

11          MR. TREMONTE:  That's on consent, Your Honor.

12          THE COURT:  That's on consent, Mr. Tremonte.

13          MR. TREMONTE:  Yes, Your Honor.

14          THE COURT:  Mr. Creizman, you as well?

15          MR. CREIZMAN:  Yes, Your Honor, on consent.

16          THE COURT:  Okay.  And -- well let me, Mr. Tremonte,

17  have you had the opportunity to speak with your client and/or

18  Mr. Creizman's client while you were in there about waiving

19  speedy trial?

20          MR. TREMONTE:  We did, Your Honor.

21          THE COURT:  And what that means.

22          MR. TREMONTE:  Yes, Your Honor.

23          THE COURT:  And do you believe that they both

24  understand what that means?

25          MR. TREMONTE:  I believe they understand it and they

1  understand that it's in their interest to so waive.

2          THE COURT:  All right. And your understanding is that

3  they are voluntarily agreeing to waive the time from today

4  until August 31st?

5          MR. TREMONTE:  That's my understanding, Your Honor.

6          THE COURT:  Okay.  I just want to make sure myself,

7  Adam and Daniel, do you understand that under the law, the

8  Government has a period of 70 days from indictment in which to

9  bring this matter to trial or otherwise dispose of the matter,

10 okay 70 days.  And today both sides are essentially making an

11 application to exclude time in that 70 day clock, so it won't

12 be counted towards the 70 days, from today until August 31st.

13 Meaning the clock doesn't even start ticking until August 31st.

14 Do you understand that?

15         DEFENDANT ADAM KAPLAN:  Yes.

16         DEFENDANT DANIEL KAPLAN:  Yes.

17         THE COURT:  Okay.  And have you had the opportunity

18 to speak with your lawyers about that?

19         DEFENDANT ADAM KAPLAN: Yes.

20         DEFENDANT DANIEL KAPLAN:  Yes.

21         THE COURT:  Okay, and are you now agreeing to exclude

22 that time?

23         UNIDENTIFIED DEFENDANT:  Yes.

24         THE COURT:  And do we have a signed writing to that

25 effect?  Okay.  Did you sign the stipulation to that effect?

1           MR. TREMONTE:  We'll do that now, Your Honor.

2           THE COURT:  All right.  So I'll ask you to do that.

3  But I'm going to ask both of you, has anyone threatened or

4  coerced you in any way to agree to this, to give up this time

5  from now until August 31st?

6           DEFENDANT ADAM KAPLAN:  No.

7           DEFENDANT DANIEL KAPLAN:  No.

8           THE COURT:  Okay.  And any other promises made to you

9  to induce you to agree to give up this time?

10           DEFENDANT ADAM KAPLAN:  No.

11           DEFENDANT DANIEL KAPLAN:  No.

12           THE COURT:  Okay.  All right, I do find that the

13  continuance of time serves the interest of justice.  And that

14  this outweighs the interest of either of the defendants or the

15  public, in denying the application.  So I'll approve that as

16  well.

17           Anything else, Mr. Bagnuola?

18           MR. BAGNUOLA:  Not from the Government, Your Honor,

19  thank you.

20           THE COURT:  All right. Mr. Tremonte?

21           MR. TREMONTE:  Nothing for us, Your Honor.

22           THE COURT:  All right, Mr. Creizman?

23           MR. CREIZMAN:  No, nothing from Mr. Kaplan, but thank

24  you.

25           THE COURT:  All right, and thank you for

38

1  participating by telephone.  All right, we're adjourned then,

2  thank you all, have a good afternoon.

3          MR. CREIZMAN:  Thank you.

4          MR. TREMONTE:  Thank you,  Your Honor.

5          MR. BAGNUOLA:  Thank you, Your Honor.

6          THE COURT:  Thank you.

7                        *  *  *  *  *

8              **C E R T I F I C A T I O N**

9          I, **PATRICIA POOLE**, court approved transcriber,

10  certify that the foregoing is a correct transcript from the

11  official electronic sound recording of the proceedings in the

12  above-entitled matter.

13

14  /S/ PATRICIA POOLE

15  TRACY GRIBBEN TRANSCRIPTION, LLC      DATE: September 24, 2024

16

17

18

19

20

21

22

23

24

25