CMM:PGS/AT/RMU
F. # 2022R00047

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                           Docket No. <u>23 CR 293 (S-1)(JMA)</u>

ADAM KAPLAN and
DANIEL KAPLAN,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM OF LAW IN SUPPORT OF
<u>THE GOVERNMENT'S MOTIONS IN LIMINE</u>

JOSEPH NOCELLA, JR.,
United States Attorney
Eastern District of New York
610 Federal Plaza
Central Islip, New York 11746

Paul G. Scotti
Adam R. Toporovsky
Rebecca M. Urquiola
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ....................................................................................................................... 2

I.   The Securities and Exchange Commission Litigation and Civil Lawsuits Brought Against the Defendants are Admissible ........................................................................................ 2

  A.  Background Regarding Other Related Legal Actions................................................. 2

    1.  *SEC v. Kaplan et al.*, No. 2:23-cv-01648 (JMA) ................................................ 2

    2.  Civil Lawsuits Brought by Former Investment Advisory Clients of the Kaplans .. 3

  B.  Applicable Law ....................................................................................................... 4

  C.  Discussion ............................................................................................................... 5

II.  The Defendants' Prior Terminations and Evidence of Such Terminations are Admissible 7

  A.  Applicable Law ....................................................................................................... 8

  B.  Discussion ............................................................................................................... 9

    1.  Evidence Regarding the Defendants' Letters to ML is Admissible........................ 9

III. Evidence of the Defendants' Dishonesty About Their Undergraduate Educations and Prior Terminations is Admissible ........................................................................ 10

  A.  Applicable Law ..................................................................................................... 10

  B.  Discussion ............................................................................................................. 10

IV. Adam Kaplan's Initial Release and Bond Conditions Are Admissible ........................... 13

  A.  Adam Kaplan's Release on Bond ........................................................................... 13

  B.  The Bond Conditions ............................................................................................. 14

  C.  Applicable Law ..................................................................................................... 15

  D.  Discussion ............................................................................................................. 15

V.  The Court Should Preclude Evidence of Investment Performance and Non-Fraudulent Representations and Transactions Engaged in by the Defendants.................................... 16

  A.  Applicable Law ..................................................................................................... 17

B.  Discussion ................................................................................................. 18

VI. Improper Use of Agent Reports to Impeach Witnesses Should Be Precluded ................ 19

VII. The Government Should Be Permitted to Elicit Testimony from Victims Regarding Their Views on Materiality ....................................................................................... 21

VIII. The Government Should Be Permitted to Authenticate Documents Based on Their Production by the Defendants and to Authenticate Documents Pursuant to Fed. R. Evid. 902(4), 902(11) and (13) ................................................................................ 22

A.  The Government Should Be Permitted to Authenticate Documents Based on Their Production by the Defendants ..................................................................... 22

B.  Business Records Can Be Authenticated Pursuant to Fed. R. Evid. 902(4), 902(11) and (13) .......................................................................................... 24

IX. The Defendants Must Disclose Rule 16(B) Discovery and Trial Exhibits to be Introduced During Their Cases-In-Chief .......................................................................... 27

CONCLUSION .................................................................................................. 31

PRELIMINARY STATEMENT

The government respectfully moves the Court for in limine rulings in advance of trial in the above-captioned matter.  The government seeks rulings (1) admitting evidence of Securities and Exchange Commission ("SEC") litigation and civil actions filed against the defendants, (2) admitting the defendants' prior terminations from financial institutions, (3) admitting evidence of the defendants' false statements about their undergraduate educations and prior terminations of employment, (4) admitting evidence of Adam Kaplan's initial release and bond conditions, (5) precluding evidence of non-fraudulent transactions engaged in by the defendants, (6) precluding improper use of agent reports, (7) admitting testimony regarding victims' views on materiality, (8) permitting the government to authenticate documents pursuant to the Federal Rules of Evidence, and (9) seeking the defendants' production of Rule 16 discovery, trial exhibits, and demonstratives prior to trial.

For the reasons set forth below, the government respectfully submits that the Court should grant these motions in their entirety.

ARGUMENT

I.    The Securities and Exchange Commission Litigation and Civil Lawsuits Brought Against the Defendants are Admissible

The government seeks to admit evidence of the civil enforcement action brought by the Securities and Exchange Commission ("SEC") and civil actions brought against the defendants by certain victims for the purpose of providing relevant background to specific actions taken by Adam Kaplan and a co-conspirator in furtherance of crimes charged in the Superseding Indictment.  Additionally, the government anticipates that counsel for the defendants will attempt, on cross-examination, to use the lawsuits to impeach the credibility of the witnesses who brought civil actions against the defendants, and, thus, further respectfully request permission to question those witnesses regarding the lawsuits on direct examination.

A.    Background Regarding Other Related Legal Actions

1.    *SEC v. Kaplan et al.*, No. 2:23-cv-01648 (JMA)

On March 3, 2023, the SEC charged both defendants with violating several federal securities laws by engaging in transactions to defraud over 60 investment advisory clients (the "SEC Complaint" or "SEC Action").  As alleged in the SEC Complaint, the defendants inflated clients' advisory fees without the clients' consent and misappropriated the clients' funds from their bank accounts.  See SEC v. Kaplan et al., No. 2:23-cv-01648 (JMA) (the "SEC Complaint", attached hereto as "Exhibit A").  ¶¶ 26-37, 38-64.

The SEC Complaint specifically charges the defendants with violating the antifraud provisions of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 and seeks injunctions, disgorgement plus prejudgment interest, and civil penalties.  On October 31, 2023,

this Court ordered the civil proceedings stayed pending the completion of the criminal proceedings.

      2.    <u>Civil Lawsuits Brought by Former Investment Advisory Clients of the Kaplans</u>

On January 12, 2023, former investment advisory clients of the defendants filed a Complaint against them in Nassau County Court, Civil Term.  <u>See Paul Sherrock, John Sherrock, Robert Franklin, Melissa Sherrock, Miranda Sherrock, Steven Valencia and Alice Snyder v. Adam S. Kaplan, Daniel E. Kaplan, and IHT Wealth Management, LLC.</u>, Index No. 600713/2023 (the "Sherrock Complaint" or "Sherrock Lawsuit", attached hereto as "Exhibit B"). The Sherrock Complaint alleges that the defendants stole approximately $330,000 from the plaintiffs in the action by charging higher advisory fees than those agreed upon, and, separately, withdrew funds from the plaintiffs' accounts without their authorization.  Exhibit B at 2.  The plaintiffs in the action seek punitive damages against the defendants.  <u>Id.</u> at 15-16.  The case was stayed pending resolution of this matter.

On March 13, 2023, Mark Tsukerman, another former investment advisory client of the defendants, filed a Complaint in New York State Supreme Court, New York County, Civil Term, against the defendants.  <u>See Mark Tsukerman v. Adam S. Kaplan and Daniel E. Kaplan</u>, Index No. 651398/2023 (the "Tsukerman Complaint" or "Tsukerman Lawsuit", attached hereto as "Exhibit C").  The Tsukerman Complaint alleges that the defendants misappropriated approximately $22,000 of Tsukerman's funds by transferring funds directly from Tsukerman's account to the defendants' accounts without Tsukerman's authorization.  Exhibit C ¶ 22. Additionally, although Tsukerman and the defendants had agreed on a 1% advisory fee, the Tsukerman Complaint alleges that the defendants charged Tsukerman a 2.5% advisory fee.  <u>Id.</u> ¶

27.  Tsukerman sought relief in the form of actual and punitive damages.  Id. at 12.  The case was dismissed for improper service.

Finally, Dr. Bruce Newman and Debbie Newman filed an arbitration in December 2021 against IHT Wealth Management and the defendants alleging the stealing of funds by the defendants while employed at IHT.   See In the Matter of the Arbitration Between Paul Newman Trust UA Sept. 13, 1991 et al.  The claimants sought an award to be entered in their favor for compensatory damages, treble damages, and attorneys' fees.  For the same reasons, the government anticipates that counsel for the defendants will attempt, on cross-examination, to use the arbitration to impeach the credibility of the witnesses and, thus, further respectfully request permission to question those witnesses regarding the arbitration on direct examination.

B.    Applicable Law

It is well-settled that evidence that does not directly establish an element of the offense charged but provides necessary background or context for the charged crimes may be admitted.  See United States v. Daly, 842 F.2d 1380, 1388 (2d Cir. 1988); United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991); and United States v. Reifler, 446 F.3d 65, 91-92 (2d Cir. 2006).  For example, this category of evidence can be introduced to show "the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed."  Daly, 842 F.2d at 1388.  Indeed, "to be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency."  United States v. Mundle, 2016 U.S. Dist. LEXIS 34736, *4 (S.D.N.Y. March 16, 2016) (internal quotation omitted).  Moreover, as the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering

party's need for evidentiary richness and narrative integrity in presenting a case." Old Chief v. United States, 519 U.S. 172, 183 (1997).

Specifically, as to the introduction of civil actions in a criminal trial, the prosecution may use evidence acquired in a civil action in a subsequent criminal proceeding unless the defendant demonstrates that such use would violate his constitutional rights or depart from the proper administration of criminal justice. United States v. Unruh, 855 F.2d 1363, 1374 (9th Cir.1987) (citing United States v. Kordel, 397 U.S. 1, 12–13 (1970) ("Kordel"), cert. denied sub nom.); Forde v. United States, 488 U.S. 974 (1988); see also United States v. Johnson, 262 F.R.D. 410, 417 (D. Del. 2009) (holding that evidence of the injunction and stipulation in an SEC action was admissible as intrinsic evidence).

C.    Discussion

The SEC Action and the Sherrock Lawsuit are highly probative and significant background evidence because their filings instigated certain criminal acts committed by Adam Kaplan that are charged in the Superseding Indictment.

As described in Federal Bureau of Investigation ("FBI") Special Agent John Iannuzzi's Affidavit in Support of the Government's Motion to Revoke Bail (the "Iannuzzi Affidavit"), after the individual lawsuits had been filed, and after the SEC had formally charged the defendants in March 2023, Adam Kaplan was determined to have the individual lawsuits dismissed because he feared that the civil lawsuits would influence and bolster the ongoing federal criminal investigation by the United States Attorney's Office in the Eastern District of New York ("EDNY") into the defendants' crimes. Iannuzzi Affidavit, Dkt. No. 105, at 11-21. To that end, Adam Kaplan solicited the help of a co-conspirator with whom he was engaged in a separate criminal scheme charged in the Superseding Indictment as the Post-Advisory Scheme, to injure and intimidate witnesses, create fake evidence, and bribe law enforcement officials, all

in the hope of avoiding indictment by EDNY.  See Dkt. No. 149 at ¶¶ 25-27.  That co-conspirator has since pleaded guilty pursuant to a cooperation agreement (hereafter, the "Cooperating Witness").  The Cooperating Witness is expected to testify that Adam Kaplan paid him to hire individuals to intimidate, threaten and injure individuals, and specifically the victims in the Sherrock Lawsuit, so that they would abandon their lawsuits.  Id.   The Iannuzzi Affidavit sets forth in detail text messages where Adam Kaplan directed the Cooperating Witness to threaten the plaintiffs and pressed for updates on the results.  For example, on May 18, 2023, the defendant wrote, "Make it happen captain.  Eric [who the Cooperating Witness will testify was Adam Kaplan's attorney at the time] wants at least 1 of the 7 plaintiffs to withdraw as a plaintiff before 5/25."  The Cooperating Witness responded, "Ok[.]  We will work on it."  And Adam Kaplan responded, "**Yes.  With one peeing blood / missing teeth and another visited / scared – should be easy [.]**" (emphasis added).  Iannuzzi Affidavit, Dkt. No. 105, ¶ 27.  This evidence of the defendant's attempted obstruction is a small sampling of a larger collection of incriminating communications between Adam Kaplan and the Cooperating Witness regarding the Sherrock Lawsuit and demonstrates the inextricable link between that case and Adam Kaplan's criminal conduct.  Accordingly, the Sherrock Lawsuit is certainly probative and properly admitted at trial.

Similarly, the SEC Action is also inextricably intertwined with evidence of the obstruction charges against Adam Kaplan.  After the defendants were charged by the SEC in March 2023, Adam Kaplan attempted to obstruct the EDNY investigation and, after indictment, further conceal the online footprint of the charges brought by the SEC from potential victims that he continued to solicit as clients in violation of his release conditions.  See generally ECF No. 105.  The government will necessarily introduce proof of Adam Kaplan's attempts to obstruct

the EDNY investigation following the SEC Action, as well as Adam Kaplan's attempts to manipulate internet search tools to shield any reports of the SEC's charges against the defendants from the public and potential victims.  In fact, the timing of the SEC Action and the defendant's subsequent conduct is integral to the new charges brought in the Superseding Indictment and essential to the overall narrative of the case.  The Cooperating Witness is expected to testify that the filing of the SEC Action is what started Adam Kaplan's serious attempts at obstruction of justice of the grand jury investigation.

The government further seeks permission to pose questions regarding the Tsukerman Lawsuit and the Newmans' arbitration to the relevant witnesses on direct examination, should any of them be called to testify at trial.  The government anticipates that the defense will seek to raise the actions on cross-examination of these witnesses to try and establish a possible bias and undermine their credibility.  Thus, unless the defendants represent that they will not pursue that line of questioning, the government intends to address the lawsuits with the witnesses before cross-examination.

## II.    The Defendants' Prior Terminations and Evidence of Such Terminations are Admissible

The defendants were both registered at Morgan Stanley Wealth Management ("MS") between July 2016 and June 2017, and registered at Merrill Lynch, Pierce, Fenner & Smith Incorporated ("ML") between May 2017 and April 2018.  On May 18, 2017, both defendants "voluntarily resigned" from MS after allegations regarding the defendants failure to "adhere[] to proper procedures in handling two other clients' forms", and, on March 8, 2018, both defendants were "discharged" from ML for "[c]onduct involving utilizing client logon credentials to access client accounts".  The fraud scheme charged in Count One of the Superseding Indictment alleges that the crimes at issue here began "[i]n or about . . . May 2018", just a few months after the defendants' termination from ML.

7

The government seeks to introduce evidence from several victim witnesses who will testify that the defendants served as their investment advisors before the defendants worked at IHT, and that either (1) the defendants lied to them during the relevant period about why the defendants left ML and MS, which induced the victims to remain as clients; or (2) despite not being lied to about why the defendants left ML and MS, those victims, due to their loyalty and trust in the defendants, retained the defendants as investment advisors.

The government seeks to introduce evidence that the defendants (1) asked victim witnesses to sign forms attesting that the defendants had engaged in no wrongdoing at ML; and/or (2) forged victim signatures on those letters. Victims will testify that once the defendants were under investigation at ML for possible misconduct, they reached out to victims to cover their tracks. The government also seeks to introduce evidence that some victims had no knowledge of these letters, yet they were still submitted with victim signatures that the defendants forged.

The evidence at trial will show that, as part of the conspiracy charged in Count One, when victims disputed fraudulent charges by the defendants to financial institutions, the defendants again forged their signatures to conceal their illegal actions.

A.    Applicable Law

Evidence of a defendant's other acts is admissible under Federal Rule of Evidence 404(b) ("Rule 404(b)") if relevant to an issue at trial other than the defendant's character, such as providing evidence of motive, intent, preparation, plan, knowledge, absence of mistake, or lack of accident. Rule 404(b)(2). To be admissible, the probative value of such evidence must not be substantially outweighed by the risk of unfair prejudice. See Fed R. Evid. 403; United States v. Williams, 205 F.3d 23, 33 (2d Cir. 2000). The Second Circuit follows an "inclusionary approach," which admits all relevant "other act" evidence that does not serve the sole purpose of

showing the defendant's bad character and that is not overly prejudicial.  Evidence admissible pursuant to Rule 404(b) should not be excluded on grounds of unfair prejudice when the evidence does not "involve conduct more inflammatory than the charged crime[s]").  United States v. Paulino, 445 F.3d 211, 223 (2d Cir. 2006).  Thus, where the uncharged crimes are similar in nature to the charged crimes, Rule 404(b) evidence is generally admissible under the Federal Rule of Evidence 403 ("Rule 403") balancing test.  See, e.g., id.; United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999); see also United States v. Rutkoske, 506 F.3d 170, 177-78 (2d Cir. 2007) (affirming district court's admission, in securities fraud case, of evidence of the defendant's involvement in a similar, separate fraudulent scheme involving other securities).

B.    Discussion

1.    Evidence Regarding the Defendants' Letters to ML is Admissible

While the defendants were being fired from ML for conduct involving utilizing client logon credentials to access client accounts, the defendants went on a campaign to get letters of support from their clients.  Ultimately, dozens of letters were sent to ML from victims that are almost identical.  A sampling of those letters are attached hereto as Exhibits D, E, F, G, H, I, J, K, and L.[1]

Some victims will testify that the defendants asked them to write letters in support.  That is Adam Kaplan's modus operandi and is exactly what he did in this case when he was trying to cover up his crimes.  For example, one victim is expected to testify that when the victim learned that IHT had fired the defendants, the victim wrote an email discussing how the

---

[1]    Exhibit D, EDNY_KAPLAN014543; Exhibit E, EDNY_KAPLAN014576;  Exhibit F, EDNY_KAPLAN015378; Exhibit G, EDNY_KAPLAN015390; Exhibit H, EDNY_KAPLAN017889; Exhibit I, EDNY_KAPLAN015426; Exhibit J, EDNY_KAPLAN015388; Exhibit K, EDNY_KAPLAN015392; and Exhibit L, EDNY_KAPLAN015459.

victim was defrauded.  But several months later, the victim was paid by Adam Kaplan and then allowed Adam Kaplan to write an email to IHT retracting that the victim had been defrauded by Adam Kaplan.

Other victims will testify that they never wrote the letters of support to ML that the defendants sent to ML (and ultimately to the SEC and EDNY).  Those victims, as well as others, will also testify that the defendants sent fake communications in their names as part of the scheme here, and that their signatures or emails sent in their names were forged.  Some of the fraud in this case literally includes forged checks as well.  This evidence is relevant to show knowledge, intent, preparation, plan and absence of mistake pursuant to Rule 404(b).

III.    Evidence of the Defendants' Dishonesty About Their Undergraduate Educations and Prior Terminations is Admissible

The government next moves in limine for the Court to permit the government to introduce evidence of the defendants' false claims to investors that they attended Harvard University and their blatant omissions regarding their terminations from ML and MS, as direct evidence of acts taken in furtherance of the conspiracies charged in the Superseding Indictment.

A.    Applicable Law

See supra I(b).

B.    Discussion

Counts One and Seventeen charge the defendants with conspiracy, "the essence of [which] is the agreement and not the commission of the substantive offense."  United States v. McDermott, 245 F.3d 133, 137 (2d Cir. 2001).  To prove that agreement, the government may admit evidence of acts taken in furtherance of the charged conspiracy as circumstantial evidence of the underlying agreement, whether or not those acts are described in the Superseding Indictment.  See United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1999) ("Where, as in this case,

the indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself."); see also United States v. Smothers, 652 F. Supp. 3d 271, 283 (E.D.N.Y. 2023) ("evidence of uncharged crimes was admissible to show the existence of the conspiracy with which the defendants were charged").  Such conduct taken in furtherance of the scheme "is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged." Diaz, 176 F.3d at 79.

Accordingly, evidence of the defendants' lying to investors about their supposed Harvard degrees and their terminations from ML and MS is admissible as direct evidence of the crimes charged in the Superseding Indictment.  The government plans on calling several witnesses who will testify to the fact that the defendants curated their personas to portray themselves as investment advisors who attended Harvard University, with impressive credentials, having previously worked for established firms like ML and MS, without ever mentioning that they were, in effect, fired from both places.  The government expects some witnesses will testify that they met the defendants at networking events hosted by Harvard University in multiple different Harvard clubs across different cities.  While at these events, the defendants would boast lucrative investment opportunities and would leverage their fake Harvard educations and exaggerated business acumen to perpetuate a sense among potential investors that the defendants could be trusted with investing their life savings.

The defendants' inflation of their Harvard education and resumes is extremely relevant and intertwined with the conduct alleged in the Superseding Indictment because without developing a sense of trustworthiness amongst the victims, the victims would not have invested their money with the defendants.  Indeed, their false personas were essential to maintaining the fraudulent scheme.  Several witnesses will testify that the defendants' purported Harvard

educations were a contributing factor in the decision to retain their services as investment advisors.  Alternatively, other victims will testify that if they knew that the defendants had been fired from prestigious institutions like ML and MS, they would not have continued using them as investment advisors.  These facts are necessary components of the narrative the prosecution intends to present at trial.[2]  As the Supreme Court explained in <u>Old Chief</u>, 519 U.S. at 117, the prosecution—the party with the burden of proof—has a "need for evidentiary richness and narrative integrity in presenting a case." <u>Id.</u> at 183.  "Thus, the prosecution may fairly seek to place its evidence before the jurors, as much to tell a story of guiltiness as to support an inference of guilt, to convince the jurors that a guilty verdict would be morally reasonable as much as to point to the discrete elements of a defendant's legal fault." <u>Id.</u> at 188.  The defendants' ability to lure their victims with false promises of investment opportunities was only strengthened by their dishonesty about attending Harvard and being fired from ML and MS.

Lastly, "[w]here it is apparent that intent will be in dispute, evidence of prior or similar acts may be introduced during the government's case-in-chief." <u>United States v. Graham</u>, 51 F.4th 67, 82 (2d Cir. 2022).  Evidence that the Kaplans regularly lied about their Harvard educations and their employment at MS and ML would undermine any defense that they did not know or intend that victims would be lied to.  <u>See id.</u> (approving admission of evidence of other dishonesty committed concurrently with the charged fraud to show "fraudulent intent" and to rebut defense that defendant "lacked the requisite mental state for a fraud conspiracy

---

[2]    Frankly, it would be difficult to imagine how a victim could testify as to their relationship with the defendants without mentioning that they first met the defendants while the defendants worked at ML or MS, and then followed the defendants from institution to institution.  Moreover, the victims' repeatedly sticking with the defendants from institution to institution is also probative of the fact that the victims trusted the defendants and were loyal to them, and the defendants then used that trust to defraud the victims.

conviction"); United States v. Jackson, 792 F. App'x 849, 853 (2d Cir. 2019) (approving admission of evidence of prior fraud conviction to show knowledge and intent and to rebut arguments that defendant's involvement in fraud was inadvertent).

Any danger of unfair prejudice to the defendants here is minimal, as the evidence of their dishonesty about their education or past employment does not involve conduct any more inflammatory than the conduct with which they are being tried. United States v. Paulino, 445 F.3d 211, 223 (2d Cir. 2006); United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990). Indeed, the conduct forming the basis of the government's case-in-chief relates to, among other things, the defendants' brazen stealing from friends and acquaintances alike, people in their social circles, and the elderly and vulnerable. And Adam Kaplan is charged with attempting to physically harm, threaten, and intimidate witnesses, create fake evidence, and bribe Department of Justice officials. Against that backdrop, it cannot credibly be argued that evidence of the defendants' falsification of their previous education and their terminations from ML and MS poses any appreciable risk of unfair prejudice under Rule 403.

IV.    Adam Kaplan's Initial Release and Bond Conditions Are Admissible

The government respectfully submits that evidence establishing Adam Kaplan's initial release on bond and the corresponding conditions of his release in this case is admissible as direct evidence of the offense conduct.

A.    Adam Kaplan's Release on Bond

Count 18 and Count 19 of the Superseding Indictment charge conspiracy to commit wire fraud and conspiracy to commit bank fraud, respectively, against Adam Kaplan while he was released on bond, each in violation of 18 U.S.C. §§ 1349 and 3147(1). Count 21 charges Adam Kaplan with attempting to obstruct justice while he was released on bond, in violation of 18 U.S.C. §§ 1512(c)(2) and 3147(1). It is well-established that when a charge is

brought under § 3147 for committing an offense while on release on another federal charge, thereby exposing a defendant to a potential sentence above what otherwise would have been the statutory maximum for the base offense, the fact of his release status "must be submitted to the jury and proved beyond a reasonable doubt."[3] Apprendi v. New Jersey, 530 U.S. 466, 490 (2000); see United States v. Gowing, 683 F.3d 406, 411 (2d Cir. 2012) ("The district court submitted the § 3147 charge to the jury, and properly required the jury to find all of the elements of that offense, as it was required to do."); United States v. Confredo, 528 F.3d 143, 153 (2d Cir. 2008) (holding that § 3147 is subject to Apprendi because it "exposes the defendant to the risk of a sentence that exceeds the statutory maximum."). Here, evidence that Adam Kaplan was on release from the initial charges in this case is an element of the offenses charged in Counts 18, 19 and 21, and must be presented to the jury.

B.    The Bond Conditions

The specific conditions of Adam Kaplan's bond are also admissible as evidence supporting the charges in Counts 18, 19, 20 and 21, which include crimes Adam Kaplan committed with the Cooperating Witness. Specifically, the government seeks to admit the following conditions of his release, which are particularly probative to explaining certain actions taken by Adam Kaplan and the Cooperating Witness in furtherance of those crimes: (1) the defendant must not commit a federal, state or local crime while on release; (2) the defendant must not have any contact with victims or witnesses; and (3) the defendant must refrain from

---

[3]    "A person convicted of an offense committed while released under this chapter shall be sentenced, in addition to the sentence prescribed for the offense, to (1) a term of imprisonment of not more than ten years if the offense is a felony . . . [and a] term of imprisonment imposed under this section shall be consecutive to any other sentence of imprisonment." 18 U.S.C. § 3147(1).

employment as an investment or financial advisor.  See Order Setting Conditions of Release and Appearance Bond, dated July 25, 2023, Dkt. No. 18.

C.    Applicable Law

See supra I(b).

D.    Discussion

Adam Kaplan's bond conditions fall squarely within the category of admissible evidence that is relevant to provide background and show the circumstances surrounding the charged crimes he committed with the Cooperating Witness (Counts 18 through 21).  The Cooperating Witness will testify that, in furtherance of his criminal activities while on release, Adam Kaplan took affirmative steps to hide violations of his bond.  For instance, knowing that he was not permitted to communicate directly with victims, Adam Kaplan instructed the Cooperating Witness to communicate with and take money from certain victims and make Ponzi-style payments to others in furtherance of the Post-Advisory Scheme, as set forth in the Superseding Indictment (Dkt. No. 149 at p. 25-27).  See Iannuzzi Affidavit at pp. 29-30, 41-43. Adam Kaplan also directed the Cooperating Witness to transfer money to victim accounts on numerous occasions and provided the Cooperating Witness with messages to send victims to whom Adam Kaplan owed money, in an ongoing effort to avoid direct contact with people that he believed would be in violation of his bond.  Id. at 41-43.

Moreover, at trial, Adam Kaplan will undoubtedly attempt to distance himself from the fraud and other crimes he committed with the Cooperating Witness and the communications and payments between the Cooperating Witness and victims of the scheme.

The presence of the bond conditions is necessary to provide the jury with a proper background for why the Cooperating Witness was having many of the communications with victims and not Adam Kaplan.  Indeed, no mention of the bond conditions could result in juror

confusion and speculation.  For example, Adam Kaplan sent the Cooperating Witness a text message on December 30, 2023, after speaking to his then-attorney, stating "We have a problem.  [Flower Victim] made a big mistake today.  He called Eric[4] this afternoon.  I'm now being read the riot act to shut this down immediately.  Bad.  I also get billed for such calls.  I can't have any more business interaction with him."  Iannuzzi Affidavit at ¶ 103.  Based on the context of the defendant's bond conditions, a jury could reasonably infer that Adam Kaplan was referencing warnings from his attorney regarding financial activities with CC-1 that were in violation of his bond.  This text message is extremely probative of Adam Kaplan's participation in the Post-Advisory Scheme and also of his consciousness of guilt.  However, without the proper context, the message would make little sense to the jury who would be left to speculate why he was "read the riot act" and "couldn't have any more business interaction with [the Flower Victim]."  Accordingly, the government respectfully submits that the conditions of Adam Kaplan's release should be admissible at trial.

V.    The Court Should Preclude Evidence of Investment Performance and Non-Fraudulent Representations and Transactions Engaged in by the Defendants

The defendants should be precluded from introducing evidence that, on some occasions, they (1) made truthful representations and/or provided sound financial advice to their victims; (2) followed through on representations and took appropriate actions in furtherance of their duties as financial advisors, for example, by opening legitimate brokerage accounts and/or moving money within those accounts to maximize profit potential, among other topics; or (3) successfully secured a positive return on investment for certain victims, to argue that these instances of truth and legitimate conduct negate their intent to lie to victims on other occasions.

---

[4]    Adam Kaplan's prior counsel.

A.    <u>Applicable Law</u>

It is well-settled that, in fraud cases, evidence that a criminal defendant did not commit fraud in all instances is irrelevant.  <u>United States v. Nekritin</u>, No. 10-CR-491 (KAM), 2011 WL 2462744, at *5 (E.D.N.Y. June 17, 2011) ("evidence that defendants engaged in other, non-fraudulent conduct is not relevant to whether the charged conduct was fraudulent").  Moreover, it would be unduly prejudicial, "because such evidence would in effect be an attempt to demonstrate [the defendant's] good character by proof of specific good acts."  <u>United States v. Rivera</u>, No. 13-CR-149 (KAM), 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015).  For this reason, the Second Circuit has repeatedly held that evidence that a defendant engaged in legal or honest conduct on some occasions is inadmissible to dispute that the defendant engaged in, or intended to engage in, the charged fraud.  <u>See</u> <u>United States v. Walker</u>, 191 F.3d 326, 336 (2d Cir. 1999) (affirming preclusion of honest acts; "Whether Khan had prepared other, non-fraudulent applications was simply irrelevant to whether the applications charged as false statements were fraudulent."); <u>see</u> <u>also</u> <u>Levine v. SEC</u>, 436 F.2d 88, 91-92 (2d Cir. 1971) (testimony of some customers that misrepresentations had not been made to them "would not negate the testimony of the customers who testified that [misrepresentations] had been made to them").  "Evidence of past 'good acts' by a defendant is generally not probative unless a defendant is alleged to have always or continuously committed 'bad acts,' or where the evidence of 'good acts' would undermine the underlying theory of a criminal prosecution."  <u>See</u> <u>United States v. Damti</u>, 109 F. App'x 454, 456 (2d Cir. 2004).  Further, it is black-letter law that economic loss is not an element of wire fraud.  <u>See</u> <u>Kousisis v. United States</u>, 145 S. Ct. 1382, 1391, 221 L. Ed. 2d 781 (2025).

B.    Discussion

The government does not allege that every communication and action taken with respect to the victims was false and in furtherance of the fraudulent conduct nor that the defendants did not, on some occasions, act in accordance with their fiduciary responsibilities to their victims.  For example, numerous victims for whom the defendants opened brokerage accounts saw positive returns on those investments.  However, while the managing of those investments and the related profits may have been, at times, performed in accordance with the defendants' advisory duties, the defendants' crimes, including by fraudulently inflating and overcharging client fees, and stealing money from client accounts, certainly was not.  As the Second Circuit and courts in this district have made clear, the fact that the defendant sometimes stated the truth is not relevant to whether the defendant made false and misleading statements and engaged in the charged schemes to defraud on other occasions.  Absent any probative value and given the risk that the jury would rely on such otherwise irrelevant acts as evidence of the defendant's good character, any evidence or arguments regarding non-fraudulent acts should be precluded.

Moreover, the defendants should be similarly precluded from introducing evidence or questioning witnesses who were former clients regarding the absence of financial loss or certain financial gains when the defendants were their financial advisors.  A defendant violates § 1343 by scheming to "obtain" the victim's "money or property," regardless of whether he seeks to leave the victim economically worse off.  Kousisis, 145 S. Ct.  at 1392.  Here, the evidence will overwhelmingly establish the various schemes to defraud that the defendants used for their own financial gain.  To the extent that there is evidence that some of the clients who they defrauded may not have lost money or saw some gains in their investment accounts is irrelevant and should be precluded.

VI.    Improper Use of Agent Reports to Impeach Witnesses Should Be Precluded

In accordance with its obligations under Fed. R. Crim. P. 26.2 and 18 U.S.C. § 3500, the government has produced, and will continue to produce, summaries of witness interviews prepared by law enforcement. The government respectfully requests that the Court preclude the defense from introducing these reports to impeach such witnesses during cross-examination, publishing the contents of the reports to the jury, or otherwise suggesting to the jury that the reports constitute prior statements of the witnesses who did not write or adopt them.

A party may impeach a witness with a prior inconsistent statement of that witness, but the statement must be the witness's own statement that the witness either made or adopted. See Fed. R. Evid. 613; United States v. Almonte, 956 F.2d 27, 29 (2d Cir. 1992) (concluding that the trial court did not err in refusing to admit prosecutor's notes taken during debriefing of witness and explaining that a "third party's characterization" of a witness's statement does not constitute a prior statement of that witness "unless the witness has subscribed to that characterization"); United States v. Leonardi, 623 F.2d 746, 757 (2d Cir. 1980) (holding that because "the written statement of the FBI agent was not attributable to [the witness]," it was "properly rejected as a prior inconsistent statement"). The problem with using a third party's summary or characterization of the witness's statement to impeach is "one of relevancy": "If a third party's notes reflect only that note-taker's summary characterization of a witness's prior statement, then the notes are irrelevant as an impeaching prior inconsistent statement, and thus inadmissible." Almonte, 956 F.2d at 29.

The Jencks Act governs the discoverability of a witness's prior statements, and its definition of "statement" accords with Fed. R. Evid. 613(a) and applicable case law on proper impeachment using prior inconsistent statements. Under the Jencks Act, a statement means "a written statement made by said witness and signed or otherwise adopted or approved by him," a

recording or transcription that "is substantially [a] verbatim recital of an oral statement made by said witness and recorded contemporaneously," or a statement made by a witness to the grand jury. See 18 U.S.C. § 3500(e). Because the Jencks Act is meant to restrict the defendant's use of discoverable statements for impeachment, "only those statements which could properly be called the witness' own words should be made available to the defense for purposes of impeachment." Palermo v. United States, 360 U.S. 343, 349, 352 (1959). An "agent's interpretations and impressions" of a witness do not fall within the purview of the Jencks Act. Id. at 352-53.

In this case, the government has provided the defense with broad discovery, which has been, and will be, supplemented as the government provides material pursuant to 18 U.S.C. § 3500, including reports summarizing investigators' interviews with government witnesses. These reports were not reviewed or adopted by any of the government witnesses. Moreover, they were finished after interviews were completed and reflect the thought processes and interpretations of the agents and officers; they do not constitute verbatim recitals or transcripts of any of the witnesses' statements.[5] As a result, the statements in these reports are not statements of any of the government's witnesses (other than the reports' authors, if called to testify at trial) and should not be read aloud or shown to the jury. See Almonte, 956 F.2d at 28; Leonardi, 623 F.2d at 757. The Court should therefore preclude any use or suggestion by defense counsel that a statement in a law enforcement summary report is a statement of the witness being interviewed.

---

[5] These reports would, however, constitute prior statements of the agents or officers who prepared the report if they are called as a witness to testify regarding the subject matter contained in the report.

The defense may ask a witness whether he or she made a statement that is reflected in a law enforcement report; however, if the defense is not satisfied with the witness's answer, the defense may not publish or introduce the report's contents as a prior inconsistent statement.  Additionally, if a witness says that he or she does not remember a fact, the defense may attempt to refresh a witness's recollection by showing the witness the report, but only if the defense does so in a manner that does not imply that the report is the witness's own statement or publish its contents to the jury.

VII.    The Government Should Be Permitted to Elicit Testimony from Victims Regarding Their Views on Materiality

A "false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decision making body to which it was addressed." Neder v. United States, 527 U.S. 1, 16 (1999); accord United States v. Johnson, 945 F.3d 606, 614 (2d Cir. 2019).  This standard "is an objective one and centers on the views of a hypothetical, reasonable investor in the market at issue."  United States v. Litvak ("Litvak II"), 889 F.3d 56, 68 (2d Cir. 2018).  The government may permissibly establish what a reasonable investor would consider material through testimony by victims regarding what they considered important.  See id. at 66 ("[T]estimony of various counterparty representatives was sufficient to sustain a finding of materiality on the counts of securities fraud."); see also United States v. Litvak ("Litvak I"), 808 F.3d 160, 177 (2d Cir. 2015) (finding that government established materiality where "counterparties' representatives testified at trial that they considered the misrepresentations meaningful in the course of those transactions and that they or their employers were harmed by Litvak's misleading course of conduct").  This is because the views of individual victims are "relevant to the nature of the market involved and as to the beliefs of a reasonable investor."  Litvak II, 889 F.3d at 69.

At trial, the government intends to ask victim witnesses whether certain information provided by the Kaplans was important to their investment decisions, and the type of information that they normally consider when making investments.  The government respectfully submits that this testimony should be admitted as proof of materiality.

VIII.   <u>The Government Should Be Permitted to Authenticate Documents Based on Their Production by the Defendants and to Authenticate Documents Pursuant to Fed. R. Evid. 902(4), 902(11) and (13)</u>

As is common in cases in this Circuit, in good faith, the government inquired whether the defendants would stipulate to the authenticity and admissibility of certain categories of documents: (1) produced by third-party institutions, such as financial institutions and IHT; and (2) produced by the defendants themselves, both to the SEC and to EDNY.  Such stipulations are common because they serve the interests of efficiency and judicial economy.  Unfortunately, at this point, the defendants have not agreed to the proposed stipulations.[6]  Thus, the government moves for a ruling that these documents can be authenticated and admitted as discussed below, subject to certain Rule 403 and hearsay objections.

A.   <u>The Government Should Be Permitted to Authenticate Documents Based on Their Production by the Defendants</u>

To authenticate a document, the proponent "must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  "[T]he

---

[6]     Specifically, the defendants stated that they were still "evaluating" the proposed stipulations and could not "agree to blanket stipulations without more information[,]" including "a list of the specific exhibits you would like us to stipulate to."  Of course, there is no need for a complete list of exhibits from certain institutions, such as Chase Bank or IHT, as the documents that those institutions (and the defendants) produced to the government are either authentic or they are not.  All of the documents are authentic, which the government will prove at trial.

bar for authentication of evidence is not particularly high, and proof of authentication may be direct or circumstantial." United States v. Al-Moayad, 545 F.3d 139, 172 (2d Cir. 2008).

As the Supreme Court has recognized, when a party produces documents in response to a subpoena, that act of production "may implicitly communicate" certain information, including a statement that the produced documents are "authentic." United States v. Hubbell, 530 U.S. 27, 36 (2000). Thus, a "jury may draw from the corporation's act of production the conclusion that the records in question are authentic corporate records" so as to meet the requirements of Fed. R. Evid. 901(a). Braswell v. United States, 487 U.S. 99, 118 (1988); see also AT Engine Controls Ltd. v. Goodrich Pump & Engine Control Sys., Inc., 637 F. App'x 645, 650 (2d Cir. 2016) ("the fact that [the challenged document] was produced by [the opposing party] itself" and other details indicating the document related to the opposing party's business was sufficient to authenticate document); 31 Wright & Miller, Fed. Prac. & Proc. Evid. § 7105 ("Authentication also can be accomplished through judicial admissions such as stipulations, pleadings, and production of items in response to subpoena or other discovery request.").

Here, counsel for the defendants produced numerous records, including communications, financial statements, and purported agreements with victims, in response to SEC subpoenas and voluntarily as part of a production to the EDNY. The implicit statement by counsel was that those records were authentic. And these documents are admissible because they are statements produced by the defendants' own attorneys in the scope of their representation of them.

As to the procedure for how the government will prove that the documents at issue were produced by the defendants, the government submits that it should be permitted to

call an individual from the defendants' prior firm to testify that they delivered the records. There is, of course, no privilege at issue considering that the defendants' counsel told the government that they had produced these documents to the SEC and would be reproducing them to the EDNY. The government can also prove that the documents were produced by the defendants using the procedure used in <u>Braswell</u>. The <u>Braswell</u> Court stated that the government may establish authenticity by "offer[ing] testimony — for example, from the process server who delivered the subpoena and from the individual who received the records — establishing that the corporation produced the records subpoenaed." <u>Braswell</u>, 487 U.S. at 118.

  If the defendants are not willing to stipulate that the documents at issue were produced by the defendants, the government also intends to call a witness who is familiar with the document-management system used by EDNY, who will describe EDNY's routine practice for filing received documents and identify particular documents produced by the defendants, based on the locations where the documents are stored in EDNY's files. This witness may also introduce certain email or letter communications by the defendants' attorneys stored in EDNY's files identifying specific documents as authentic copies. Such testimony would be sufficient to establish that the proffered documents are documents produced by the defendants.

  B. <u>Business Records Can Be Authenticated Pursuant to Fed. R. Evid. 902(4), 902(11) and (13)</u>

  At trial, the government intends to authenticate certain certified business and electronic records pursuant to Fed. R. Evid. 902(11) and (13).[7] The government will produce additional certifications as they become available.

---

  [7] To the extent the defendants oppose admission of any certified records, the government is prepared to provide any or all of the certifications to the Court upon request.

The Supreme Court has held that admitting business records that have been authenticated by affidavit or certificate does not violate a defendant's right to confrontation.  See Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009).  The Court has explained that "[b]usiness and public records are generally admissible absent confrontation . . . because — having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial — they are not testimonial."  Id. at 324.

Relying on Melendez-Diaz, the Second Circuit and at least five other circuits have concluded that certifications authenticating records are not testimonial and therefore are permissible.  See, e.g., United States v. Qualls, 613 F. App'x 25, 28 (2d Cir. 2015); United States v. Johnson, 688 F.3d 494, 504-05 (8th Cir. 2012); United States v. Yeley-Davis, 632 F.3d 673, 680-81 (10th Cir. 2011); United States v. Morgan, 505 F.3d 332, 339 (5th Cir. 2007); United States v. Ellis, 460 F.3d 920 (7th Cir. 2006); United States v. Weiland, 420 F.3d 1062, 1077 (9th Cir. 2005).  As the Seventh Circuit explained in Ellis, an authenticating certification under Fed. R. Evid. 902(11) is "nothing more than the custodian of records . . . attesting that the submitted documents are actually records kept in the ordinary course of business" and "merely establish the existence of the procedures necessary to create a business record."  460 F.3d at 927.  It is the underlying records, not the certification, that are introduced to establish the facts at trial.

Consistent with this understanding of the confrontation right, federal law permits the authentication of business and electronic records by certification and sets forth specific requirements for their admission.  Fed. R. Evid. 902(11) expressly permits the authentication of domestic business records by certification, and Fed. R. Evid. 902(13) expressly permits the authentication of electronic records by certification.  Courts in the Second Circuit have routinely applied these provisions to admit certified business records at trial.  See, e.g., United States v.

Komasa, 767 F.3d 151 (2d Cir. 2014); Qualls, 613 F. App'x at 28 (affirming district court decision to allow government to offer into evidence foreign business records based upon a certification, absent a live witness to authenticate the documents).  Similarly, Fed. R. Evid. 803(6)(D) provides that a document may be qualified as a record of a regularly conducted activity "by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification."  Fed. R. Evid. 803(6)(D); see also United States v. Michel, 879 F. Supp. 2d 291, 304 n.13 (E.D.N.Y. 2012) (bank representative's signed declaration under penalty of perjury sufficiently laid foundation for admission of bank records).  Thus, "Rule 902(11) extends Rule 803(6) by allowing a written foundation in lieu of an oral one."  United States v. Rom, 528 F. App'x 24, 27 (2d Cir. 2013).

Thus, if the defendants refuse to stipulate to the authenticity of documents from third party institutions, the government should therefore be permitted to authenticate business and electronic records using certifications because it is proper under the law.  As noted, the government has provided the defendants, and will continue to provide as they become available, the certifications and underlying records in discovery, and the defendants are hereby informed of the government's intention to offer them as evidence at trial.  Such a process would eliminate unnecessary witnesses and help the case proceed in an efficient manner without the need for wasteful sidebars.  Accordingly, the government seeks a pretrial ruling that these records may properly be authenticated as self-authenticating public, business and electronic records.[8]

---

[8]    To the extent that the government is unable to obtain any certification, and the defense refuses to stipulate, the government will call additional custodial witnesses from institutions.  The government will notify the defense of these custodial witnesses in advance.

IX.    The Defendants Must Disclose Rule 16(B) Discovery and Trial Exhibits to be Introduced During Their Cases-In-Chief

Federal Rule of Criminal Procedure 16(b) governs a defendant's disclosures in a criminal case.  In relevant part, it requires the defendant to provide the government with documents and records that the defendant "intends to use . . . in the defendant's case-in-chief at trial."  Fed. R. Crim. P. 16(b)(1)(A).  The Rule's purpose "is to avoid surprise and gamesmanship" and "it definitely contemplates reciprocity in the production of evidence that both parties intend to introduce in their case-in-chief at trial."  United States v. Hsia, 2000 WL 195067, at *1 (D.D.C. Jan. 21, 2000); see also United States v. Watson, 23-CR-82 (E.D.N.Y. May 24, 2024), Dkt. No. 160 at 2-3.

Of course, Rule 16 does not require a defendant to disclose documents he intends to use for purposes of impeaching a government witness (just as Rule 16 does not require the government to disclose documents it intends to use to impeach defense witnesses).  But to the extent a defendant seeks to admit into evidence a document while cross-examining a witness during the government's case-in-chief to affirmatively support the defendant's theory of the case, such a document falls within the ambit of Rule 16 and must be produced. As the District Court for the District of Columbia has explained:

> A "case-in-chief" is defined as "[t]he part of a trial in which a party presents evidence to support its claim or defense." Defendant's cross-examination of government witnesses, and the evidence introduced during that cross-examination, certainly may be used to support her defense . . . . The cross-examination of these and other government witnesses therefore is properly seen as part of defendant's case-in-chief if it buttresses her theory of the case.

> Hsia, 2000 WL 195067, at *2 (quoting Black's Law Dictionary 207 (7th ed.

1999)).  The Hsia court distinguished documents introduced by a defendant via a government witness— which do fall within Rule 16 and should be disclosed—from documents used by a

defendant "merely to impeach a government witness, and not as affirmative evidence in furtherance of [the defendant's] theory of the case, [which] is not part of [the defendant's] case-in-chief." Id. at *2 n.1.

Courts in this district have repeatedly recognized this distinction ordering the production of defense exhibits that will not be used solely for impeachment purposes, even if the defense intends to introduce such exhibits during cross-examination. See United States v. Watson, 23-CR-82 (E.D.N.Y. May 24, 2024), Dkt. No. 160 at 3 n.1; United States v. Aguilar, No. 20-CR-390 (ENV), 2024 WL 3629471, ECF No. 362 at 25-26 (E.D.N.Y. Dec. 11, 2023) (ordering disclosure of "any documents [defendant] intends to use in his case-in-chief, including any exhibit he intends to use during cross-examination of a government witness, where such exhibit will not be used solely for impeachment," two weeks prior to trial) (emphasis in original); United States v. Smothers, No. 20-CR-213 (KAM), 2023 WL 348870, at *22 (E.D.N.Y. Jan. 20, 2023); see also United States v. Warren, No. 22-CR-231 (DLI), ECF Order (E.D.N.Y. Sept. 6, 2023) (ordering disclosure of defense exhibits in felon-in-possession trial six days prior to jury selection); United States v. Thorpe, No. 19-CR-492 (HG), Pretrial Conference Tr. 41 (E.D.N.Y. Aug. 23, 2023) (granting government's motion for disclosure of Rule 16 discovery and defense exhibits two weeks before trial, explaining, "It's not only exhibits that you would introduce if you called a witness, but it's exhibits that you know you're going to introduce through, let's say, the case agent. . . . It's not only what you're going to put on once the Government says, 'the Government rests.'"); United States v. Napout, No. 15-CR-252 (PKC), 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12, 2017) (holding that "Rule 16 requires Defendants to identify all nonimpeachment exhibits they intend to use in their defense at trial, whether the exhibits will be introduced through a government witness or a witness called by a Defendant."). That obligation

extends to material produced by the government in discovery that the defense intends to use as an exhibit.  See Smothers, 2023 WL 348870, at *22 (requiring advance production of defense exhibits "regardless of whether such an exhibit is in the defense's sole custody").

Numerous other district courts outside of this District have interpreted Rule 16(b) similarly.  See United States v. Swenson, 298 F.R.D. 474, 477 (D. Idaho 2014) ("Defendants have a duty to produce any exhibits they intend to use at trial during cross-examination of a government witness other than for impeachment purposes."); United States v. Holden, No. 13-CR-444 (AJB), 2015 WL 1514569, at *4 (D. Or. Mar 19, 2015) (holding, based on Swenson and Hsia, that a defendant must disclose non-impeachment substantive evidence that the defendant seeks to use in examination of government or defense witnesses); United States v. Larkin, No. 12-CR-319 (GWF), 2015 WL 4415506, at *5 (D. Nev. July 20, 2015) (stating that the approach adopted in Holden, Swenson, and Hsia is "consistent with the structure and integrity of Rule 16(b) as a whole"); United States v. Aiyaswamy, No. 15-CR-568 (LHK), 2017 WL 1365228, at *5 (N.D. Cal. Apr. 14, 2017) (same).

To date, the defendants have not disclosed a single document.  Accordingly, to avoid gamesmanship, unfair surprise and undue delay during the trial, the government respectfully requests that the Court order the defendants to identify any defense exhibits they intend to introduce during the government's case (but not those documents to be used for impeachment purposes only) or any defense case no later than August 29, 2025, ten days before jury selection.

The government further respectfully submits that, to avoid gamesmanship and delay during the trial, the Court should set a schedule for disclosure of the statements of any defense witnesses other than the defendants themselves.  See Fed. R. Crim. P. 26.2.  See United

States v. Watson, 23-CR-82 (EK) 2024 WL 3443459 (E.D.N.Y. 2024) at *13-18 (precluding

defense witness's testimony where defendant willfully violated Rule 26.2); United States v.

Boustani, No. 18-CR-681 (WFK), ECF No. 120 at 1-2 (E.D.N.Y. July 31, 2019) (ordering

simultaneous exchange of Rule 26.2 material); see also Aguilar, No. 20-CR-390 (ENV), 2024

WL 3629471, ECF No. 362 at 26 (ordering disclosure of defense witness statements under Fed.

R. Crim. P. 26.2 two days prior to testimony).

　　　　　Finally, to avoid any unnecessary objections or delays during opening statements,

the government respectfully requests that the Court order that the parties mutually exchange any

demonstratives each party intends to use during opening statements no later than August 29,

2025.  See United States v. Aguilar, No. 20-CR-390 (ENV), ECF No. 238 at 1-2 (E.D.N.Y. Jan.

2, 2024) (ordering exchange of opening-statement demonstratives after completion of jury

selection).  The government respectfully submits that such demonstratives should not include

any exhibits, as exhibits generally may not be shown to the jury during opening statements.  See

id. at 1 ("Aguilar may not during his opening statement show or reference by exhibit number

exhibits marked for use at trial."); Williams v. Vahey, No. 20-CV-2560 (KAM), 2023 WL

130834, at *1 (E.D.N.Y. Jan. 8, 2023).

CONCLUSION

For the reasons set forth above, the government respectfully submits that the

Court should grant the government's motions in limine in its entirety.

Dated:      Central Islip, New York
            August 15, 2025

                                    Respectfully submitted,

                                    JOSEPH NOCELLA, JR.,
                                    United States Attorney
                                    Eastern District of New York


                        By:      /s/
                                 _____
                                 Paul G. Scotti
                                 Adam R. Toporovsky
                                 Rebecca M. Urquiola
                                 Assistant United States Attorneys
                                 (631) 715-9000

CC:      Clerk of the Court (JMA)
         Defense Counsel (by ECF)