UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
UNITED STATES OF AMERICA,

                                              **MEMORANDUM & ORDER**
                                              23-cr-00293-JMA-JMW

       -against-

ADAM KAPLAN and DANIEL KAPLAN,

                      Defendants.
----------------------------------------------------------------------X

**AZRACK, United States District Judge:**

      Presently before the Court is a motion filed by Defendant Adam Kaplan ("Defendant") that seeks to suppress statements made by Defendant to Co-Conspirator 1 ("CC-1") between April 2024 and September 2024. (See ECF No. 324.) In his pretrial briefing, Defendant initially made a motion to suppress all potentially incriminating statements allegedly elicited by CC-1 from Defendant pursuant to the Massiah doctrine. (See ECF No. 184 at 15-24.) In its opposition, the Government revealed that it first made contact with CC-1 in April 2024. (See ECF No. 198 at 62.) The Court denied Defendant's Massiah motion with explicit leave for renewal after review of the 3500 material. (ECF No. 229 at 43.) Defendant filed a renewed Massiah motion with his motions in limine but noted that his review of 3500 material was ongoing and that it was therefore "premature to file an exhaustive Massiah motion." (See ECF No. 255 at 6.) The Court then ordered the Government to submit a proffer of post-April 2, 2024 statements by Defendant involving CC-1 that the Government intends to introduce at trial, which the Government submitted on September 12, 2025. (See Sept. 9, 2025 Transcript ("Tr.") at 373:23-374:4; ECF No. 311.) Defendant now renews his motion to suppress statements made to CC-1 after April 2, 2024 pursuant to the Massiah doctrine. (See ECF No. 326.) For the reasons that follow, Defendant's motion to suppress is denied.

I.  DISCUSSION

A.  **Factual Background**[1]

On July 18, 2023, twin brothers Adam and Daniel Kaplan were charged in a 16-count Indictment. (ECF No. 1.) The Indictment charged the Kaplans with conspiracy to commit wire fraud, wire fraud, investment advisor fraud, and money laundering in connection with a scheme to defraud their financial services clients between May 2018 and November 2022. (Id.) The Government alleges that Defendants defrauded at least 50 clients (the "Victims") of at least $5,000,000. (Id. ¶ 6.) The Kaplans were associated with a financial services firm which managed the assets of the Victims throughout the relevant period. (Id. ¶ 5.)

The Government alleges that the Kaplans defrauded their clients through three principal means: (1) the Kaplans fraudulently overbilled advisory fees to their clients (the "Overbilling of Advisory Fees Scheme"); (2) the Kaplans misappropriated client funds by, inter alia, fraudulently charging clients' credit cards and forging checks in clients' names (the "Misappropriation Scheme"); and (3) the Kaplans concealed the proceeds of these schemes by, among other things, fraudulently representing to financial institutions that the Victims had agreed to the fraudulent transactions. (Id. ¶¶ 13-21.)

On July 25, 2023, pursuant to the Indictment, the Kaplans were arraigned before Magistrate Judge James M. Wicks. (ECF No. 10.) Defendants pled not guilty and were later both released on bond. (See ECF No. 14; ECF No. 17; ECF No. 18.)

According to the Government, while Adam Kaplan was on bond awaiting trial, he committed three further crimes – a wire fraud conspiracy, a bank fraud conspiracy, and attempted obstruction of justice. (See SI, ECF No. 149 ¶¶ 43-50.) The Government alleges that Adam

---

[1] The Court presumes familiarity with the procedural posture and factual background of this case and recites only the facts relevant to the instant motion.

2

Kaplan and CC-1 defrauded several individuals, including some victims of the original advisory fraud scheme, through two new fraudulent schemes. (Id. ¶ 25.) Adam Kaplan and CC-1 allegedly claimed that they could invest those victims' funds in new investment opportunities, such as the sale of flowers, but instead used those funds for their own benefit, including to pay back other victims. (Id. ¶ 26.) In addition, Adam Kaplan and CC-1 allegedly defrauded a bank through a credit card fraud scheme in which Adam Kaplan instructed CC-1 to charge credit cards in others' names without authorization. (Id. ¶ 27.) Adam Kaplan then allegedly instructed CC-1 to charge those cards from the account of a corporation in order to make them appear to be legitimate business transactions. (Id.) The purpose of these allegedly fraudulent transactions was to pay money back to victims, including victims of Defendant's original fraud scheme charged in the original indictment. (See ECF No. 311 at 2.)

Finally, the Superseding Indictment ("SI") alleges that between April 2023 and September 2024, Adam Kaplan attempted to obstruct justice by impeding the EDNY investigation into Defendants' criminal conduct, including through attempts to threaten, injure, and pay off witnesses, and destroy evidence. (Id. ¶ 28.) As part of his alleged efforts to obstruct the investigation, Adam Kaplan used a "burner" cellular phone provided to him by CC-1 and instructed CC-1 to, among other things:

> (i) create a fraudulent email from a victim to use as impeachment evidence against that victim at trial; (ii) threaten victims of the Advisory Fraud Scheme; (iii) physically assault victims of the Advisory Fraud Scheme; (iv) <u>pay off victims of Adam Kaplan's criminal conduct</u>; and (v) bribe public officials to not bring and/or dismiss charges against him.

(Id. ¶ 29 (emphasis added).)

Later, on September 11, 2024, this Court revoked Adam Kaplan's bond and detained him pending trial. (ECF No. 109; ECF No. 110.) On February 20, 2025, a grand jury in the Eastern District of New York returned the SI. The SI again charges Defendants, in Counts 1-16, with

3

conspiracy to commit wire fraud, wire fraud, investment advisor fraud, and money laundering in connection with the original scheme to defraud their financial services clients between May 2018 and November 2022, but adds charges against Adam Kaplan for the new conspiracy to commit wire fraud (Count 18); new conspiracy to commit bank fraud (Count 19); and two counts of attempted obstruction of justice (Counts 20 and 21).[2]  (Id. ¶¶ 43-50.)  On March 5, 2025, the Kaplans were arraigned on the SI and pled not guilty.  (ECF No. 152.)

On September 17, 2025, Adam Kaplan filed a renewed motion to suppress statements that he made to CC-1 between April 2024 and September 2024, arguing that these statements "were elicited in violation of the well-established Massiah doctrine and Mr. Kaplan's Sixth Amendment right to counsel."  (ECF No. 324 at 1-2.)  Defendant argues that CC-1 was acting as a government informant starting on April 2, 2024, when he first began communicating with the Government regarding his alleged criminal activity with Defendant.  (Id. at 2.)  Defendant further argues that CC-1 deliberately elicited incriminating statements from Defendant regarding the charges in the original indictment, outside the presence of Defendant's counsel and in violation of Defendant's Sixth Amendment rights.  (Id.)  The Government responds by arguing that CC-1 was not a government informant during the relevant time period because he was not instructed by law enforcement to gather evidence about the Defendant (other than one recorded call, which the Government has not included in its proffer of post-April 2, 2024 statements it wishes to introduce).[3]  (See ECF No. 329 at 1-2.)  The Government also argues that the Sixth Amendment

---

[2] The SI also adds Count 17 against both Defendants, which alleges a conspiracy to commit money laundering.  (SI ¶¶ 41-42.)

[3] The Government notes that the May 2024 recorded call related to ongoing bank fraud and that CC-1 was specifically instructed before that call not to discuss anything relating to Defendant's pending case.  (ECF No. 329 at 2.)  The Government further notes that CC-1 was specifically instructed that he was not acting on behalf of law enforcement and should not commit any crimes, and CC-1 did not sign a cooperation agreement until December 10, 2024.  (Id.; ECF No. 267 at 16.)  As discussed below, Defendant's motion to suppress fails on other grounds, and the Court need not address the Government's argument that CC-1 was not acting as a government informant during the relevant period.

right to counsel is "offense-specific," and no constitutional violation arises from questioning of a represented defendant with respect to novel criminal conduct for which the right to counsel has not attached. (Id. at 3.) Thus, the Government maintains that, even if CC-1 was acting as a government informant during the relevant period, any statements made by the Defendant to CC-1 during the relevant period regarding the then-uncharged fraud and attempted obstruction counts is admissible. (Id.) The Court addresses these arguments below.

**B.**     **Sixth Amendment**

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST. AMEND. VI. "[T]he Sixth Amendment imposes on the government an affirmative obligation not to solicit incriminating statements from the defendant in the absence of his counsel." United States v. Siri-Reynoso, 807 F. App'x 103, 106 (2d Cir. 2020) (summary order). The government breaches that obligation by "tak[ing] some action that was designed deliberately to elicit incriminating remarks." Id. (cleaned up).

However, a fundamental limitation on the Sixth Amendment right to counsel is that it "'is offense specific,' meaning that even when the right to counsel attaches for one offense, that does not mean that the defendant has a right to counsel for all ongoing criminal investigations." United States v. Moore, 670 F.3d 222, 235 (2d Cir. 2012) (quoting Texas v. Cobb, 532 U.S. 162, 164 (2001)). In conducing this analysis, "the definition of an 'offense' is not necessarily limited to the four corners of a charging instrument." Cobb, 532 U.S. at 173. Rather, to determine whether two crimes constitute a single offense for purposes of the Sixth Amendment, a court must apply the Blockburger test developed in double jeopardy jurisprudence: "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which

5

the other does not." Id. (quoting Blockburger v. United States, 284 U.S. 299, 304); see also Moore, 670 F.3d at 235.

As for CC-1's post-indictment contacts with Defendant between April 2024 and September 2024, the Government contends that statements made by Adam Kaplan to CC-1 about Counts 18, 19, 20, and 21 (the new fraud and attempted obstruction charges) are "distinct from the charges in the original indictment." (See ECF No. 267 at 16; see also ECF No. 329 at 3.) Accordingly, the Government argues that CC-1's contacts fell outside Defendant's "offense-specific" right to counsel that attached due to the original indictment. (Id.) In response, Defendant argues that the communications in the Government's proffer focus on "efforts to make payments to and address concerns voiced by Mr. Kaplan's former investment advisory clients—namely, [Victim 1], [Victim 2], [Victim 3], and [Victim 4][4]— all of whom are alleged victims of the fraud charged in the Original Indictment." (ECF No. 324 at 4.) According to Defendant, this means the communications are "intertwined with the scheme to defraud alleged in the Original Indictment," and thus cannot be admitted without violating Defendant's Sixth Amendment rights. (Id. at 8.)

However, the new offenses subsequently charged in the SI alleging attempted obstruction of justice, wire fraud conspiracy, and bank fraud conspiracy are separate offenses from the initial wire fraud scheme charged in the original indictment. Defendant does not argue that the new charges in the SI are not distinct from the charges in the original indictment under the Blockburger test. Nor can he. Under the Blockburger elements test, which applies when considering whether an offense is distinct for Sixth Amendment purposes, each new count requires proof that the charges in the original indictment do not. See Cobb, 532 U.S. at 173. Here, it is clear that each of

---

[4] The Court refers to the victims identified on page 4 of the redacted version of Defendant's filing of ECF No. 324 as "Victim 1," "Victim 2," "Victim 3," and "Victim 4" for the purposes of this Order.

6

the new charges in the SI satisfies this test, as the new charges are different and do not even involve the same time periods.

Consequently, CC-1's April 2024–September 2024 communications with Defendant in connection with the Government's investigation into ongoing attempted obstruction of justice as well as the new wire fraud and bank fraud schemes did not violate the Sixth Amendment. As the Supreme Court has explained:

> The police have an interest in investigating new or additional crimes after an individual is formally charged with one crime. To exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities.

McNeil v. Wisconsin, 501 U.S. 171, 175-76 (1991); see also United States v. Kavoukian, 180 F. Supp. 2d 402, 406 (N.D.N.Y. 2002) ("[L]aw enforcement agents have an interest in investigating new or additional crimes, even if the investigations require surveillance of individuals already under indictment.").

The Court's review of the Government's proffer reveals that CC-1's communications with Defendant concerned attempted obstruction of justice as well as the new wire fraud and bank fraud schemes charged in the SI—distinct offenses from the original advisory fraud charged in the original indictment. Thus, those contacts did not violate Defendant's offense-specific right to counsel. See United States v. Shvartsman, 722 F. Supp. 3d 276, 307 (S.D.N.Y. 2024). In Shvartsman, the defendant was originally charged with insider trading. Id. at 290. The court held that a confidential informant's subsequent communications with the defendant did not violate his right to counsel because they related to an ongoing investigation into money laundering of the proceeds of the insider trading, which was a separate offense from the insider trading. See id. at 305-08. The defendant in Shvartsman—who was subsequently charged with money laundering in a superseding indictment—argued that the new money laundering investigation was "inextricably

7

intertwined" with the underlying insider trading offense. Id. at 306. The court, however, applied the Blockburger test and held that the communications did not violate defendant's offense-specific right to counsel. Id. The court also stressed that even though one question posed by the informant referenced the SEC's investigation of the defendant, the informant's question "did not inquire into the legality of the underlying trades," which showed that the informant did not "actively elicit[ ] statements that are incriminating with respect to the charged crimes" of the original indictment. Id. at 308 (cleaned up).

Similarly, a review of the Government's proffered communications in this case leads the Court to conclude that the communications with CC-1 did not violate Defendant's right to counsel as to the original fraud scheme. Notably, CC-1 did not seek to elicit any information about the allegedly fraudulent misrepresentations and conduct underlying the original charges. In fact, Defendant's statements to CC-1 are not backwards-looking admissions about past misconduct but instead constitute new criminal acts themselves and are therefore not subject to suppression based on Massiah. See United States v. Barragan-Rangel, 198 F. Supp. 2d 973, 977 (N.D. Ill. 2002) (holding that Massiah's prohibition does not apply to statements, such as solicitation of a bribe or witness tampering, that are not statements of past conduct but are themselves criminal acts).

Defendant identifies a handful of communications focused on efforts to make payments and address concerns voiced by Defendant's former investment advisory clients, but none of these communications involve CC-1 "actively elicit[ing] statements that are incriminating with respect to the 'charged crimes'" of the original indictment. United States v. Espinal, 96 F. Supp. 3d 53, 63–64 (S.D.N.Y. 2015) (quoting United States v. Jacques, 684 F.3d 324, 332). For example, Defendant points to the Government's proffered text messages regarding providing Victim 1 with "paperwork," an alleged effort to "buy out" Victim 1, and the need to make payments to Victim 1

8

on a particular schedule. (See ECF No. 324 at 4 (citing ECF No. 311 at 4-11).) As the Government notes in its proffer, these communications were in furtherance of CC-1 and Adam Kaplan's alleged conspiracy, charged in Count 18, to steal money from Victim 1 and cover up their crimes by paying their victim[s] back. (See ECF No. 311 at 4.) Moreover, these communications pertain to Defendant's alleged attempted obstruction of justice in that they involve efforts by Defendant to "pay off witnesses" related to the fraud charged in the original indictment. (SI ¶ 28.) Undoubtedly, CC-1's communications with Defendant reflect that the suspected attempted obstruction of justice, wire fraud, and bank fraud schemes were "factually related" to the charges in the original indictment, but such an overlap is insufficient to render CC-1's conduct impermissible. United States v. Basciano, 763 F. Supp. 2d 303, 329 (E.D.N.Y. 2011), aff'd, 634 F. App'x 832 (2d Cir. 2015); see also United States v. Garey, 813 F. Supp. 1069, 1072 (D. Vt. 1993), aff'd, 19 F.3d 8 (2d Cir. 1994).

The same reasoning applies to the Government's proffered communications regarding Victims 2 and Victim 3. (See ECF No. 311 at 6-10.) The Government notes in its proffer that in and before April 2024, Defendant and CC-1 "were making illegal credit card transactions that are part of the conspiracy charged in Count 19." (Id. at 2.) CC-1 is expected to testify that the purpose of those transactions was "to pay money back to victims of Defendant's fraud, including, potentially, [Victim 3], [Victim 2] and [Victim 1]." (Id.) CC-1 also is expected to testify that he was "attempting to assist Adam Kaplan in delaying payments to Adam Kaplan's victims and offering explanations to Adam Kaplan's victims about what had happened to their money." (Id.) To the extent CC-1 and Defendant discussed attempting to delay payments to Victim 2 and Victim 3, these discussions were at Adam Kaplan's initiative and insistence. (See ECF No. 311, Ex. A at 324 (Adam Kaplan directing CC-1 to "[k]eep talking [Victim 2] down and around . . . Slow walk him with questions. His answers do not suffice."); Ex. B at 3050 ("There is no flexibility to furnish

9

[Victim 3] at this very moment . . . []yet")); see also Jacques, 684 F.3d at 331.  Furthermore, the communications show Defendant directing CC-1 to make allegedly fraudulent credit card transactions and to use the proceeds of such transactions to pay back the victims.  See ECF No. 311, Ex. B at 3161-62, 66 ("This 5K is exclusively for [Victim 2]").

The proffered communications during the relevant period regarding Victim 4 pertain to the new wire fraud conspiracy and to attempted obstruction of justice charged against Adam Kaplan in the SI.  (See ECF No. 311 at 7.)  CC-1 is expected to testify that CC-1 and Adam Kaplan told Victim 4's mother that they would invest funds for her and her son, but instead, Adam Kaplan and CC-1 allegedly took the funds for themselves.  (Id.)  The Government notes in its proffer that CC-1 is corroborated by text records, banking records, Intuit records, and Victim 4's mother's expected testimony.  (Id.)  For example, on April 9, 2024, Defendant messaged CC-1 regarding Victim 4's mother sending CC-1 sums of money as part of the alleged wire fraud conspiracy charged in Count 18 of the SI.  (ECF No. 311, Ex. A at 332.)  Similarly, the Government's proffer includes a July 2, 2024 audio recording of CC-1 and Defendant discussing Victim 4 and placing a call to Victim 4's mother and providing a false explanation as why Defendant had not been responding to Victim 4 regarding his invested funds.  (Id. at 11.)  Again, these conversations did not involve CC-1 actively eliciting statements that are incriminating as to the original fraud scheme.  Instead, they involve Defendant allegedly directing CC-1 to make contact with Victim 4's mother as part of the new fraud scheme and in order to give certain explanations regarding the victim's previously invested funds.  (Id. at 7, 10-11.)  Here, the Government did not "knowingly circumvent[ ]" Defendant's right to counsel for the charges in the original indictment by investigating the new charges of attempted obstruction of justice, wire fraud, and bank fraud.  Jacques, 684 F.3d at 331 n.4 (quoting Maine v. Moulton, 474 U.S. 159, 180 (1985)); see also Massiah v. United States, 377 U.S. 201, 206 (1964).

10

Thus, CC-1's communications with Defendant identified in the Government's proffer did not violate Defendant's Sixth Amendment right to counsel. While statements pertaining to the new attempted obstruction of justice, wire fraud, and bank fraud charges may also relate factually to the fraud scheme charged in the original indictment, the Court is willing to provide a limiting instruction that will direct the jury that they may not consider any evidence concerning communications between Defendant and CC-1 after April 2, 2024 in determining whether Defendant is guilty of Counts 1-16 and that they may only consider that evidence in determining Counts 18-21. That instruction will address any conceivable prejudice to Defendant. See United States v. Mir, 525 F.3d 351, 355 (4th Cir. 2008) (holding that defendant's right to counsel was not violated by government's investigation into witness tampering offense after initial charge for labor certification fraud and noting the potential use of limiting instructions to cure any prejudice).

Finally, the Court is mindful of Defendant's argument regarding the Government's intent to introduce "all of the messages in Exhibit A and Exhibit B . . . between CC-1 and Adam Kaplan."[5] (ECF No. 311 at 3.) Given that Exhibit A and Exhibit B consist collectively of almost 3,200 pages of text messages, admission of the entire extraction reports risks wasting time through the presentation of irrelevant, unnecessary, and cumulative evidence. The Court will address these concerns during the lunch break on Monday, September 22.

---

[5] Defendant raises additional arguments that (i) all "testimony from CC-1 regarding post-April 2, 2024 statements" must be more clearly identified or suppressed; and (ii) post-April 2, 2024 conversations between CC-1 and Adam Kaplan that were recorded by CC-1" but have not been described in the government's proffer should be precluded. (ECF No. 324 at 8-9.) Regarding CC-1's testimony, such testimony is permissible to the extent it is confined to the topics and discussions outlined in this Order. To the extent the Government wishes to introduce other testimony from CC-1 regarding topics not covered by this Order, it shall make a proffer before doing so. Additionally, the Government shall make a proffer of any recorded conversation from the relevant period that it wishes to introduce other than the one identified in its September 12, 2025 proffer.

11

## II. CONCLUSION

For the reasons stated above, Defendant Adam Kaplan's motion to suppress statements made to CC-1 after April 2, 2024 is denied without the need for a hearing.

**SO ORDERED.**

Dated: September 20, 2025
       Central Islip, New York

/s/ JMA
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE
