UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

For Online Publication Only

---------------------------------------------------------------------X
UNITED STATES OF AMERICA,

Plaintiff,

-against-

ADAM KAPLAN,

Defendant.
---------------------------------------------------------------------X

**MEMORANDUM & ORDER**
23-cr-00293 (JMA)

**AZRACK, United States District Judge:**

Before the Court is the Government's motion pursuant to Fed. R. Crim. P. 46(f) for an Order and Judgment of Default on a Forfeiture of a $2.5 million bond against defendant Adam Kaplan ("Defendant") and his sureties, his parents Stewart Kaplan and Idida Kaplan ("the Sureties"). (ECF No. 111 ("Mot.").) For the following reasons, the Government's Motion is GRANTED.

## I. BACKGROUND

### A. The Arraignment and Bond

On July 18, 2023, the Defendant was charged in a 16-count indictment along with his twin brother, Daniel Kaplan. (ECF No. 1.) The Indictment charged the Kaplan brothers with conspiracy to commit wire fraud, wire fraud, investment advisor fraud, and money laundering in connection with a scheme to defraud their financial services clients between May 2018 and November 2022. (Id.) The Indictment alleged that the Kaplans defrauded at least 50 victims, including elderly and disabled individuals, out of more than $5 million. (Id. ¶ 6.)

On July 25, 2023, the Kaplans were arraigned before Magistrate Judge James M. Wicks. (ECF No. 10.) They pleaded not guilty and were later released on bond. (See ECF No. 14; ECF No. 15.) Defendant Adam Kaplan was released on a $2.5 million dollar bond secured by his

parents' home in Great Neck, New York and their apartment in Manhattan, together worth at least $5 million. (See id.) At his arraignment, Magistrate Judge Wicks warned the Defendant of the potential consequences if he violated the conditions of his bond and explained that if he violated "any of these conditions, any of them, you could have the bond revoked immediately," and "your parents will be on the hook for the $5 million."[1] (ECF No. 118 ("7-25-23 Tr."), 29:23–30:2.) Judge Wicks specifically warned the Defendant:

> Okay, so it's critically important you comply with this. And if you comply there will [be] no consequences for your parents, all right. Okay, you're also not to commit any, needless to say, new crimes while on bond. If you're found to have done that, it's also grounds for revoking, apart from the conditions that are in the bond. And it's, one of the conditions is that you're not to have any association of contact with any victims or witnesses to the case. So needless to say, don't threaten to attempt to influence anyone's testimony that you might think could be a witness. Again, that could lead to revocation of the bond and detention.

(Id. at 30:11–22.)

Judge Wicks also swore in the Sureties under oath and explained the risks and possible consequences to them, specifically warning them that if either defendant violated the conditions of his bond, the Sureties would "owe [the Government] two and half million dollars." (Id. at 26–28.) Under oath, the Sureties represented that they were each physicians with net incomes of at least $500,000. (Id. at 22–23.) Each Surety confirmed multiple times on the record that they understood the risks and obligations. (See id. at 28:13–14 (Ms. Kaplan: "We do, we understand," Mr. Kaplan: "Yes"); id. at 28:23–24 (Ms. Kaplan: "No, I think you explained it well," Mr. Kaplan: "No questions").) Additionally, the bond signed by the Sureties and the Defendant expressly stated that if the Defendant failed to comply, "this appearance bond may be forfeited" and "the

---

[1] Defendant Daniel Kaplan was also released on a $2.5 million bond, so the "$5 million" figure refers to the total amount of the bond for both defendants. (See 7-25-23 Tr. 13:21–14:3.)

court may order a judgment of forfeiture against the defendant and each surety for the entire amount of the bond." (ECF No. 14.)

**B. Defendant's Pre-Trial Bond Violations and Revocation**

On September 9, 2024, the Government filed a motion to revoke Adam Kaplan's bond. (ECF No. 104.) The Government's motion, which was supported by an affidavit from FBI Special Agent John Iannuzzi, described that, while Adam Kaplan was on bond awaiting trial, he engaged in additional criminal conduct and attempted to obstruct justice and intimidate witnesses. (See ECF No. 105 ("Iannuzzi Aff.").) Iannuzzi attested that the Defendant—both before his arrest, while he was aware of the pending FBI and EDNY grand jury investigations into his crimes, and after his arrest while on bond—attempted to threaten and injure victims and witnesses and to bribe law enforcement officials. The conduct detailed by Iannuzzi is too extensive to list here, but among other things, the Defendant:

- Worked with an associate to create a fake email from a victim to use to impeach that victim's credibility, (Iannuzzi Aff. ¶¶ 10–13);
- Engaged in a months-long Ponzi scheme to defraud victims into purchasing shares of a flower-selling investment, (id. ¶¶ 14–22);
- Attempted to tamper with, threaten, and pay off witnesses, (id. ¶¶ 27–28, 36–39, 40);
- Attempted to obtain information on federal prosecutors to blackmail them into not prosecuting him, (id. ¶¶ 47–59); and
- Committed credit card fraud, (id. ¶¶ 60–62.)

The Affidavit specifically described evidence that, while the Defendant was released on bond from July 25, 2023, until September 11, 2024, the Defendant continued to obstruct justice and engage in new crimes. During that period, the Defendant, among other things:

- Attempted to pay off victims so that they would not speak to law enforcement or participate in the investigation against him, (id. ¶ 68–72);

- Continued communicating with victims, both on his own and through an associate, attempting to pay off victims and purporting to provide financial services to victims in direct violation of the conditions of his bond, (id. ¶¶ 64–66, 75, 87–99);
- Instructed an associate to pay off a victim so that victim would not assist in the investigation against him (id. ¶¶ 76–82);
- Continued the fraudulent flower-selling Ponzi scheme, (id. ¶ 86–89, 100–07);
- Engaged in credit card fraud, including using the Sureties' credit cards, to pay back victims and cover up his crimes, (id. ¶¶ 96, 108–20);
- Continued to attempt to bribe law enforcement officers, including a supposed chief in a criminal section at the EDNY U.S. Attorney's Office, (id. ¶ 121); and
- Used burner phones and aliases to avoid detection and monitoring by law enforcement, (id. ¶¶ 127–34).

On September 11, 2024, this Court revoked the Defendant's bond over his objection and detained him pending trial. (ECF No. 109; ECF No. 110.) The Court found that the weight of the evidence was strong that Defendant participated in criminal activity while on pretrial supervision. (ECF No. 110.) Agents executed a bond violation warrant for the Defendant's arrest at his parents' home in Great Neck, New York, and the Defendant was taken into custody and remanded to the Metropolitan Detention Center.

In November 2024, the Defendant again moved for bail. (See ECF No. 127.) At the hearing on Defendant's motion, counsel for the Defendant revealed that, in addition to the $5 million worth of assets put up for the initial bond (including the Manhattan apartment and Great Neck residence), the Sureties have at least $5 million in additional assets, including a $1.5 million Miami condominium, medical office space, and a residential building. (See ECF No. 268-6 ("12-17-24 Tr.") at 4:15–19.) The Sureties offered a $5 million package consisting of those assets. On December 17, 2024, this Court denied the Defendant's motion. (ECF No. 139.)

The Defendant moved for release again, but his application was denied, including by the Second Circuit. (See ECF No. 226, ECF No. 237, ECF No. 249; see also United States v. Kaplan, No. 25-2060, 2025 WL 3485026 (2d Cir. Sept. 25, 2025).)

On February 20, 2025, a grand jury in the Eastern District of New York returned a Superseding Indictment, which added charges against the Defendant for conspiracy to commit wire fraud, conspiracy to commit bank fraud, and one count of attempted obstruction of justice, based on his conduct while on bond. (Superseding Indictment, ECF No. 149 ¶¶ 43–50 (Counts 18, 19, 21).) On March 5, 2025, the Kaplans were arraigned on the superseding indictment. (ECF No. 152.)

**C. Trial and Conviction**

On November 13, 2025, after a twelve-week trial, the Defendant was convicted of all charges in the Superseding Indictment, including the three crimes he committed while released on bond: conspiracy to commit wire fraud between January 2024 and September 2024; conspiracy to commit bank fraud between March 2024 and April 2024; and one count of attempted obstruction of justice between July 2023 and October 2023. (See Superseding Indictment, ECF No. 149 ¶¶ 43–50 (Counts 18, 19, 21); Verdict Sheet, ECF No. 423 at 7–8 (finding the Defendant guilty of Counts 18, 19, 21).) During the trial, the Government introduced overwhelming evidence concerning each of those crimes. Specifically, the Government introduced thousands of text messages between the Defendant and a cooperating witness, which demonstrated that the Defendant used the cooperator to further his schemes and to attempt to hide his violations of his bond. For example, knowing he was not permitted to contact victims, the Defendant sent texts instructing the cooperator to communicate with and take money from victims and make payments in furtherance of his Ponzi schemes; directed him to transfer money to victim accounts; and

provided him with messages to send to victims to whom he owed money. (See, e.g., Trial Transcript, 3560:4–3591:2, Oct. 28, 2025.)

After trial, the Government moved to forfeit the Defendant's bail.[2] (See ECF No. 422.) The Defendant and Sureties submitted letters in opposition to the Government's motion, (ECF No. 477 ("Sureties' Opp."); ECF No. 479 ("Def. Opp.")), the Government filed a reply, (ECF No. 480 ("Gov. Reply")), and the Defendant and Sureties filed sur-replies. (ECF No. 486 ("Sureties' Sur-Reply"); ECF No. 491 ("Def. Sur-Reply").)

## II. LEGAL STANDARD

Forfeiture proceedings are governed by Rule 46(f) of the Federal Rules of Criminal Procedure, which provides that "[t]he court must declare bail forfeited if a condition of the bond is breached." Fed. R. Crim. P. 46(f)(1). However, bail forfeiture may be "set aside in whole or in part . . . if it appears that justice does not require bail forfeiture." Fed. R. Crim. P. 46(f)(2); see also United States v. Gambino, 17 F.3d 572, 574 (2d Cir. 1994); United States v. Hatfield, No. 06-cr-0550, 2015 WL 3476927, at *2 (E.D.N.Y. June 2, 2015), aff'd sub nom. United States v. Brooks, 872 F.3d 78 (2d Cir. 2017); United States v. Blake, No. 14-cr-0312, 2014 WL 6606692, at *2 (E.D.N.Y. Nov. 19, 2014). If the forfeiture is not set aside, "the court must, upon the government's motion, enter a default judgment." Fed. R. Crim. P. 46(f)(3).

Whether justice requires setting aside a forfeiture is a matter within the court's discretion. See, e.g., Hatfield, 2015 WL 3476927, at *2 ("[The determination of whether to set aside bail forfeiture] lies within the discretion of the district court."); see also Gambino, 17 F.3d at 574 ("We will not reverse the court absent an abuse of discretion."); United States v. Alrahib, No. 22-13172,

[2] The Government initially moved for forfeiture regarding the Defendant's bond on September 11, 2024. (ECF No. 111.) The Court held the forfeiture motion in abeyance pending trial, (ECF No. 123), and now considers the renewed motion.

2024 WL 4298263, at *3 (11th Cir. Sept. 26, 2024) ("District courts have 'virtually unbridled discretion' to remit bond forfeiture.") (quoting United States v. Diaz, 811 F.2d 1412, 1415 (11th Cir. 1987)). Courts in the Second Circuit consider several factors, known as the Gambino factors, when deciding whether to set aside or remit bail forfeiture, namely: "[1] whether the defendant's breach of the bond conditions was willful; [2] the cost, inconvenience and prejudice suffered by the government as a result of the breach; . . . [3] any explanation or mitigating factors presented by the defendant; . . . [4] whether the surety has assisted in the apprehension of the defendant; and [5] whether the surety is a professional or a friend or member of the defendant's family." Gambino, 17 F.3d at 574 (quoting United States v. Carvajal, 674 F. Supp. 973, 974 (E.D.N.Y. 1987)). "A court must also consider 'the deterrence value of total forfeiture.'" United States v. Rufai, No. 18-cr-201, 2022 WL 2751857, at *1 (S.D.N.Y. July 13, 2022) (quoting Gambino, 17 F.3d at 575). "Notably, however, the court cannot consider . . . the financial hardship of the surety because it is the interests of justice—and not the interests of the surety—which must be considered." United States v. Shen, No. 18–cr–302, 2025 WL 3005048, at *7 (E.D.N.Y. Oct. 27, 2025) (cleaned up); see also United States v. Billini, No. 99-cr-156, 2006 WL 1586553, at *2 (S.D.N.Y. June 8, 2006) ("[I]t is well established that the personal financial situation of the surety is not a basis for setting aside the forfeiture because it is the interest of justice that should be assessed, not the personal financial situation of the individual surety."); United States v. Gallego, No. 02-cv-5987, 2003 WL 1193536, at *3 (E.D.N.Y. Jan. 29, 2003) ("The cases are clear, however, that the court may not consider the financial plight of the sureties, since it is the interests of justice, not of the sureties, that must be considered.").

The party opposing forfeiture bears the burden of establishing that "justice does not require bail forfeiture" under Rule 46(f)(2)(B). United States v. Billini, No. 99-cr-156, 2006 WL 1586553,

at *1 (E.D.N.Y. June 8, 2006) (citing Gambino, 17 F.3d at 574); see Blake, 2014 WL 6606692, at *2 (citing Gambino, 17 F.3d at 574) ("The burden of establishing grounds to set aside or remit a forfeiture of bail rests with the defendant and sureties.").

## III. Discussion

### A. Bail Forfeiture is Warranted.

This Court already revoked the Defendant's bond on the basis that he breached multiple bond conditions, including the requirement that he refrain from committing new federal, state, or local crimes while released on bond. (See ECF No. 109; ECF No. 110.) Therefore, the Court must declare the bond forfeited. See Fed. R. Crim. P. 46(f)(1) ("The court must declare bail forfeited if a condition of the bond is breached."); see also, e.g., United States v. Gigante, 85 F.3d 83, 85 (2d Cir.1996) ("[B]ail bond and its collateral may be forfeited not only for the defendant's failure to appear, but also for other violations of bond conditions, including the defendant's commission of a crime."). Defendant's breach was subsequently confirmed by the jury's guilty verdict on Counts 18, 19, 20 and 21. Additionally, this Court—which presided over the twelve-week trial—agrees that the Government's overwhelming evidence supported the jury's guilty verdict on those counts.

### B. The *Gambino* Factors Weigh Against Remission.

The Government argues that each of the Gambino factors weighs in favor of total forfeiture of the bond because:

> (1) the Defendant's "many egregious breaches, which included attempted obstruction of justice, were willful" (Gov. Reply at 7);
>
> (2) "the cost, inconvenience, and prejudice suffered by the government as a result of the defendant's breaches were substantial" (id. at 9);
>
> (3) the Defendant has identified "no explanation—let alone any mitigating justification" for his breaches (id. at 10);
>
> (4) "the Sureties did not assist in apprehending the defendant" (id. at 11); and

> (5) although the Sureties are the Defendant's parents, they "fully understood the obligations they were undertaking" and were "advised of the risks associated with serving as sureties, including the consequences of the defendant's failure to comply with the conditions of release," (id. at 11).

The Government also argues that there is a "particularly compelling" deterrent value of forfeiture given "the unprecedented nature and sheer scope of the defendant's misconduct while on pretrial release." (Id. at 13.)

The Defendant and Sureties do not dispute that the Defendant's breaches were willful. However, they argue that the other Gambino factors militate against imposing forfeiture because (1) the Government "suffered no cost, inconvenience, or prejudice from the alleged bond violations," (Def. Opp. at 5), nor any prejudice "attributable to the Sureties' conduct," (Sureties' Sur-Reply at 3); and (2) although the Defendant did not flee, the Sureties' "facilitating their sons' surrender to law enforcement for processing and promptly identifying [the Defendant's] location to arresting agents [when they entered their home] constitute affirmative cooperation," (Def. Sur-Reply at 12). They further argue that this case does not involve "the traditional flight-related concerns that often justify substantial forfeiture," (Sureties' Opp. at 5), and that justice does not require forfeiture "in light of [the Defendant's] lengthy detention at the MDC." (Def. Sur-Reply at 11.)

Taking each Gambino factor in turn, the Court finds that the analysis favors granting the Government's motion for forfeiture.

**1. Willfulness and/or mitigating factors.**

First, it is not seriously disputed that Defendant's violations of his bond conditions were willful.[3] This factor weighs heavily in favor of forfeiting the bond. This case is unique for the sheer breadth, depth, and volume of violations that the Defendant committed in the just over a year that he was released on bond. Among an extensive list of other illegal conduct, Defendant contacted and attempted to defraud victims, continued Ponzi schemes to steal from victims, committed credit card fraud, and attempted to bribe victims and witnesses. (See Verdict Sheet, ECF No. 423 at 7–8, see also Iannuzzi Aff. ¶¶ 68–134.) The Government presented extensive evidence of this conduct at trial, and the Defendant was convicted of it beyond a reasonable doubt.

Moreover, the Defendant and Sureties have not attempted to argue that there are any mitigating circumstances justifying the Defendant's violations, nor could they. See, e.g., Brooks, 872 F.3d at 95 (finding that, where the defendant's bond required that he disclose his overseas assets, the defendant offered "no adequate explanation or mitigating factors" for his failure to disclose them). There are no mitigating circumstances justifying the commission of Defendant's new crimes, and the Defendant has not attempted to point to any.

**2. Cost, inconvenience, and prejudice to the Government**

The second Gambino factor also favors the Government. The Government argues that it suffered substantial prejudice and incurred significant costs as a result of the Defendant's commission of new crimes and attempted obstruction of justice. Specifically, the Government explains that, beyond the Court's cost in conducting "multiple bond hearings over several years"

[3] The Defendant emphasizes that he does "not concede the merits of the government's allegations, the propriety of his remand, or the validity of the verdict," but instead declines to "address the merits of the willfulness factor," recognizing that this proceeding "is not the vehicle to litigate" those issues. (Def. Sur-Reply at 2–3, 10.) The Defendant's decision not to contest this factor concedes it for purposes of this motion. In any event, Defendant's egregious criminal conduct while released on bond—which was proven beyond a reasonable doubt at trial—was clearly willful.

and its own costs associated with responding to Defendant's release motions, including on appeal, it was required to investigate Defendant's new criminal conduct, obtain a superseding indictment based in part on that conduct, and prosecute the "extensive multi-week jury trial" that resulted in Defendant's conviction on all counts. (Gov. Reply at 9.)

In response, the Defendant argues that the Government conflates the costs of investigating and prosecuting the underlying offenses with costs "attributable to its investigation of Mr. Kaplan's alleged bail violations"—and argues that the costs of the latter are insufficient to justify forfeiture. (Def. Opp. at 6.) That argument is unpersuasive. As the Defendant acknowledges, the Government "need not quantify its costs dollar by dollar." (Id. at 6); see also, e.g., Hatfield, 2015 WL 3476927, at *3 ("The fact that the Government did not quantify, in absolute terms, the cost incurred as a result of [the defendant's] breach of the bail agreement gives the Court no pause."); United States v. Nguyen, 279 F.3d 1112, 1117 (9th Cir. 2002) ("The government has no obligation to furnish a bill of costs, nor can the cost and inconvenience factor be dismissed simply because they were not substantial."). Here, the Government identifies several forms of prejudice: Defendant's new criminal conduct required a separate investigation, consumed significant investigative resources, expanded the scope of discovery, delayed resolution of the original charges, and exposed additional victims to harm. The fact that the Government was already prosecuting the Defendant—and therefore would have incurred some costs regardless—is of no consequence.

The Defendants and Sureties also point out that many cases involving ordering forfeiture involve cases of flight, and that, unlike in those cases, here, there were no flight-related costs. (See, e.g., Def. Opp at 3 ("Unlike the vast majority of cases involving a bail forfeiture motion, this is not a case involving a defendant who fled"); Sureties' Opp at 9 ("Nor does this case involve the

traditional flight-related concerns that often justify substantial forfeiture.").) However, the absence of flight-related costs does not mean that there were no costs or that this factor automatically favors the Defendant. As the Defendant and Sureties acknowledge, Rule 46(f) authorizes forfeiture of bail if any condition of the bond is breached, not only for a defendant's failure to appear. See Fed. R. Crim. P. 46(f)(1); see also United States v. Stathakis, No. 04-cr-790, 2007 WL 3124703, at *4 (E.D.N.Y. Oct. 24, 2007) ("[T]he majority of courts have concluded that forfeiture of the bond under Rule 46(f) is an appropriate sanction for the violation of any condition of release, whether that condition relates to the defendant's appearance in court or not . . . Specifically, courts have upheld forfeiture for violation of the 'break no laws' condition of a bond[.]") (collecting cases). In determining whether to set aside a forfeiture, the Court has an "obligation to strike a balance between the competing interests of costs to the government and deterrence to defendants and sureties." Stathakis, 2007 WL 3124703, at *4. In assessing the costs to the Government, courts have accounted for the costs of non-flight-related violations, including, as here, where the Government incurs substantial costs after a defendant commits new crimes and attempts to intimidate witnesses or otherwise obstruct justice while released on bond. For example, in United States v. Alrahib, which was affirmed by the Eleventh Circuit, the district court ordered forfeiture on the basis that the defendant, among other things, attempted "to persuade a grand jury witness to travel to Mexico in order to avoid appearing and testifying before the grand jury," and "the docket entries in the case and a related case indicated that Government expended considerable resources as a result of defendant's witness tampering."[4] United States v. Alrahib,

[4] The Defendant's attempt to distinguish Alrahib only underscores the similarities between that case and this one. As the Defendant states, the defendant in Alrahib "offered a key government witness $200,000 annually to leave the country and hide in Mexico, thereby directly threatening the government's ability to prosecute its case," and "[h]is conduct produced a second indictment and at least six proceedings concerning the violations." (Def. Sur-Reply at 5.) Here, the Defendant not only attempted to bribe witnesses but also committed additional other federal crimes, and his conduct threatened the Government's ability to prosecute its case, produced a second indictment, and resulted in multiple proceedings concerning his violations and motions for release.

627 F. Supp. 3d 1288, 1298 (S.D. Fla. 2022), aff'd Alrahib, 2024 WL 4298263; see Brooks, 872 F.3d at 96 (2d Cir. 2017) (finding that the Government "expended significant resources in investigating [the defendant's] concealment and transfer of assets"); see also Hatfield, 2015 WL 3476927, at *2 ("Notwithstanding that [the defendant's] apprehension was straightforward, the Government still suffered prejudice 'as a result of the breach' . . . If the Court were to conclude that the only costs relevant to this calculus is that of apprehending the defendant, the Court would render the non-custodial portions of the bail agreement meaningless.") (citing Gambino, 17 F.3d at 574).

**3. Sureties' assistance in apprehension and their relationship to the Defendant**

The fourth and fifth factors also do not support setting aside the bail forfeiture. Initially, consideration of "whether the surety has assisted in the apprehension of the defendant," Gambino, 17 F.3d at 574, has little relevance here, as the Defendant was apprehended based on his criminal conduct, not based on his flight. See, e.g., Hatfield, 2015 WL 3476927, at *3 ("[The defendant's] apprehension following the revocation of his bail was not difficult, and Movants had little time to aid in that apprehension. As a consequence, consideration of 'whether the surety has assisted in the apprehension of the defendant,' is inapplicable here."); Stathakis, 2007 WL 3124703, at *7 (concluding the apprehension factor was irrelevant "because [the defendant voluntarily appeared for the bond revocation hearing . . . and the surety's assistance in apprehending the defendant was not necessary").

As to the fifth factor, the rationale for considering this factor is that "nonprofessionals may not fully comprehend the risks incurred when executing a bail bond as a surety." Blake, 2014 WL 6606692, at *3 (citing Gallego, 2003 WL 1193536, at *2). The Court acknowledges that the Sureties are not professional sureties and are the Defendant's parents. However, the Sureties were

carefully advised of their responsibilities by Magistrate Judge Wicks. They indicated that they understood all the conditions and were comfortable serving as sureties for Defendant. (See ECF No. 118.) Other courts have concluded that the fact that sureties were members of a defendant's family and not professionals was not a compelling reason to set aside forfeiture. See, e.g, Blake, 2014 WL 6606692, at *3 (citing Billini, 2006 WL 1586553, at *2); Gallego, 2003 WL 1193536, at *2. Moreover, although they are not professional sureties, the Sureties are physicians, highly educated in their respective fields, and are familiar with the American legal system and bail procedures. They were unequivocally aware of their potential exposure if the bond were revoked.

The Sureties argue that, even if the Court declines to set aside forfeiture and enters judgment as to the Defendant, the Court should set aside forfeiture against them.[5] (See Sureties' Sur-Reply at 2–3 ("Rule 46(f)(2)(B) permits the Court to set aside forfeiture 'in whole or in part,' and that authority extends to relieving individual sureties.")) The Sureties contend that they "upheld their obligations under the bond . . . [and] fully cooperated at every turn," and they argue that the Government failed to show "any cost or prejudice caused by the Sureties that would justify enforcement of a $2.5 million judgment against them." (Id. at 4.) That argument also fails. Although the Sureties are correct that the Court may set aside a forfeiture in whole or in part, the

[5] The Sureties cite two cases to support this argument, neither of which is relevant here. (See Sureties' Opp. at 7; Sureties' Sur-Reply at 2 (citing Shen, 2025 WL 3005048 and United States v. Smith, No. 08-cr-379, 2010 WL 2010870, at *3 (S.D.N.Y. May 18, 2010).) First, in Shen, the court granted the Government's forfeiture motion and entered judgment against the defendant but deferred entering judgment against the sureties because the sureties had not yet been afforded notice of the forfeiture or an opportunity to be heard. 2025 WL 3005048, at *7. By contrast, here, the Sureties have been on notice of the Government's decision to seek forfeiture for nearly two years. They have had ample time to be heard and have filed multiple rounds of opposition papers. Second, in Smith, which involved a bond signed by five family sureties, the court weighed the Gambino factors and found that several favored the defense, and that "[t]he only factor that weigh[ed] against [a partial set-aside of the defendant's bond] is the fact that the Defendant's breach . . . was willful." 2010 WL 2010870, at *3; see id. (stating, for example, that "the Government has not made any showing to rebut the sureties' claim that it has suffered little, if any, 'cost, inconvenience, and prejudice' as a result of the Defendant's flight to Jamaica, and the sureties gave "extensive assistance to the Government" in locating the defendant). As a result, the court decided to partially set aside forfeiture and release two of the sureties from liability. Id. Here, after conducting the same analysis, the Court decides that the relevant factors weigh against remitting the Defendant's bond.

analysis of whether justice requires remission does not depend upon whether the Sureties violated the bond. Brooks, 872 F.3d at 95 ("Fed. R. Crim. P. 46 does not require that sureties be involved in the violation of the terms of the bond order to forfeit their interests. All that is required for the security bond to be forfeited is that the defendant violate one of the terms.").

To the extent the Sureties argue that Stewart Kaplan's recent medical issues and resulting financial hardship constitute mitigating circumstances, (see, e.g., Sureties' Opp. at 10 n.1; Sureties' Sur-Reply at 4), the case law makes clear that the Court may not consider the "financial plight of the sureties" as mitigating circumstances excusing the Defendant's breach, as "it is the interests of justice, not of the sureties, that must be considered." Gallego, 2003 WL 1193536, at *3. In any event, any purported financial hardship is not supported by the record. The Sureties were able to offer an initial bond package of $5 million worth in real estate, $2.5 million of which is not being forfeited. At the Defendant's second bond hearing, counsel for the Defendant represented that the Sureties were able to offer an additional $5 million in assets—not including the encumbered assets offered in the initial package. Therefore, although the Sureties have never disclosed their total assets to the Court, that suggests that they have at least $10 million in assets, more than enough to cover the $2.5 million being forfeited by the Court. Moreover, the Sureties represented under oath that they each have annual net incomes of at least $500,000. The Court finds that any claims of purported financial hardship are therefore meritless and not supported by the record.

**4. Deterrence considerations**

Finally, the Court finds that setting aside the forfeiture would diminish the deterrence goals of bonds and sureties. See Stathakis, 2007 WL 3124703, at *4 (E.D.N.Y. Oct. 24, 2007) ("In making the decision as to what, if any, part of the forfeiture to set aside, the court has an obligation to strike a balance between the competing interests of cost to the government and deterrence to

defendants and sureties."). The Defendant did not commit a technical or isolated violation. To the contrary, he not only engaged in additional criminal conduct similar to the offenses charged, but he also committed the federal crime of witness tampering and attempted to obstruct the pending investigation against him. The Sureties voluntarily agreed to pay this sum if the Defendant failed to comply with his bond. His failures to comply are numerous and egregious. Setting aside the forfeiture would substantially diminish the deterrent purpose of Rule 46(f).

In sum, Defendant willfully violated the conditions of his bond by committing multiple new crimes while on release and the Gambino factors weigh against equitable relief. Although this is a significant forfeiture, it is more than justified by the Defendant's extremely serious violations. Therefore, the relevant factors support ordering forfeiture of the Defendant's bond.

## IV. CONCLUSION

Upon consideration of the relevant factors, the Court finds that forfeiture is warranted. Accordingly, the Government's motion for forfeiture is GRANTED.

**SO ORDERED.**

Dated: August 19, 2026
Central Islip, New York

/s/ JMA
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE